Nos. 15-15449

# In the United States Court of Appeals for the Ninth Circuit

IVAN PENA, DONA CROSTON, ROY VARGAS, BRETT STEWART,
SECOND AMENDMENT FOUNDATION, INC. AND
THE CALGUNS FOUNDATION, INC.,

Plaintiffs-Appellants,

v.

STEPHEN LINDLEY, Chief of the
California Dep't of Justice Bureau of Firearms,

Defendant-Appellee.

Appeal from a Judgment of the
United States District Court for the Eastern District of California
The Hon. Kimberly J. Mueller, District Judge
(Dist. Ct. No. 2:09-CV-01185-KJM-CKD)

## APPELLANTS' OPENING BRIEF

Donald E. J. Kilmer, Jr.
Law Offices of Donald Kilmer
1645 Willow Street, Suite 150
San Jose, CA 95125
408.264-8489/408.264-8487
don@dklawoffice.com

Alan Gura
   Counsel of Record
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
703.835.9085/703.997.7665
alan@gurapossessky.com

July 20, 2015

Counsel for Appellants

CORPORATE DISCLOSURE STATEMENT

Appellants Second Amendment Foundation, Inc. and Calguns Foundation have no parent corporations, and no publicly-held corporations hold 10% or more of their stock.

/s/ Alan Gura
Alan Gura

Counsel for Appellants

# TABLE OF CONTENTS

Corporate Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jurisdictional Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement Regarding Addendum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.    Semiautomatics and Revolvers. . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.    The Handgun Rostering Program. . . . . . . . . . . . . . . . . . . . . 5

        a.    Magazine Disconnect Mechanisms and
Chamber Loaded Indicators. . . . . . . . . . . . . . . . . . . . 5

        b.    Microstamping. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        c.    Grandfathering and the "Similar Gun" Exception. . . 11

        d.    Listing and Maintenance Fees. . . . . . . . . . . . . . . . . . . 13

        e.    Exemptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    3.    Defendant's Enforcement of the "Handgun Roster"
Program Against Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . 15

4.      Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5.      The District Court's Opinion. . . . . . . . . . . . . . . . . . . . . . . . . 20

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.      The Individual Plaintiffs' Standing Is Secured. . . . . . . . . 27

II.     The Second Amendment Guarantees a
        Fundamental Right to Acquire Handguns. . . . . . . . . . . . . 28

III.    California's Ability to Regulate Commerce in Arms
        Does Not Erase the Second Amendment Right
        to Acquire Arms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.     The Handguns Banned By California's Handgun
        Rostering Scheme Are Within the Second
        Amendment's Protection. . . . . . . . . . . . . . . . . . . . . . . . . . 38

V.      People Enjoy a Fundamental Right to Acquire Protected
        Semiautomatic Handguns Regardless of Whether Other
        Arms Are Available. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VI.     The Handgun Roster Law Would Also Fail Means-Ends
        Second Amendment Scrutiny. . . . . . . . . . . . . . . . . . . . . . 50

VII.    The Handgun Roster Law Violates Plaintiffs' Rights
        to Equal Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Statement of Related Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# TABLE OF AUTHORITIES

Cases

*Andrews* v. *State*,
50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ashcroft* v. *ACLU*,
542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Bd. of Trs.* v. *Fox*,
492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Bridenbaugh* v. *Freeman-Wilson*,
227 F.3d 848 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Brown* v. *Entm't Merchants Ass'n*,
131 S. Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Carey* v. *Pop. Servs. Int'l*,
431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Citizens United* v. *FEC*,
558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*City of Cleburne* v. *Cleburne Living Center*,
473 U.S. 432 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Clark* v. *Jeter*,
486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Doe* v. *Bolton*,
410 U.S. 179 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Dunn* v. *Blumstein*,
    405 U.S. 330 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Ezell* v. *City of Chicago*,
    651 F.3d 684 (7th Cir 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Harper* v. *Virginia Board of Elections*,
    383 U.S. 663 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Hussey* v. *City of Portland*,
    64 F.3d 1260 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Ill. Ass'n of Firearms Retailers* v. *City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014). . . . . . . . . . . . . . . . . . 29, 35

*Jackson* v. *City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) . . . . . . . . . . 30, 31, 33, 34, 44, 45, 51

*Kasler* v. *Lockyer*,
    23 Cal. 4th 472 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59

*Lane* v. *Holder*,
    703 F.3d 668 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 27

*Lopez-Valenzuela* v. *Arpaio*,
    770 F.3d 772 (9th Cir. 2014) (en banc). . . . . . . . . . . . . . . . . . 25

*Mance* v. *Holder*, No. 4:14-cv-539-O,
    2015 U.S. Dist. LEXIS 16679 (N.D. Tex. Feb. 11, 2015). . . 27, 29,
                                                30, 35, 55

*Martin* v. *Harrington & Richardson, Inc.*,
    743 F.2d 1200 (7th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . 23

*Maya* v. *Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 27

*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 39, 41

*Mem'l Hosp.* v. *Maricopa Cnty.*,
    415 U.S. 250 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Minnesota* v. *Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc.* v. *Brown*,
    567 F.3d 521 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol,
Tobacco, Firearms & Explosives*,
    700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . 27, 29, 36, 50

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 46, 47

*Patsone* v. *Pennsylvania*,
    232 U.S. 138 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People* v. *Yanna*,
    297 Mich. App. 137, 824 N.W.2d 241 (Mich. Ct. App. 2012). . . . 49

*Reliable Consultants, Inc.* v. *Earle*,
    517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Richmond Newspapers* v. *Virginia*,
    448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Silveira* v. *Lockyer*,
    312 F.3d 1052 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 57

*Silvester* v. *Harris*,
    41 F. Supp. 3d 927 (E.D. Cal. 2014). . . . . . . . . . . . . . . . . . . . 49

*Staples* v. *United States*,
      511 U.S. 600 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*State* v. *Reid*,
      1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Teixeira* v. *Cnty. of Alameda*, No. 12-cv-03288-WHO,
      2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013). . . . . . . 31

*United States* v. *12 200-Foot Reels of Super 8mm. Film*,
      413 U.S. 213 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Barton*,
      633 F.3d 168 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Chafin*,
      423 Fed. Appx. 342 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Chester*,
      628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States* v. *Chovan*,
      735 F.3d 1127 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . 37, 53

*United States* v. *Henry*,
      688 F.3d 637 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Liles*,
      432 F.2d 18 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Marzzarella*,
      614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*United States* v. *Masciandaro*,
      638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States* v. *Miller*,
307 U. S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

*United States* v. *Moore*,
666 F.3d 313 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Virginia*,
518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States* v. *Von Willie*,
59 F.3d 922 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *White*,
593 F.3d 1199 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Williams*,
616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Wilson* v. *County of Cook*,
2012 IL 112026. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Statutes and Rules

11 Calif. Code of Regulations § 4059(c). . . . . . . . . . . . . . . . . . . . 13

11 Calif. Code of Regulations § 4070(d). . . . . . . . . . . . . . . . . . . . 13

11 Calif. Code of Regulations §4070(e). . . . . . . . . . . . . . . . . . . . 14

27 C.F.R. § 478.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Cal. Penal Code § 16380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cal. Penal Code § 27545 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Cal. Penal Code § 27875. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Cal. Penal Code § 31610. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Cal. Penal Code § 31910. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cal. Penal Code § 31910(b)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cal. Penal Code § 31910(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cal. Penal Code § 31910(b)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cal. Penal Code § 31910(b)(7)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Cal. Penal Code § 32000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 26

Cal. Penal Code § 32000(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Cal. Penal Code § 32000(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Cal. Penal Code § 32010(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cal. Penal Code § 32010(d)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cal. Penal Code § 32015(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cal. Penal Code § 32030. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cal. Penal Code § 32100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Cal. Penal Code § 32105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Cal. Penal Code § 32110. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Cal. Penal Code § 32110(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Cal. Penal Code § Section 16900 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. App. P. 4(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Other Authorities

A New and Complete Law Dictionary (1771). . . . . . . . . . . . . . . . . . . . . 38

Bureau of Alcohol, Tobacco, Firearms & Explosives,
    *Annual Firearms Manufacturing and Export
    Report–Year 2013* ("ATF Report"), available at
    http://www.atf.gov/ file/3341/download
    (last visited July 13, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Dep't of Justice Bureau of Firearms, De-Certified
    Handgun Models,  http://oag.ca.gov/sites/oag.ca.gov/files/
    pdfs/firearms/removed.pdf (last visited July 18, 2015). . . . . . . . . 13

Indictment, *United States* v. *McGowan*,
    U.S. Dist. Ct. E.D. Cal. No.: 2:12-CR-00207-TN,
    Dkt. 1 (May 31, 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*McDonald* v. *City of Chicago*, N.D. Ill. No. 08-3645,
    Dkt. 34-3 (Exhibit A to summary judgment motion). . . . . . . . . . 41

N. Webster, American Dictionary of the
    English Language (1828) (reprinted 1989). . . . . . . . . . . . . . . . . 38

Petition for Certiorari,
    *District of Columbia* v. *Heller,* No. 07-290. . . . . . . . . . . . . . . . 48

Roster of Handguns Certified for Sale,
    http://certguns.doj.ca.gov/safeguns_resp.asp
    (last visited July 18, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

Some Considerations on the Game Laws (1796). . . . . . . . . . . . . . . . . 30

The Writings of Thomas Jefferson
    (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

INTRODUCTION

What Washington, D.C. and Chicago could not do in one step—ban handguns—California might yet accomplish in piecemeal, but equally-effective fashion. Just as Washington, D.C. and Chicago did before it, California bases its scheme on the unconstitutional presumption that all handguns must be banned as "unsafe." California's alleged innovation is to allow exemptions that are inexorably, and in dramatically large steps, being ratcheted down to zero as its legislature continuously re-imagines the handgun category notwithstanding the American people's very different preferences.

California depends on the argument, once also advanced by Washington, D.C., that it can ban constitutionally protected firearms so long as it deigns to tolerate the acquisition of at least one gun. "[I]f the state were to issue a handgun to everybody . . . issue a handgun and say that's the handgun you can use . . . that would probably be okay . . . ." ER 135.

On this logic, some books, gods, contraceptives, etc., may be banned simply because others are tolerated. But this is not how constitutional

law works. A reader stuck with PAUL CLIFFORD because LOLITA is banned still leaves the library with a book, but no court would hold that First Amendment rights are thereby not implicated. The District Court seriously erred in failing to acknowledge that the Supreme Court has rejected this approach to fundamental Second Amendment rights.

If California wishes to ban a particular handgun, it must show that the handgun's characteristics are such that it lacks Second Amendment protection. Nobody disputes that California can ban particular handguns on product safety rationales, but California's prohibition has nothing to do with consumer safety. The law exempts specially-favored individuals whose safety is no less important, mandates alleged "safety" features that California instructs consumers to ignore as unreliable, and demands unproven features having nothing to do with safety at all. With the mandates now entering the realm of science fiction, obliterating the handgun market by commanding the use of non-existent technology, the state's conflict with the People's fundamental right to keep guns of the kind in common use for traditional lawful purposes requires judicial intervention.

California has effectively declared the Second Amendment "unsafe." Scores of common, popular firearms are being banned not because they malfunction, but because the legislature dislikes the manner in which Second Amendment arms work quite well. But handguns, as they have come to be expected and understood by the American people, are not "unsafe" merely because the legislature would prefer that they function differently. The decision below should be reversed.

## JURISDICTIONAL STATEMENT

(a) The District Court had jurisdiction to decide this case under 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

(b) This is an appeal from an order and final judgment disposing of all claims. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

(c) The order and final judgment appealed from were entered February 26, 2015. Appellants filed the Notice of Appeal the same day. The appeal is therefore timely per Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

May California prohibit the acquisition of handguns of the kind in common use for traditional lawful purposes, including self-defense,

(1) because they lack features that are either rejected by the market or unavailable [ruled on at ER 19-25];

(2) so long as it allows the possession of other constitutionally protected firearms; [ruled on at ER 19-25] or

(3) depending on the firearms age; or the consumer's employment in law enforcement or entertainment, recent residence in another state, or out-of-state familial relationship? [ruled on at ER 25-29]

## STATEMENT REGARDING ADDENDUM

A statutory addendum is bound with this brief.

## STATEMENT OF THE CASE

### 1. *Semiautomatics and Revolvers*

Semiautomatic pistols and revolves are "the two most common types of handguns." ER 166.[1] And of these, semiautomatics are over six times as common as revolvers.[2] Semiautomatic handguns are arms of the kind in common use for traditional lawful purposes. ER 125, 128-29.

———————————

[1]To compare how these two handgun types work, see ER 166, 167.

[2]*See* Bureau of Alcohol, Tobacco, Firearms & Explosives, *Annual Firearms Manufacturing and Export Report–Year 2013* ("ATF Report"), at 1, available at http://www.atf.gov/file/3341/download (last visited July 20, 2015); *see also* ER 161 (estimate that 70% of handguns sold in California are semiautomatic).

2. *The Handgun Rostering Program*

California law presumes that all handguns are "unsafe" and
therefore, generally barred from importation and sale, unless those
handguns have been placed on the state's special roster of handguns
"determined not to be unsafe." Cal. Penal Code § 31910.[3]

> [A]ny person in this state who manufactures or causes to be
> manufactured, imports into the state for sale, keeps for sale, offers
> or exposes for sale, gives, or lends any unsafe handgun shall be
> punished by imprisonment in a county jail not exceeding one year.

Section 32000.

The roster program began by requiring safety mechanisms, and
testing handguns' reliability and susceptability to misfiring upon being
dropped. ER 35. Those rostering requirements are not at issue in this
case. Rather, the controversy concerns the manner in which the law is
implemented, and to other qualifications added over the program's life,
described below.

    a.    Magazine Disconnect Mechanisms and
              Chamber Loaded Indicators.

A magazine disconnect mechanism ("MDM") is "a mechanism that

---

[3]All further statutory references are to the California Penal Code
unless otherwise noted.

prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." Section 16900. A semiautomatic handgun is loaded if a bullet remains in its chamber, even if its magazine is detached, but a handgun with an MDM (in working order) will not fire that bullet absent the magazine being inserted in the firearm.

A chamber load indicator ("CLI") is "a device that plainly indicates that a cartridge is in the firing chamber." Section 16380.

> A device satisfies this definition if it is readily visible, has incorporated or adjacent explanatory text or graphics, or both, and is designed and intended to indicate to a reasonably foreseeable adult user of the pistol, without requiring the user to refer to a user's manual or any other resource other than the pistol itself, whether a cartridge is in the firing chamber.

*Id*. In practice, however, the regulatory agency deems CLIs insufficient if its employees allegedly fail to understand it. ER 152-57.

Since 2007, a center-fire[4] semiautomatic handgun cannot be placed on the roster—and is thus "unsafe"—if it does not have both a CLI and

---

[4]Most handguns use center-fire ammunition, which fires a bullet when the primer at the bottom-center of the cartridge case is struck by the gun's firing pin.

an MDM (if it accepts detachable magazines). Sections 31910(b)(5), 32010(d)(2). Rimfire[5] semiautomatic handguns with detachable magazines have required a magazine disconnect mechanism since 2006 to be listed. Sections 31910(b)(6), 32010(d)(3).

Given the rarity of CLIs and MDMs, handguns lacking these features are in common use today, and comprise the overwhelming majority of handguns currently for sale in other states. ER 126, 129. The sponsor of the bill imposing these roster requirements noted that CLIs and MDMs are available on only perhaps 11% and 14% of semiautomatic handguns, respectively, and hoped that the state's market size would alter the nature of guns in America. ER 159-61, 163. "[It] is arguable that a requirement in California would 'drive' the technology of chamber load indicators." ER 160. "It might also be assumed that a mandate in California would drive technology in the market for magazine disconnect devices." ER 161.

But this has not come to pass. The CLI and MDM requirements thus ban from California's market many common handguns, including "the

---

[5]Rimfire ammunition, primarily used in small caliber firearms, incorporates the primer into the bottom rim of the cartridge case.

overwhelming majority" of Smith & Wesson's semiautomatic handguns, ER 126, two of Ruger's most popular models, ER 129, and the current generation of Glocks, introduced in 2008. *See* Br. Amicus Curiae of Glock, Inc., Dist. Ct. R. 66 at 1 (no current Glocks owing to MDM and microstamping requirement).[6]

California mandates these features for manufacturers on the theory that people will rely on CLIs to learn whether a gun is loaded and MDMs to save them from falsely believing a gun is unloaded, but it sends consumers a different message: "Any machine can malfunction. A firearm is no different." ER 169. California requires handgun consumers to pass a written handgun safety test. Section 31610, et seq. The first rule tested is: "Treat all guns as if they are loaded." ER 165.

In other words, in order to pass California's handgun safety test, consumers must learn to disregard CLIs and MDMs.

> Always assume that a gun is loaded even if you think it is unloaded.
> Every time a gun is handled for any reason, check to see that it is

---

[6] *See also* Roster of Handguns Certified for Sale, http://certguns. doj.ca.gov/safeguns_resp.asp (last visited July 18, 2015) (selecting "Glock" as "gun make [manufacturer]" yields, in red, the following disclaimers: "No Generation 4 Glock handguns have been approved as of: [current date]" and "No Glock handguns made in the USA have been approved as of: [current date]").

unloaded [by following specific instructions for unloading the gun]. If you are unable to check a gun to see if it is unloaded, leave it alone and seek help from someone more knowledgeable about guns.

*Id*. The study guide specifically instructs that in order to verify a semi-automatic handgun is unloaded, one must remove the magazine and visually inspect the chamber to verify that it is empty. ER 170-72. Indeed, in a large red box marked "CAUTION," the state's gun safety study guide warns, "You should NOT assume a semiautomatic pistol is unloaded just because the magazine is removed from the handgun," and offers specific instructions for clearing the chamber. ER 168.

    b.    Microstamping

As of May 17, 2013, all semiautomatic handguns not already rostered cannot be submitted for roster listing unless they employ so-called "microstamping technology." ER 43-45. To comply, handguns must be:

designed and equipped with a microscopic array of characters that identify the make, model, and serial number of the pistol, etched or otherwise imprinted in two or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired . . . .

Section 31910(b)(7)(A).

Defendant-Appellee, Chief of California's Bureau of Firearms, admits that no handgun available for sale in the United States has the microstamping technology required by California's roster law. ER 194. No firearms manufacturer has submitted any microstamping-compliant handguns for testing, ER 196-97, and Defendant has no information as to whether any manufacturer will ever produce microstamping handguns, ER 194.

The Chief Executives of two of the country's largest firearms manufacturers, Sturm Ruger and Smith & Wesson; and a senior executive with the firearms industry's accredited standards development organization and leading trade association, all testified that no plans exist to introduce microstamping because it cannot be practically implemented. ER 39-40, 126-27, 129-30. "Independent, peer-reviewed studies, including ones by the inventor of microstamping, Todd Lizotte, have confirmed that firearm microstamping is unproven and unreliable to perform in the manner that [California law] requires." ER 39; *see also* ER 40-42, and studies referenced therein at ER 46-124. Moreover, studies demonstrate that microstamping can

easily be defeated with sandpaper, or by replacing the firing pin—the most common firearm repair, which is also cheap and simple. ER 41.

     c.    *Grandfathering and the "Similar Gun" Exception*

Once rostered, a handgun's listing may be renewed annually upon payment of a fee (see *infra*), and certification that the handgun was not modified. Firearms rostered prior to the implementation of each new additional "mechanical" requirement (CLI, MDM, microstamping) are "grandfathered," Section 31910(b)(7), and manufacturers may submit for testing new models that are virtually identical to rostered handguns, but for minor cosmetic differences, Section 32030.

However—this "similar handgun" exception, as it has come to be known, is extremely narrow. Handguns are not considered similar, but rather "new" models requiring CLIs, MDMs, and microstamping, upon the slightest update. For example, outsourcing a single minor component to a different vendor who utilizes a different manufacturing process, or improving the metallurgical composition of any part, triggers all current mechanical requirements. ER 38.

Manufacturers, however, need to update their designs and production processes from time to time to remain competitive. ER 126,

129. They cannot practically maintain two separate product lines, one obsolete for California, and another, normally-evolved line for everyone else. ER 126, 129. Microstamping's infeasability, combined with this restrictive approach to "similar" guns, effectively freezes the design and manufacturing processes of all semi-automatic handguns as of May 16, 2013. ER 38-39. As time marches on, handguns are forced off the roster as they are updated without CLIs, MDMs, and of course, the wholly fictional microstamping, without any new models taking their place.

The effect is dramatic. "[T]he microstamping requirement is now forcing Ruger to cease semi-automatic handgun sales in California as its handguns are forced off the roster." ER 127. Smith & Wesson, which has already stopped selling many of its more popular handguns in California, believes that "it may be unrealistic" for it to maintain semiautomatic handgun sales in the state. ER 130. As noted *supra*, Glock cannot sell any handgun introduced since 2008. At the end of 2013, the roster contained 1,273 handguns, including 883 semiautomatics. ER 132. By July, 2014, those numbers had dropped to 980 handguns, including 735 semiautomatics. Dist. Ct. R. 91 at 5. As of this writing, there are only 817 total handgun models, including 590

semiautomatics. See Roster, *supra* n.6. In comparison, California has de-certified 1,197 handguns previously declared "not unsafe." See Dep't of Justice Bureau of Firearms, De-Certified Handgun Models, http://oag.ca.gov/sites/oag.ca.gov/files/pdfs/firearms/removed.pdf (last visited July 18, 2015).

  d. Listing and Maintenance Fees

Other than the California DOJ, only the manufacturer/importer of a handgun model is authorized to submit that handgun model to a DOJ-Certified Laboratory for testing. 11 Calif. Code of Regulations § 4059(c). Even if rostered as "not unsafe," handguns fall off the roster (and become "unsafe") absent an annual listing fee. Section 32015(b)(2). A handgun can remain on the roster if its manufacturer/ importer goes out of business or discontinues the model, provided that the model is not being offered for sale to licensed dealers, and "a fully licensed wholesaler, distributor, or dealer submits a written request to continue the listing and agrees to pay the annual maintenance fee." 11 Calif. Code of Regulations § 4070(d).

A manufacturer/importer or other responsible party may request that a voluntarily discontinued handgun model, or one removed for lack

of the annual fee's payment be restored to the roster, provided the fee is paid. 11 Calif. Code of Regulations §4070(e).

e.    Exemptions

The roster scheme exempts: (1) firearms defined as curios or relics under federal law; (2) the purchase of any firearm by any law enforcement officer; (3) pistols designed for use in Olympic target shooting events; (4) certain single-action revolvers; and (5) the sale, loan, or transfer of any firearm that is to be used solely as a prop during the course of a motion picture, television, or video production by authorized people related to the production. Sections 32000, 32100, 32105, 32110.

Individuals moving to California may import an unrostered handgun without the intention of selling it. Section 32000(a). California also exempts from the rostering law the transfer of guns between private parties, intra-familial transfers,[7] gifts and bequests, and various loans,

_____

[7]The handgun roster law does not apply to transfers "exempt from the provisions of Section 27545." Section 32110(b). Section 27545 requires private parties to complete any transfers between them through a dealer, but an exemption is provided for intra-familial transfers, Section 27875. Californians may thus receive unrostered handguns from out-of-state relatives per Section 32110(b). (While a separate law, Section 27585, requires such importation be processed by

14

of unrostered handguns that were lawfully acquired. Section 32110.

3. *Defendant's Enforcement of the "Handgun Roster" Program Against Plaintiffs*

Plaintiff Ivan Peña sought to purchase a Para USA (Para Ordnance) P1345SR / Stainless Steel .45 ACP 4.25". ER 136. Peña is unaware of any individuals in California who could privately transfer him this gun, ER 207, but has identified a licensed dealer who would sell him the gun upon importing it from Grey Peterson of Lynnwood, Washington. ER 136, 208-10. The Para USA P1345SR that Peña wants to buy was listed on California's Handgun Roster until December 31, 2005, when it was discontinued and its listing not renewed. ER 136-37, 174, 210-13.

The Glock 21 SF with a standard magazine release, the Glock 21 SF-STD, is listed on the California Handgun Roster. ER 141; Roster, *supra* n.6. Glock's efforts to add the Glock 21 SF with an ambidextrous magazine release to the California Roster as a similar handgun failed, ER 175-88, but Defendant permits Glock customers to purchase the gun's rostered version, and send it to the Glock factory for retrofitting

a dealer, an exemption to this requirement is allowed for transfers by bequest or intestate succession.)

15

with an ambidextrous release. ER 183. "No further testing of the retrofitted handgun would be required." *Id.*

The ambidextrous magazine release model is superior for left-handed shooters such as Plaintiff Roy Vargas, who was born without an arm below the right elbow, and who has sought to purchase that handgun. ER 141. Vargas is unaware of any individuals in California who could privately transfer him this gun, ER 215, but has identified a licensed dealer who would sell him the gun upon importing it from its distributer. ER 141, 217-18.

Plaintiff Doña Croston has sought to purchase a Springfield Armory XD-45 Tactical 5" Bi-Tone stainless steel/black handgun in .45 ACP, model number XD9623. ER 139. Other models of this identical gun are listed on the handgun roster and are thus available to Ms. Croston, albeit, in different color finishes: black (model XD9621), OD Green (model XD9622), and Dark Earth (XD9162). ER 189, 191; Roster, *supra* n.6. Croston is unaware of any individuals in California who could privately transfer her this gun, ER 223, but has identified a licensed dealer who would sell her the gun upon importing it from its distributer. ER 139, 225.

The handgun at issue in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), was a High Standard 9-shot revolver in .22 with a 9.5" Buntline-style barrel. ER 192. Plaintiff Brett Thomas sought to purchase that model handgun, and identified a willing seller who would sell him the gun upon importing it from its current owner, Robert Dawson of Savannah, Georgia. ER 143, 201-02.

Each individual plaintiff fears arrest, prosecution, fine and incarceration if he or she completes their intended handgun purchase, and further complains of the limited access, reduced price competition, and increased costs in having handguns shipped from out of state owing to the handguns' unavailability in California, even were such importation legal. ER 137, 139, 141, 143.

Plaintiffs Ivan Peña and Brett Thomas are shooting enthusiasts and gun collectors, as are other members and supporters of Plaintiffs Second Amendment Foundation, Inc. ("SAF") and Calguns Foundation, Inc. ("CGF"). ER 137, 143, 146, 149-50. Peña, Thomas, Croston, and other SAF and CGF members and supporters would acquire new semiautomatic handguns of the kind in common use throughout the United States, for traditional lawful purposes including self-defense,

but cannot do so owing to the operation of California's handgun rostering scheme. ER 137, 139, 143, 146, 149-50.

Moreover, even if Plaintiffs could procure the handguns they intend to purchase consistent with California law, the handgun rostering scheme substantially limits commerce in (and therefore Plaintiffs' access to) these handguns, since no dealer can stock these firearms. This results in a significant loss of choice and price competition. ER 137, 139, 141, 143, 147, 150. Plaintiffs would also suffer increased costs in transporting and transferring their firearms from out-of-state that they would not suffer if the firearms were available for sale in California. ER 137, 139, 141, 143, 146, 149-50.

SAF and CGF, non-profit membership organizations with many California members, work to promote and defend Second Amendment rights. The organizations expend their resources encouraging exercise of the right to bear arms, and advising and educating their members, supporters, and the general public about the legality of particular firearms. The issues raised by, and consequences of, Defendant's policies, are of great interest to SAF and CGF's constituencies. Defendant's policies regularly cause the expenditure of resources by

SAF and CGF as people turn to these organizations for advice and information. ER 145-50.

4. *Procedural History*

Plaintiffs brought this lawsuit on April 30, 2009, against Wilfredo Cid, then-Chief of the California Department of Justice's Bureau of Firearms. The parties filed cross-dispositive motions, but on October 2, 2009, the District Court (Judge Damrell) stayed the action pending the outcome of the en banc decision in *Nordyke* v. *King*, Ninth Cir. No. 07-15763. When this Court remanded *Nordyke* in light of *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), the District Court again stayed this case, on August 9, 2010, pending *Nordyke*'s outcome.

The case was re-assigned to Judge Mueller on January 20, 2011. On December 15, 2011, the court lifted the stay and ordered the parties to renotice any motions they would want heard. But five days later, the court again stayed the case pending the next event in *Nordyke*. The stay was continued again June 11, 2012, but was finally lifted August 1, 2012.

Per the parties' stipulation, Defendant Stephen Lindley, who had replaced Cid in office, substituted into the case on September 6, 2012.

The parties continued working the case, but on May 17, 2013, the microstamping requirement went into effect, necessitating an amendment to the complaint and the reopening of discovery.

The parties filed new cross-motions for summary judgment on October 25, 2013, on which the Court heard argument December 16, 2013. On December 31, 2013, the parties filed a stipulation regarding certain points as ordered by the court, and on January 28, 2014, Plaintiffs moved to supplement the record further.

On June 5, 2014, the court entered an order finding the record insufficient to decide the case, and requesting additional briefing and factual support. On February 26, 2015, the Court granted Defendant's summary judgment motion, denied Plaintiffs' summary judgment motion, and entered judgment for Defendant.[8] Plaintiffs immediately noticed their appeal.

5. *The District Court's Opinion*

The District Court began by rejecting three of the four injuries asserted as a basis for individual standing—fear of criminal sanctions

---

[8]The court also declared moot the outstanding motion to supplement the record, as the Court had subsequently directed supplemental briefing.

for violating the rostering law, increased costs in shipping firearms to California that would not be sustained were the firearms available for sale in California, and loss of price competition. ER 12-13. But with respect to the fourth injury, loss of choice in being unable to purchase the banned handguns, the District Court held that standing and the merits were inextricably intertwined, as Plaintiffs would only suffer a constitutional injury if they had a right to purchase those arms. The District Court would thus reach the merits. ER 13. The District Court did not reach SAF and CGF's representational standing, as it found that these plaintiffs had organizational standing. ER 15.

Turning to the merits, the District Court found that the roster law "does not effectively ban firearms," because "the commercial sale of firearms proceeds robustly." ER 21. It read *Heller* as being limited to its facts of a ban on *all* handguns as a class. ER 22. California's law, the District Court found, contains only "a degree of regulation [that] is negligible and does not burden plaintiffs' rights under the Second Amendment." ER 22.

Holding that "[t]he Second Amendment does not protect guns, but rather conduct," ER 23 (citation omitted), the District Court found

California's rostering law merely regulates the manner in which people keep guns. ER 22-23. Moreover, because the law purportedly regulate commerce, the District Court found it presumptively lawful. ER 23. "The [handgun roster law] does not burden plaintiffs' Second Amendment rights." ER 24. Accordingly the District Court "denie[d] plaintiffs' Second Amendment challenge, without the need for further discussion." ER 25.

The District Court then rejected Plaintiffs' equal protection claims. The exemptions for curios and relics, essentially, handguns that "age out" of the roster ban, was found not to discriminate amongst classes of people. ER 27. The District Court applied the same logic to provisions allowing the importation of handguns by non-residents, by residents with out-of-state family members, and by those involved in movie and television production. ER 27-28. And it found that law enforcement personnel are not similarly situated to ordinary citizens, and thus should be able to access different handguns, without explaining why law enforcement personnel require "unsafe" handguns in their private capacities. ER 28-29.

The question here is not whether California's law makes for good policy (a dubious proposition). Public safety arguments lie at the heart of every unconstitutional handgun ban. If the Second Amendment means anything, it means that the People's right to keep and bear protected arms overrides the state's concern that such arms, though protected, are too "unsafe." Tort doctrines "which would in practice drive [handgun] manufacturers out of business, would produce a handgun ban by judicial fiat in the face of" a constitutional right to handgun possession. *Martin* v. *Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984). Regulatory "safety" schemes having the same result are no different.

Indeed, the worst aspect of California's law has nothing at all to do with safety. Microstamping does not make guns safer. In theory, it might aid the tracing of guns belonging to criminals too careless to sandpaper or replace the firing pin, or pick up their shell casings. But if a handgun is "unsafe" because it does not potentially litter marked shell casings, California could just as well ban all revolvers.

This case begins and ends with the fact that California bans many, if not the majority, of handguns of the kind in common use for traditional lawful purposes throughout the United States. Indeed, no semiautomatic handgun models introduced since May 17, 2013, can be sold to California consumers.

The District Court's view that this is a "negligible" regulation that does not at all burden Second Amendment rights is no less astonishing than is California's position that it can ban all handguns but one. Of course, the Second Amendment does not refer to "handguns," but to "arms." No rule holds that at least one of each type of arm must be protected. Plainly read and logically understood, the Constitution simply prohibits  banning those articles that fit within the definition of protected "arms." The Supreme Court could not have been clearer in rejecting the notion that some protected arms may be banned because others are not.

Just as *Heller* did not apply any tiers of scrutiny to analyze a handgun ban, this, too, is not a case for means-ends scrutiny. The Second Amendment guarantees the right to acquire arms of the kind in common use for traditional lawful purposes. Period, full stop. It is no

answer to say that a handgun ban may be imposed simply by banning the acquisition of guns, because all allegedly commercial regulations are presumptively lawful (nor is the challenged law limited to commercial transactions). The challenged requirements constitute a massive ban on handguns whose possession and use is secured by the Second Amendment. They cannot be sustained.

Even if some form of heightened means-ends scrutiny were applied—an avenue *Heller* specifically foreclosed when dealing with handgun bans—the state could not meet its burden in showing that law-abiding, responsible adult citizens may be denied Second Amendment-protected arms. Nor are the law's classifications discriminating among similarly-situated people rational, let alone compelling enough to pass heightened scrutiny.

The decision below should be reversed.

## STANDARD OF REVIEW

"We review de novo a district court's grant or denial of summary judgment." *Lopez-Valenzuela* v. *Arpaio*, 770 F.3d 772, 777 (9th Cir. 2014) (en banc).

## I. THE INDIVIDUAL PLAINTIFFS' STANDING IS SECURED.

Although the District Court reached the merits of the individual plaintiffs' claims, and found that the organizational plaintiffs have standing, Plaintiffs are nonetheless constrained to address the District Court's errors in rejecting some of their bases for standing.

First, there is nothing speculative about Plaintiffs' fear of prosecution under the act, which prohibits "import[ing] [unrostered handguns] into the state for sale." Section 32000. Thomas would pay Dawson to ship an unrostered handgun from Georgia to California so that he could buy it, Peña would pay Peterson to ship an unrostered handgun from Washington to California so that he could buy that one, and the other Plaintiffs' handguns would also likely be imported into California as they are not available for sale in the state. They each might at least be accessories to the transferring dealer's unlawful importation.

Nor does it matter that the act targets sellers rather than purchasers. Courts have found that sales restrictions directed at dealers inflict Article III injuries on putative handgun consumers. *See*

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 191-92 (5th Cir. 2012) ("*NRA*"); *Mance* v. *Holder*, No. 4:14-cv-539-O, 2015 U.S. Dist. LEXIS 16679, at *9-*11 (N.D. Tex. Feb. 11, 2015); *accord Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 750-57 (1976); *but see Lane* v. *Holder*, 703 F.3d 668 (4th Cir. 2012). As Judge Easterbrook noted under similar circumstances, "Plaintiffs' claim . . . is direct rather than derivative: every interstate sale has two parties, and entitlement to transact . . . is as much a constitutional right of consumers as it is of shippers—if it is a constitutional right at all." *Bridenbaugh* v. *Freeman-Wilson*, 227 F.3d 848, 850 (7th Cir. 2000).

Second, there is no requirement that Plaintiffs itemize the specific costs of shipping the handguns to California. Obviously, there is some cost involved in shipping goods over state lines; the specific amount is immaterial. "Allegedly, plaintiffs spent money that, absent defendants' actions, they would not have spent. This is a quintessential injury-in-fact." *Maya* v. *Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011).

Similarly, detailed economic studies are not required when considering the obvious consumer injuries visited by restricting the availability of various goods and services.

> [T]he restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition.

*Carey* v. *Pop. Servs. Int'l*, 431 U.S. 678, 689 (1977) (footnotes omitted); *cf. Doe* v. *Bolton*, 410 U.S. 179 (1973).

In any event, as the District Court essentially upheld one basis for individual standing, as well as the organizational plaintiffs' standing, much of this discussion was superfluous. *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977); *Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc.* v. *Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

II.  THE SECOND AMENDMENT GUARANTEES A FUNDAMENTAL RIGHT TO ACQUIRE HANDGUNS.

"[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the

enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). The Second Amendment does not merely protect the right to possess the handguns that someone might manufacture from raw materials. Because there is a right to possess handguns, there is, necessarily, a right to acquire them. After all, "restricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (footnote omitted); *accord Carey*, 431 U.S. at 687-88 ("A total prohibition against the sale of contraceptives . . . would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use.").

Courts have long accepted this logic in the arms context. "The right to keep and bear arms, necessarily involves the right to purchase them . . . ." *Andrews* v. *State*, 50 Tenn. 165, 178 (1871). "[A]lthough that acquisition right is far from absolute," the Second Amendment "right must also include the right to *acquire* a firearm . . . ." *Ill. Ass'n of Firearms Retailers* v. *City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014); *cf. NRA*, 700 F.3d at 205-11 (applying heightened scrutiny to age restriction on handgun sales); *Mance*, 2015 U.S. Dist. LEXIS 16679

at *25 n.8 ("operating a business that provides Second Amendment services is generally protected by the Second Amendment, and prohibitions on firearms sales are subject to similar scrutiny.").

As the Supreme Court acknowledged in surveying the right's history, "What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece . . .?" *Heller*, 554 U.S. at 583 n.7 (quoting SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796)). "Our citizens have always been free to make, vend and export arms. It is the constant occupation and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph, ed., 1830).

This Court apparently accepts the right to acquire arms. Observing that "*Heller* did not differentiate between regulations governing ammunition and regulations governing the firearms themselves," this Court held that "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Jackson* v. *City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (citing *Ezell* v. *City of Chicago*, 651 F.3d 684, 704 (7th Cir 2011)).

The District Court seriously erred in suggesting, contrary to *Jackson* and the weight of other published opinions (if not common sense), that there is no right to acquire handguns. ER 20. It did so by relying on (wrongly decided) *Teixeira* v. *Cnty. of Alameda*, No. 12-cv-03288-WHO, 2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013), *appeal pending*, Ninth Circuit No. 13-17132. It should not have.

*Teixeira*'s cursory treatment of the issue relied upon the Fourth Circuit's unpublished opinion in *United States* v. *Chafin*, 423 Fed. Appx. 342 (4th Cir. 2011), wherein a defendant asserted that the Second Amendment protects "the sale of a firearm *to an unlawful user of drugs*,"—very far from the issues here—and did "not point[] this court to any authority" for the proposition that there exists a right to sell firearms, again, unlike the instant brief. *Id*. at 344 (emphasis added). To the extent the Fourth Circuit did not locate such authority itself, *id*., respectfully, it missed a few sources, *see supra*. Indeed, the only authority that the Fourth Circuit cited for its proposition that there is no right to firearms commerce was a case holding that there is no First Amendment right to distribute obscenity. *See Chafin*, 423 Fed.

Appx. 344 (citing *United States* v. *12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 213 (1973)). But obscenity, unlike handguns, is not constitutionally protected.

III. CALIFORNIA'S ABILITY TO REGULATE COMMERCE IN ARMS DOES NOT ERASE THE SECOND AMENDMENT RIGHT TO ACQUIRE ARMS.

Apart from failing to recognize that the Second Amendment guarantees a right to acquire firearms, the District Court actually went so far as to hold that *Heller* forecloses this right as a "presumptively lawful" regulatory exception to the Second Amendment. That is, people may have a right to keep guns, but the historical tradition of keeping guns does not include the right to acquire them in the first place. The fact that gun sales may be regulated means they are entitled to no constitutional protection at all.

The District Court was confused by *Heller*'s cautionary statement that

> [a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626-27. In a footnote, the Court offered that such laws are "presumptively lawful." *Id*. at 627 n.26. To the District Court, this dicta foreclosed the case. Believing that "all regulatory measures falling within" the category of "imposing conditions and qualifications on the commercial sale of arms" are presumptively constitutional, ER 17, and assuming that the roster law fits this definition, the District Court saw "no need for further discussion," ER 25.

This was serious error.

First, though the handgun roster law acts largely by restricting the commercial sale of arms, it does so by banning the sale of certain guns, not by "imposing conditions and qualifications" on arms sales. Training requirements, background checks, and licensing laws arguably impose conditions and qualifications on arms sales (though it would remain to be seen whether any of these are historically rooted). Banning the sale of certain items does not merely "condition" and "qualify" their sales. The "challenged law" thus does not "fall[] within a 'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected.'" *Jackson*, 746 F.3d at 960 (quoting *Brown* v. *Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011)).

It could hardly be otherwise. After all, not all "arms" were historically protected. But if historic arms bans were merely "presumptively lawful commercial restrictions," then *any* modern gun ban is presumptively lawful—obviously, not what *Heller* had in mind, and not at all reflective of *Heller*'s approach to the handgun ban before it. Positing gun bans as "presumptively lawful commercial restrictions" has the exception swallow the constitutional rule.

And of course, there is no "persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson*, 746 F.3d at 960 (citations omitted). The Framing Era saw nothing approaching California's handgun rostering scheme. Plaintiffs are unaware, and Defendant has failed to identify, any eighteenth century laws mandating the inclusion of particular features into firearm designs (assuming such a law could be considered a measure of regulating gun sales)—let alone the inclusion of CLIs, MDMs, or microstamping—or conditioning the legality of a firearm on its paid-for appearance on a special roster. There is no presumption of constitutionality here.

But even viewing the roster law as a "commercial restriction," the fact that *some* commercial restrictions are *presumptively* lawful does not mean that *all* commercial restrictions are *conclusively* lawful. Would the Court uphold a law restricting gun stores to operating by the light of a full moon? Would banning all gun sales fail to implicate the Second Amendment? The District Court suggested as much, but some limiting principles must apply. As the Third Circuit explained,

> Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment . . . In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

*United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010); *Mance*, 2015 U.S. Dist. LEXIS 16679 at *25 n.8. Indeed, while the court below would approve of banning all gun sales, the Northern District of Illinois had no trouble striking down Chicago's prohibition on the commercial sale of firearms, especially as the city could not show that banning gun sales was historically acceptable. *Ill. Retailers*, 968 F. Supp. 2d at 937.

The Fifth Circuit is in accord. In *NRA*, the Fifth Circuit considered the constitutionality of federal laws banning federally-licensed dealer handgun sales to adults ages 18-20—plainly, in *Heller*'s phrasing, "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. Referencing *Heller*'s class of "presumptively lawful" laws, the Fifth Circuit expressed confusion as to whether the Supreme Court meant that such laws are presumptively lawful because they fall outside the Second Amendment's scope, or presumptively lawful because they satisfy means-ends scrutiny. *NRA*, 700 F.3d at 196. The Fifth Circuit settled on the former explanation. "For now, we state that a longstanding, presumptively lawful regulatory measure . . . would likely fall outside the ambit of the Second Amendment." *Id.* In so doing, the Fifth Circuit read "longstanding" as an element of a presumptively lawful regulation, thus "necessarily . . . examin[ing] the nature and extent of the imposed condition." *Marzzarella*, 614 F.3d at 92 n.8. Following an historical survey of age restrictions, the court proceeded to step two and upheld the law under heightened scrutiny.

In other words, it is not enough to simply declare a regulation "commercial." There must be something more—the contested practice

must have some historical pedigree to warrant exclusion from the Constitution's reach.

Moreover, the District Court seriously erred not only by assuming the existence of a commercial presumption, but by providing it conclusive effect. *Heller*'s list of presumptively lawful exceptions to the Second Amendment's scope are just that—presumptions, which may be overcome. *See, e.g., United States* v. *Moore*, 666 F.3d 313, 319 (4th Cir. 2012); *United States* v. *Barton*, 633 F.3d 168, 173 (3d Cir. 2011); *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010).

The lower court relied, in part, on the Eleventh Circuit's decision upholding the domestic violence misdemeanant ban as an analog to the presumptively lawful felon ban. ER 25 (citing *United States* v. *White*, 593 F.3d 1199 (11th Cir. 2010)). But after reviewing other courts' criticism of *White*'s approach, *United States* v. *Chovan*, 735 F.3d 1127, 1134 (9th Cir. 2013), this Court took a different path, *id.*, at 1136.

There are no shortcuts here. Laws banning gun sales obviously implicate the Second Amendment. The Court must examine whether the guns that California bans are protected by the Second Amendment. Undoubtedly, the answer to that question is "yes."

IV.  THE HANDGUNS BANNED BY CALIFORNIA'S HANDGUN ROSTERING SCHEME ARE WITHIN THE SECOND AMENDMENT'S PROTECTION.

California can ban the sale of weapons which do not meet the historic definition of "arms" as used in the Second Amendment—"any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (citing 1 A New and Complete Law Dictionary (1771); N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)).

While historically "all firearms constituted 'arms,'" *id.* (citation omitted), the Supreme Court has recognized some limiting principles. "[T]he sorts of weapons protected [by the Second Amendment are] those 'in common use at the time,'" *id.* at 627 (quoting *United States* v. *Miller*, 307 U. S. 174, 179 (1939)), "the sorts of lawful weapons that [citizens] possessed at home." *Id.* "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. And of course, Defendant is still free to ban "arms" that are "dangerous and unusual weapons," *id.* at 627 (citations omitted), including "sophisticated arms that are highly unusual in society at large." *Id.* "Historically, weapons like machine

guns, sawed-off shotguns, grenade launchers, and other high-powered weapons have fallen into this category due to their extreme nature." *Wilson* v. *County of Cook*, 2012 IL 112026, at ¶ 46.

But handguns, as a class of arms, enjoy Second Amendment protection. "[T]he American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629; *see also Patsone* v. *Pennsylvania*, 232 U.S. 138, 143 (1914) ("pistols . . . may be supposed to be needed occasionally for self-defence."). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. And the presumptions applicable to common types of arms are often a matter of judicial notice. Neither in *Heller* nor *McDonald* did any justice struggle with whether the plaintiffs' particular handguns were of the kind in common use for traditional lawful purposes. Indeed, before *Heller*, the Supreme Court invoked the "long tradition of widespread lawful gun ownership by private individuals in this country" to hold that possession of an apparent semiautomatic rifle does not create a duty to inquire whether the

firearm happens to be an illegal machine gun. *Staples* v. *United States*, 511 U.S. 600, 610 (1994).

This presumption, that arms are what they appear to be, works in both directions. Without bothering with the particular details of the item's form or function, this Court understood what a machine gun was, and based solely on that generic description, upheld a conviction for manufacturing an arm lacking Second Amendment protection. *United States* v. *Henry*, 688 F.3d 637 (9th Cir. 2012); *see also United States* v. *Von Willie*, 59 F.3d 922, 929 (9th Cir. 1995) (allowing officer to testify that "the MK-11 . . . was a particularly intimidating gun and he knew of drug dealers who used that specific weapon . . . These observations are common enough and require such a limited amount of expertise, if any, that they can, indeed, be deemed lay witness opinion"); *United States* v. *Liles*, 432 F.2d 18, 20 (9th Cir. 1970) ("The manager of the sporting goods section, a man who sold a wide variety of firearms, identified the weapon as common variety of revolver.").[9]

---

[9]Of course, evidence might be required where courts cannot tell whether an arm's possession is constitutionally protected. Stumped by "the absence of any evidence tending to show" that a sawed-off shotgun merited Second Amendment protection, and the gun's suitability for particular uses "not [being] within judicial notice," *Miller*, 307 U.S. at

Here, as in *Heller* and *McDonald*, the subject is obvious enough: handguns. California therefore shoulders some burden of disproving that any particular handgun it wishes to ban falls within *Heller*'s common use test. California could meet its burden in a case involving some unusual handgun with a particularly uncommon function. And if its roster merely tested for dangerous and unusual functions, it might itself enjoy some presumptive validity. But the mere fact that a handgun does not appear on California's special list does not take it outside the category of being an arm of the kind in common use for traditional lawful purposes—after all, even the very handgun model at issue in *Heller*, the handgun Thomas would purchase, is banned in California.[10]

Apart from the drop and firing tests, and perhaps the mechanical safety requirement, the roster does not test handguns for unusual function. Rather, it tests whether a fee was paid within the year, the

---

178, the Supreme Court "remanded for further proceedings," *id.* at 183.

[10]Otis McDonald's handgun was a semiautomatic Beretta 950. *See McDonald* v. *City of Chicago*, N.D. Ill. No. 08-3645, Dkt. 34-3 (Exhibit A to summary judgment motion). That handgun also does not appear on Defendant's roster.

only problem with Ivan Peña's gun which, like over a thousand other guns, was once tested and considered "not unsafe." The roster tests whether anyone submitted a handgun for testing, the only problem with Brett Thomas's revolver. And it tests whether each semiautomatic handgun has a CLI, MDM, and microstamping, features absent from 89%, 86%, and *100%*, respectively, of all semiautomatic handguns—a class of handguns that itself includes the overwhelming majority of all handguns.

There is simply no denying that California's roster scheme bans are handguns of the kind in common use for lawful purposes. The roster now bans *all* semiautomatics introduced since 2013. It has already banned all Glocks introduced since 2008, and some of the most popular Smith & Wesson and Ruger firearms available elsewhere. What good is constitutional protection for the acquisition of handguns, if any handgun could fail the state's ever-evolving definition of "not unsafe?"[11]

---

[11]The District Court's notion that the roster law amounts to a regulation of the manner in which people exercise Second Amendment rights is unconvincing. The law does not regulate how people keep and carry arms; it bans the acquisition of arms of which the state disapproves. Washington, D.C. could not have won *Heller* by arguing that it merely restricted the way in which people exercised the right to keep arms, *i.e.*, not with a handgun.

In time, semiautomatics will completely disappear from California's market, and the state could then turn, if it even wants to wait that long, to banning all revolvers for failing to deposit microstamped cartridges. Today, the state demands CLIs, MDMs, and microstamping. But why stop there? If microstamping, which does not practically exist, can be required, why not mandate that handguns read the operator's mind and refuse to fire when detecting criminal intent? Even were the state to limit itself to demanding matters within the realm of feasible technology, why not decree that the only "not unsafe" guns are those equipped with GPS, a rear facing camera, and an internet connection, instantly transmitting the shooter's picture and location to law enforcement with every trigger pull?

The limits here are real, and they are not found in the legislature's imagination. That body, operating in a pre-*Heller* environment, approached the handgun issue backwards from a constitutional, post-*Heller* perspective. The legislature sought to declare almost all handguns "unsafe" for failing to conform to its design preferences, or for the manufacturer's inability or unwillingness to pay for and

participate in the state's regulatory scheme. Consciously, the state sought to "drive" the market towards its preferred outcomes.

But *Heller* stands for the proposition that it is the regulatory environment that must accommodate itself to the choices made by the lawful, constitutionally protected market for arms, and not the other way around. Thus, while Defendant, and the court below, both posited that Plaintiffs' Second Amendment challenge would fail at step one of the familiar two-step means-ends approach to Second Amendment claims, *Jackson*, 746 F.3d at 960, the challenge succeeds before even arriving at the first step.

Quite simply, Californians have a right to acquire the handguns banned by the state. There is nothing to "balance."

"As *Heller* made clear, '[a] statute which, under the pretence of regulating, amounts to a destruction of the right . . . would be clearly unconstitutional.'" *Id.* (quoting *Heller*, 554 U.S. at 629); *State* v. *Reid*, 1 Ala. 612, 616-17 (1840)). Brett Thomas has as much right to his High Standard revolver as did Dick Heller. The roster law does not regulate that right, but destroys it. There is no room for means-ends scrutiny.

However useful the two-step, means-ends approach may often be, *Heller* and *Jackson* confirm that not *all* Second Amendment cases lend themselves to such analysis. The Supreme Court notably did not reference any "standard of review" or means-ends balancing test in dispensing with Washington, D.C.'s handgun ban. "It is enough" that handguns, as a general class of arms, are in common use for traditional lawful purposes. *Heller*, 554 U.S. at 629.

Nor did the Supreme Court utilize such tests in resolving Heller's challenge to Washington, D.C.'s bans on the possession of functional firearms in the home, and handgun carrying within the home. With respect to the former law, the Court simply offered that the ban "makes it impossible for citizens to use [guns] for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630.

This same process, identifying whether a regulation conflicts with a "core protection" of the Amendment without resort to interest-balancing, resolved Heller's challenge to a requirement that he obtain an unavailable permit to move a handgun inside his home. The D.C. Circuit had found that the restriction violated the Second Amendment's core:

It is sufficient for us to conclude that just as the District may not flatly ban the keeping of a handgun in the home, obviously it may not prevent it from being moved throughout one's house. Such a restriction would negate the lawful use upon which the right was premised–i.e, self-defense.

*Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*. The Supreme Court affirmed using the same approach, concluding the city had no discretion to refuse issuance of the permit: "Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 554 U.S. at 635. No balancing needed.

Just as some First Amendment cases turn on the question of whether something constitutes protected speech, and some Fourth Amendment cases turn on whether conduct constitutes a "search" or a "seizure," *Heller* demonstrates that in the Second Amendment, categorical prohibitions on types of "arms" are resolved by the common-use test. Were balancing tests required to discern whether handguns are protected "arms" under the Second Amendment, *Heller* would have utilized them.

## V. People Enjoy a Fundamental Right to Acquire Protected Semiautomatic Handguns Regardless of Whether Other Arms Are Available.

Defendant did not seriously challenge the fact that semiautomatic handguns lacking CLIs, MDMs, and microstamping are arms of the kind in common use for traditional lawful purposes. Nor did the District Court deny this much. Apart from rejecting the notion that the Second Amendment applies to any law having something to do with gun sales, Defendant and the District Court reasoned that a ban on selling some guns is perfectly acceptable so long as others—in Defendant's formulation, at least one—remained available for sale.

This, too, was serious error. Washington, D.C. attempted the same argument, unsuccessfully, reasoning that it could ban too-dangerous handguns because it tolerated some long guns. The D.C. Circuit dismissed the argument as "frivolous." *Parker*, 478 F.3d at 400.

> It could be similarly contended that all firearms may be banned so long as sabers were permitted. Once it is determined—as we have done—that handguns are 'Arms' referred to in the Second Amendment, it is not open to the District to ban them.

*Id.* (citation omitted).

Undeterred, District of Columbia officials presented the Supreme Court with the following question on certiorari: "Whether the Second

Amendment forbids the District of Columbia from banning private possession of handguns while allowing possession of rifles and shotguns." Petition for Certiorari, *District of Columbia* v. *Heller,* No. 07-290. Heller successfully challenged this question as not accurately reflecting the issues in the case, and the Supreme Court adopted a very different "Question Presented" along the lines Heller proposed, namely, whether the city's laws violated the Second Amendment.

On the merits, the Supreme Court rejected the alternative arms argument.

> It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.

*Heller*, 554 U.S. at 629.

Similarly, the right to have a handgun is not diminished by the fact that one keeps, or has access to, *other* handguns. Just as the First Amendment does not allow the rationing of books or deities, the Second Amendment, without more, does not permit the rationing of handguns. This much the Eastern District of California recently made clear, in striking down the application of firearm purchase waiting periods to

individuals who already possessed firearms. The state argued that waiting periods did not burden the Second Amendment rights of those who already had guns, but the court held otherwise:

> [T]hat [Plaintiffs] have been able to exercise their Second Amendment right with respect to at least one firearm does not mean that they have diminished rights under the Second Amendment. The Second Amendment applies to "arms" and its language does not limit its full protections to a single firearm. Some firearms are better suited for particular lawful purposes than others.

*Silvester* v. *Harris*, 41 F. Supp. 3d 927, 962 n.33 (E.D. Cal. 2014).

It simply does not matter that "the commercial sale of firearms proceeds robustly." ER 21. We do not know how many people forwent the purchase of a handgun because they could not obtain the one that best suited their needs, or to what extent a consumer's needs are met by her second, third, or fifth choice of handgun. Plainly, many consumers throughout the United States prefer *modern* Glocks, Smith & Wessons, Rugers, and other guns forbidden to Californians. The sale of all semiautomatic handguns introduced since May, 2013, has ceased and will not resume in the foreseeable future, if ever.

It bears repeating: the same logic compelling microstamping would also support a ban on all revolvers. And since tasers may be considered Second Amendment arms, *People* v. *Yanna*, 297 Mich. App. 137, 824

N.W.2d 241 (Mich. Ct. App. 2012), the state might decide tomorrow that all bullet-firing guns can be banned as "unsafe" if it allows the sale of stun guns.

Plaintiffs appreciate that California's gun laws can always become more restrictive, as demonstrated by the roster law's evolution. But the state is not justified in violating the Constitution just because it has not (yet) violated it to a greater extent. And this violation is not minor.

## VI. THE HANDGUN ROSTER LAW WOULD ALSO FAIL MEANS-ENDS SECOND AMENDMENT SCRUTINY.

The roster law would not survive two-step means-ends scrutiny even were that approach applicable. "A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." *NRA*, 700 F.3d at 195; *see also United States* v. *Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny").

The handgun roster law—with its vast ban of handguns that would otherwise be kept at home for self-defense—squarely fits this

description. In *Jackson*, this Court applied intermediate scrutiny to a law implicating core Second Amendment rights because it did not "substantially prevent law-abiding citizens from using firearms to defend themselves in the home." *Jackson*, 746 F.3d at 964. Banning scores of popular handguns, including all semiautomatic handguns introduced since May, 2013, obviously impacts core Second Amendment rights more severely.

Under strict scrutiny, the Government carries the burden of proving the law "furthers a compelling interest and is narrowly tailored to achieve that interest," *Citizens United* v. *FEC*, 558 U.S. 310, 340 (2010) (quotation omitted), a burden that cannot be met where less restrictive alternatives are available, *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004).

The handgun rostering requirements cannot survive strict scrutiny. The state may have a compelling interest in handgun safety, but it can advance handgun safety in other ways, *e.g.*, by imposing the educational requirements that it does, or even by reverting the roster to its original purpose—a mechanism for weeding out defective handguns. Banning common, well-built and normally functioning handguns that are highly suitable for traditional lawful purposes is not

an appropriate means of preventing accidental discharges. The notion that microstamping is so necessary to the important interest of solving crimes, such that there is no alternative but to require it—when this technology does not actually exist in the marketplace—is untenable.

The roster law's supposed benefits are also belied by the numerous exemptions afforded to individuals employed by law enforcement, the entertainment industry, people moving into the state, intra-familial transfers, private party transfers of handguns already present in the state, and curios and relics.

And not every aspect of the roster obviously advances the state's regulatory interest. Safety is not advanced by barring the sale of handguns already proven "safe," or barring the testing of handguns that *would* be proven "safe," on account of purely administrative requirements. Since the state teaches consumers to disregard chamber loaded indicators and magazine disconnect devices, requiring handguns to have these features actually impedes the state's safety interests.

None of this is to suggest that the outcome of means-ends scrutiny would turn on the standard of review. While not as rigorous as strict scrutiny, intermediate scrutiny is nonetheless an exacting test that

requires the government to show the challenged action is "'substantially related to an important governmental objective.'" *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988). "[A] tight fit" between the regulation and the important or substantial governmental interest must be established— one "that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Bd. of Trs.* v. *Fox*, 492 U.S. 469, 480 (1989)). And "[s]ignificantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government." *United States* v. *Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (citing *Fox*, 492 U.S. at 480-81); *Chovan*, 735 F.3d at 1140. The "justification must be genuine, not hypothesized or invented post hoc in response to litigation." *United States* v. *Virginia*, 518 U.S. 515, 533 (1996).

The roster law would fail this test, too. Requiring, in the name of safety, features deemed dangerously misleading by the state, and banning most people's access to massive numbers of perfectly functional and useful handguns, does not "tightly fit" any important state interests. It must be remembered that handguns also provide significant safety benefits to their owners, and there is a real cost in

safety when people are denied the handguns that would suit them best, including handguns that may function better and safer, simply because manufacturers cannot meet the state's vision of how handguns should function.

## VII. THE HANDGUN ROSTER LAW VIOLATES PLAINTIFFS' RIGHTS TO EQUAL PROTECTION.

The Equal Protection Clause "is essentially a direction that all person similarly situated should be treated alike." *City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). Strict scrutiny usually applies to government classifications that "impinge on personal rights protected by the Constitution." *Id.* at 440 (citations omitted). "Where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized." *Hussey* v. *City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) (quoting *Harper* v. *Virginia Board of Elections*, 383 U.S. 663, 670 (1966)).

The sort of classifications created by the handgun roster and microstamping requirements are unacceptable under any sort of scrutiny reserved for enumerated rights. While most consumers are

barred from accessing unrostered guns, the law privileges similarly-situated people who cannot be said to deserve handguns more than others, or benefit less from the roster program's supposed advantages.

For all its restrictions, the law allows the importation of privately-owned non-rostered handguns by people who move into the state, or who have family out-of-state. These classifications make no sense. A person who wants to buy an unrostered handgun might happen upon one already lawfully in the state, but she cannot obtain one from a dealer or import one from out of state. Her neighbor, however, can easily obtain the same handgun as a gift from an out-of-state relative. And her other neighbor might have just brought into California the five unrostered handguns he bought the previous week while living across the state border, even though discrimination on the basis of state residency normally triggers strict scrutiny as well. *Mance*, 2015 U.S. Dist. LEXIS 16679 at *43 (citing *Mem'l Hosp.* v. *Maricopa Cnty.*, 415 U.S. 250, 254-64 (1974)).[12]

---

[12]This doctrine normally comes into play when states discriminate against newcomers, not in their favor, but the discrimination is equally suspect.

California's wide exemptions for law enforcement personnel, allowing them to purchase unrostered guns for personal use, is likewise completely irrational. If a gun is unacceptably dangerous, it is odd to allow it to those perhaps most likely to use it. And if the harm to be ameliorated is the unauthorized use of guns by people not knowledgeable in their use, police weapons, including those owned privately by police officers, are no less likely to be stolen or mishandled by unauthorized users.

The District Court misread the law enforcement exemption, offering that "transactions involving 'sworn members' of law enforcement personnel 'for use in the discharge of their official duties' are exempt," ER 28 (citing Section 32000(b)(4)). But the "official duties" language applies largely to institutional sales, as well as "a sheriff's official." Section 32000(b)(4). Separately, without qualification, the law provides that "[t]his section does not prohibit the sale to, or purchase by, sworn members of these agencies of a handgun," *id.*, a circumstance that has led to allegations that some police officers combine their personal exemption with the private-party transfer exemption to illegally deal unrostered handguns to the public. *See* Indictment, *United States* v.

*McGowan*, U.S. Dist. Ct. E.D. Cal. No.: 2:12-CR-00207-TN, Dkt. 1, at ¶ 4 (May 31, 2012).

In any event, police officers, unlike other people, do get to take home handguns deemed "unsafe" in California. The District Court justified this disparate treatment by offering that officers should be able to "possess and use firearms more potent than those available to the rest of the populace in order to maintain public safety," ER 28 (quotation omitted), but the handgun roster law does not address the relative potency of firearms, and officers use their personal handguns in the same way that everyone else does—not to maintain public safety, but their own. Even under rational basis review, this Court struck down an exemption from California's Assault Weapons Control Act allowing retired police officers to purchase, for private non-law enforcement purposes, guns barred as too dangerous to others. *Silveira* v. *Lockyer*, 312 F.3d 1052, 1089-92 (9th Cir. 2002), *abrogated on other grounds*, *Heller*, 554 U.S. 570.

The exceptions for curios and relics is particularly egregious. Modern Glocks may be banned as "unsafe" for lacking microstamping and MDMs, but in 2058, when the first of these very used guns qualify

as curios and relics, they will become "not unsafe." Brett Thomas's High Standard revolver is not quite old enough to be exempt from the rostering law as a curio or relic, though in perhaps ten years, it would qualify. Ironically, Mr. Heller's particular gun might qualify today based on the fact of its involvement in an historic Supreme Court case. 27 C.F.R. § 478.11. But then, if Thomas prevails here, his gun, too, by that virtue, might also be transformed into an exempted curio or relic.

The District Court rejected the equal protection arguments related to the curios and relics exception, and the arbitrary manner of approving CLIs, by asserting that Plaintiffs "claim disparate treatment of objects, not persons." ER 27. But this is too hypertechnical an approach to equal protection law. As then-Justice Brown offered for California's Supreme Court, this argument "overlooks the fact that it is the persons who make and own guns who are penalized." *Kasler* v. *Lockyer*, 23 Cal. 4th 472, 479 (2000) (quotation omitted).

"Courts not uncommonly refer to issues of equal protection as involving discrimination among things when they mean discrimination among persons having interests in those things." *Id.* at 479-80. As an example, *Kasler* offered a U.S. Supreme Case concerning "the narrow

issue [of] whether the legislative classification between plastic and nonplastic nonreturnable milk containers is rationally related to achievement of the statutory purposes." *Id.* at 480 (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 (1981)). *Kasler*'s more practical equal protection approach is correct. Equal protection cases call upon courts to examine "the individual interests affected by the classification," *Dunn* v. *Blumstein*, 405 U.S. 330, 335 (1972), interests which might be identical when considering two similarly-situated individuals who own different, irrationally-classified firearms.

Then there are the exceptions for movie and television production, which are not merely irrational, but also underscore the fact that unrostered handguns are so common in American culture that audiences would not expect to see only those guns approved by Defendant in realistic depictions of American life. Here, the District Court offered there was no equal protection problem because the law does not "dictat[e] who may or may not be" starring on stage or screen. ER 27. But one should not have to work in Hollywood to obtain modern firearms, or have greater handgun access to *depict* rather than to enjoy their constitutionally protected use.

If unrostered handguns are dangerous, they are dangerous to *everyone*—including law enforcement employees, actors, newcomers to the state, individuals who already possess these "unsafe" handguns, those who would acquire them through private party and familial transfer, and indeed, those who lawfully possess such guns today.

## CONCLUSION

The judgment below should be reversed.

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants are unaware of any related cases.

Dated:   July 20, 2015                    Respectfully submitted,

/s/ Donald E. J. Kilmer, Jr.             /s/ Alan Gura
Donald E. J. Kilmer, Jr.                 Alan Gura
Law Offices of Donald Kilmer                Counsel of Record
1645 Willow Street, Suite 150            Gura & Possessky, PLLC
San Jose, CA 95125                       105 Oronoco Street, Suite 305
408.264-8489/408.264-8487                Alexandria, VA 22314
don@dklawoffice.com                      703.835.9085/703.997.7665
                                         alan@gurapossessky.com

CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-3(3) because this brief contains 11,492 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.


/s/ Alan Gura
Alan Gura
Attorney for Plaintiffs-Appellants
Dated: July 20, 2015

Statutory Addendum

# **Table of Contents**

## Statutes

Cal. Penal Code § 27545 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-1

Cal. Penal Code § 27585 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-2

Cal. Penal Code § 27875 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-5

Cal. Penal Code § 31610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-7

Cal. Penal Code § 31910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-8

Cal. Penal Code § 32000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-10

Cal. Penal Code § 32005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-11

Cal. Penal Code § 32010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-12

Cal. Penal Code § 32015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-13

Cal. Penal Code § 32020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-14

Cal. Penal Code § 32025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-15

Cal. Penal Code § 32030 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-16

Cal. Penal Code § 32100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-17

Cal. Penal Code § 32105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-18

Cal. Penal Code § 32110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-19

## <u>Regulations</u>

11 CCR § 4059 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-21

11 CCR § 4070 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-24

11 CCR § 4071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-26

11 CCR § 4072 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-27

11 CCR § 4073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-27

11 CCR § 4074 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-29

11 CCR § 4075 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-31

PENAL CODE
Part 6.  Control of Deadly Weapons
Title 4.  Firearms
Division 6.  Sale, Lease, or Transfer of Firearms
Chapter 4.  Crimes Relating to Sale, Lease, or Transfer of Firearms
Article 1.  Crimes Relating to Sale, Lease, or Transfer of Firearms

## Cal Pen Code § 27545 (2015)

§ 27545.  Transaction where neither party holds a dealer's license

Where neither party to the transaction holds a dealer's license issued pursuant to Sections 26700 to 26915, inclusive, the parties to the transaction shall complete the sale, loan, or transfer of that firearm through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

PENAL CODE
Part 6. Control of Deadly Weapons
Title 4. Firearms
Division 6. Sale, Lease, or Transfer of Firearms
Chapter 4. Crimes Relating to Sale, Lease, or Transfer of Firearms
Article 1. Crimes Relating to Sale, Lease, or Transfer of Firearms

## Cal Pen Code § 27585 (2015)

§ 27585. Importation of firearm by resident prohibited; Exceptions

(a) Commencing January 1, 2015, a resident of this state shall not import into this state, bring into this state, or transport into this state, any firearm that he or she purchased or otherwise obtained on or after January 1, 2015, from outside of this state unless he or she first has that firearm delivered to a dealer in this state for delivery to that resident pursuant to the procedures set forth in Section 27540 and Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2.

(b) Subdivision (a) does not apply to or affect any of the following:
    (1) A licensed collector who is subject to and complies with Section 27565.
    (2) A dealer, if the dealer is acting in the course and scope of his or her activities as a dealer.
    (3) A wholesaler, if the wholesaler is acting in the course and scope of his or her activities as a wholesaler.
    (4) A person licensed as an importer of firearms or ammunition or licensed as a manufacturer of firearms or ammunition, pursuant to Section 921 et seq. of Title 18 of the United States Code and the regulations issued pursuant thereto if the importer or manufacturer is acting in the course and scope of his or her activities as a licensed importer or manufacturer.
    (5) A personal firearm importer who is subject to and complies with

Section 27560.

(6) A person who complies with subdivision (b) of Section 27875.

(7) A person who complies with subdivision (b), (c), or (d) of Section 27920.

(8) A person who is on the centralized list of exempted federal firearms licensees pursuant to Section 28450 if that person is acting in the course and scope of his or her activities as a licensee.

(9) A firearm regulated pursuant to Chapter 1 (commencing with Section 18710) of Division 5 of Title 2 acquired by a person who holds a permit issued pursuant to Article 3 (commencing with Section 18900) of Chapter 1 of Division 5 of Title 2, if that person is acting within the course and scope of his or her activities as a licensee and in accordance with the terms and conditions of the permit.

(10) A firearm regulated pursuant to Chapter 2 (commencing with Section 30500) of Division 10 acquired by a person who holds a permit issued pursuant to Section 31005, if that person is acting within the course and scope of his or her activities as a licensee and in accordance with the terms and conditions of the permit.

(11) A firearm regulated pursuant to Chapter 6 (commencing with Section 32610) of Division 10 acquired by a person who holds a permit issued pursuant to Section 32650, if that person is acting within the course and scope of his or her activities as a licensee and in accordance with the terms and conditions of the permit.

(12) A firearm regulated pursuant to Article 2 (commencing with Section 33300) of Chapter 8 of Division 10 acquired by a person who holds a permit issued pursuant to Section 33300, if that person is acting within the course and scope of his or her activities as a licensee and in accordance with the terms and conditions of the permit.

(13) The importation of a firearm into the state, bringing a firearm into the state, or transportation of a firearm into the state, that is regulated by any of the following statutes, if the acquisition of that firearm occurred outside of California and is conducted in accordance with the applicable provisions of the following statutes:

(A) Chapter 1 (commencing with Section 18710) of Division 5 of Title 2, relating to destructive devices and explosives.

(B) Section 24410, relating to cane guns.

(C) Section 24510, relating to firearms that are not immediately recognizable as firearms.

(D) Sections 24610 and 24680, relating to undetectable firearms.

(E) Section 24710, relating to wallet guns.

(F) Chapter 2 (commencing with Section 30500) of Division 10, relating to assault weapons.

(G) Section 31500, relating to unconventional pistols.

(H) Sections 33215 to 33225, inclusive, relating to short-barreled rifles and short-barreled shotguns.

(I) Chapter 6 (commencing with Section 32610) of Division 10, relating to machineguns.

(J) Section 33600, relating to zip guns, and the exemptions in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, as they relate to zip guns.

(c) The provisions of this section are cumulative and do not restrict the application of any other law. However, an act or omission punishable in different ways by this section and different provisions of this code shall not be punished under more than one provision.

PENAL CODE
Part 6.  Control of Deadly Weapons
Title 4.  Firearms
Division 6.  Sale, Lease, or Transfer of Firearms
Chapter 4.  Crimes Relating to Sale, Lease, or Transfer of Firearms
Article 6.  Exceptions to the Requirement of Using a Dealer for a
Private Party Firearms Transaction

**Cal Pen Code § 27875 (2015)**

§ 27875.  Additional exception for transfer between immediate family
members by gift, bequest, intestate succession or similar

(a) Section 27545 does not apply to the transfer of a firearm by gift,
bequest, intestate succession, or other means from one individual to
another, if all of the following requirements are met:
 (1) The transfer is infrequent, as defined in Section 16730.
 (2) The transfer is between members of the same immediate family.
 (3) Within 30 days of taking possession of the firearm, the person to
whom it is transferred shall submit a report to the Department of
Justice, in a manner prescribed by the department, that includes
information concerning the individual taking possession of the firearm,
how title was obtained and from whom, and a description of the firearm
in question. The reports that individuals complete pursuant to this
subdivision shall be made available to them in a format prescribed by
the department.
 (4) Until January 1, 2015, the person taking title to the firearm
shall first obtain a valid handgun safety certificate if the firearm is a
handgun, and commencing January 1, 2015, a valid firearm safety
certificate for any firearm, except that in the case of a handgun, a valid
unexpired handgun safety certificate may be used.
 (5) The person receiving the firearm is 18 years of age or older.

(b) Subdivision (a) of Section 27585 does not apply to a person who
imports a firearm into this state, brings a firearm into this state, or

transports a firearm into this state if all of the following requirements are met:

(1) The person acquires ownership of the firearm from an immediate family member by bequest or intestate succession.

(2) The person has obtained a valid firearm safety certificate, except that in the case of a handgun, a valid unexpired handgun safety certificate may be used.

(3) The receipt of any firearm by the individual by bequest or intestate succession is infrequent, as defined in Section 16730.

(4) The person acquiring ownership of the firearm by bequest or intestate succession is 18 years of age or older.

(5) Within 30 days of that person taking possession of the firearm and importing, bringing, or transporting it into this state, the person shall submit a report to the Department of Justice, in a manner prescribed by the department, that includes information concerning the individual taking possession of the firearm, how title was obtained and from whom, and a description of the firearm in question. The reports that individuals complete pursuant to this subdivision shall be made available to them in a format prescribed by the department.

PENAL CODE
Part 6.  Control of Deadly Weapons
Title 4.  Firearms
Division 10.  Special Rules Relating to Particular Types of Firearms or
Firearm Equipment
Chapter 4.  Handguns and Firearm Safety
Article 2.  Handgun Safety Certificate

## Cal Pen Code § 31610 (2015)

§ 31610.  Legislative intent

(a) It is the intent of the Legislature in enacting this article to require that persons who obtain firearms have a basic familiarity with those firearms, including, but not limited to, the safe handling and storage of those firearms. It is not the intent of the Legislature to require a firearm safety certificate for the mere possession of a firearm.

(b) This section shall become operative on January 1, 2015.

CALIFORNIA PENAL CODE
Part 6.  Control of Deadly Weapons
Title 4.  Firearms
Division 10.  Special Rules Relating to Particular Types of Firearms or
Firearm Equipment
Chapter 4.  Handguns and Firearm Safety
Article 4.  "Unsafe Handgun" and Related Definitions

## Cal Pen Code § 31910 (2015)

§ 31910.  "Unsafe handgun"

As used in this part, "unsafe handgun" means any pistol, revolver, or other firearm capable of being concealed upon the person, for which any of the following is true:

 (a) For a revolver:
    (1) It does not have a safety device that, either automatically in the case of a double-action firing mechanism, or by manual operation in the case of a single-action firing mechanism, causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge.
    (2) It does not meet the firing requirement for handguns.
    (3) It does not meet the drop safety requirement for handguns.

 (b) For a pistol:
    (1) It does not have a positive manually operated safety device, as determined by standards relating to imported guns promulgated by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives.
    (2) It does not meet the firing requirement for handguns.
    (3) It does not meet the drop safety requirement for handguns.
    (4) Commencing January 1, 2006, for a center fire semiautomatic pistol that is not already listed on the roster pursuant to Section 32015, it does not have either a chamber load indicator, or a magazine disconnect mechanism.
    (5) Commencing January 1, 2007, for all center fire semiautomatic

pistols that are not already listed on the roster pursuant to Section 32015, it does not have both a chamber load indicator and if it has a detachable magazine, a magazine disconnect mechanism.

(6) Commencing January 1, 2006, for all rimfire semiautomatic pistols that are not already listed on the roster pursuant to Section 32015, it does not have a magazine disconnect mechanism, if it has a detachable magazine.

(7)

(A) Commencing January 1, 2010, for all semiautomatic pistols that are not already listed on the roster pursuant to Section 32015, it is not designed and equipped with a microscopic array of characters that identify the make, model, and serial number of the pistol, etched or otherwise imprinted in two or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired, provided that the Department of Justice certifies that the technology used to create the imprint is available to more than one manufacturer unencumbered by any patent restrictions.

(B) The Attorney General may also approve a method of equal or greater reliability and effectiveness in identifying the specific serial number of a firearm from spent cartridge casings discharged by that firearm than that which is set forth in this paragraph, to be thereafter required as otherwise set forth by this paragraph where the Attorney General certifies that this new method is also unencumbered by any patent restrictions. Approval by the Attorney General shall include notice of that fact via regulations adopted by the Attorney General for purposes of implementing that method for purposes of this paragraph.

(C) The microscopic array of characters required by this section shall not be considered the name of the maker, model, manufacturer's number, or other mark of identification, including any distinguishing number or mark assigned by the Department of Justice, within the meaning of Sections 23900 and 23920.

PENAL CODE
Part 6.  Control of Deadly Weapons
Title 4.  Firearms
Division 10.  Special Rules Relating to Particular Types of Firearms or
Firearm Equipment
Chapter 4.  Handguns and Firearm Safety
Article 5.  Rules Governing Unsafe Handguns

## Cal Pen Code § 32000 (2015)

§ 32000.  Punishment for manufacture, import, sale, gift, or loan of unsafe handgun; Exceptions

(a) Commencing January 1, 2001, any person in this state who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends any unsafe handgun shall be punished by imprisonment in a county jail not exceeding one year.

(b) This section shall not apply to any of the following:
    (1) The manufacture in this state, or importation into this state, of a prototype handgun when the manufacture or importation is for the sole purpose of allowing an independent laboratory certified by the Department of Justice pursuant to Section 32010 to conduct an independent test to determine whether that handgun is prohibited by Sections 31900 to 32110, inclusive, and, if not, allowing the department to add the firearm to the roster of handguns that may be sold in this state pursuant to Section 32015.
    (2) The importation or lending of a handgun by employees or authorized agents of entities determining whether the weapon is prohibited by this section.
    (3) Firearms listed as curios or relics, as defined in Section 478.11 of Title 27 of the Code of Federal Regulations.
    (4) The sale or purchase of a handgun, if the handgun is sold to, or purchased by, the Department of Justice, a police department, a sheriff's official, a marshal's office, the Department of Corrections and Rehabilitation, the California Highway Patrol, any district attorney's

office, any federal law enforcement agency, or the military or naval forces of this state or of the United States for use in the discharge of their official duties. This section does not prohibit the sale to, or purchase by, sworn members of these agencies of a handgun.

(c) Violations of subdivision (a) are cumulative with respect to each handgun and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by this section and other provisions of law shall not be punished under more than one provision, but the penalty to be imposed shall be determined as set forth in Section 654.

## Cal Pen Code § 32005 (2015)

§ 32005.  Certification by manufacturers and sellers that firearms are not unsafe

(a) Every person who is licensed as a manufacturer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and who manufactures firearms in this state shall certify under penalty of perjury and any other remedy provided by law that every model, kind, class, style, or type of pistol, revolver, or other firearm capable of being concealed upon the person that the person manufactures is not an unsafe handgun as prohibited by Sections 31900 to 32110, inclusive.

(b) Every person who imports into the state for sale, keeps for sale, or offers or exposes for sale any firearm shall certify under penalty of perjury and any other remedy provided by law that every model, kind, class, style, or type of pistol, revolver, or other firearm capable of being concealed upon the person that the person imports, keeps, or exposes for sale is not an unsafe handgun as prohibited by Sections 31900 to 32110, inclusive.

# Cal Pen Code § 32010 (2015)

§ 32010.  Testing requirement; Certification of laboratories; Test report; Requirements for center-fire semiautomatic pistols and rimfire semiautomatic pistols

(a) Any pistol, revolver, or other firearm capable of being concealed upon the person manufactured in this state, imported into the state for sale, kept for sale, or offered or exposed for sale, shall be tested within a reasonable period of time by an independent laboratory certified pursuant to subdivision (b) to determine whether that pistol, revolver, or other firearm capable of being concealed upon the person meets or exceeds the standards defined in Section 31910.

(b) On or before October 1, 2000, the Department of Justice shall certify laboratories to verify compliance with the standards defined in Section 31910. The department may charge any laboratory that is seeking certification to test any pistol, revolver, or other firearm capable of being concealed upon the person pursuant to Sections 31900 to 32110, inclusive, a fee not exceeding the costs of certification.

(c) The certified testing laboratory shall, at the manufacturer's or importer's expense, test the firearm and submit a copy of the final test report directly to the Department of Justice along with a prototype of the weapon to be retained by the department. The department shall notify the manufacturer or importer of its receipt of the final test report and the department's determination as to whether the firearm tested may be sold in this state.

(d)
   (1) Commencing January 1, 2006, no center-fire semiautomatic pistol may be submitted for testing pursuant to Sections 31900 to 32110, inclusive, if it does not have either a chamber load indicator, or a magazine disconnect mechanism if it has a detachable magazine.
   (2) Commencing January 1, 2007, no center-fire semiautomatic pistol may be submitted for testing pursuant to Sections 31900 to 32110, inclusive, if it does not have both a chamber load indicator and a magazine disconnect mechanism.

(3) Commencing January 1, 2006, no rimfire semiautomatic pistol may be submitted for testing pursuant to Sections 31900 to 32110, inclusive, if it has a detachable magazine, and does not have a magazine disconnect mechanism.

## Cal Pen Code § 32015 (2015)

§ 32015.  Roster of firearms determined not to be unsafe; Fee for maintenance of roster

(a) On and after January 1, 2001, the Department of Justice shall compile, publish, and thereafter maintain a roster listing all of the handguns that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold in this state pursuant to this part. The roster shall list, for each firearm, the manufacturer, model number, and model name.

(b)
    (1) The department may charge every person in this state who is licensed as a manufacturer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code, and any person in this state who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, or offers or exposes for sale any handgun in this state, an annual fee not exceeding the costs of preparing, publishing, and maintaining the roster pursuant to subdivision (a) and the costs of research and development, report analysis, firearms storage, and other program infrastructure costs necessary to implement Sections 31900 to 32110, inclusive. Commencing January 1, 2015, the annual fee shall be paid on January 1, or the next business day, of every year.
    (2) Any handgun that is manufactured by a manufacturer who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, or offers or exposes for sale any handgun in this state, and who fails to pay any fee required pursuant to paragraph (1), may be excluded from the roster.
    (3) If a purchaser has initiated a transfer of a handgun that is listed on the roster as not unsafe, and prior to the completion of the transfer,

the handgun is removed from the roster of not unsafe handguns because of failure to pay the fee required to keep that handgun listed on the roster, the handgun shall be deliverable to the purchaser if the purchaser is not otherwise prohibited from purchasing or possessing the handgun. However, if a purchaser has initiated a transfer of a handgun that is listed on the roster as not unsafe, and prior to the completion of the transfer, the handgun is removed from the roster pursuant to subdivision (d) of Section 32020, the handgun shall not be deliverable to the purchaser.

## Cal Pen Code § 32020 (2015)

§ 32020.  Retesting of handguns on roster

(a) The Attorney General may annually retest up to 5 percent of the handgun models that are listed on the roster described in subdivision (a) of Section 32015.

(b) The retesting of a handgun model pursuant to subdivision (a) shall conform to the following:
    (1) The Attorney General shall obtain from retail or wholesale sources, or both, three samples of the handgun model to be retested.
    (2) The Attorney General shall select the certified laboratory to be used for the retesting.
    (3) The ammunition used for the retesting shall be of a type recommended by the manufacturer in the user manual for the handgun. If the user manual for the handgun model makes no ammunition recommendation, the Attorney General shall select the ammunition to be used for the retesting. The ammunition shall be of the proper caliber for the handgun, commercially available, and in new condition.

(c) The retest shall be conducted in the same manner as the testing prescribed in Sections 31900 and 31905.

(d) If the handgun model fails retesting, the Attorney General shall remove the handgun model from the roster maintained pursuant to subdivision (a) of Section 32015.

# Cal Pen Code § 32025 (2015)

§ 32025.  Removal of handgun from roster

A handgun model removed from the roster pursuant to subdivision (d) of Section 32020 may be reinstated on the roster if all of the following are met:

(a) The manufacturer petitions the Attorney General for reinstatement of the handgun model.

(b) The manufacturer pays the Department of Justice for all of the costs related to the reinstatement testing of the handgun model, including the purchase price of the handguns, prior to reinstatement testing.

(c) The reinstatement testing of the handguns shall be in accordance with subdivisions (b) and (c) of Section 32020.

(d) The three handgun samples shall be tested only once for reinstatement. If the sample fails it may not be retested.

(e) If the handgun model successfully passes testing for reinstatement, and if the manufacturer of the handgun is otherwise in compliance with Sections 31900 to 32110, inclusive, the Attorney General shall reinstate the handgun model on the roster maintained pursuant to subdivision (a) of Section 32015.

(f) The manufacturer shall provide the Attorney General with the complete testing history for the handgun model.

(g) Notwithstanding subdivision (a) of Section 32020, the Attorney General may, at any time, further retest any handgun model that has been reinstated to the roster.

# Cal Pen Code § 32030 (2015)

§ 32030.  Listing of firearms differing only cosmetically from firearms on roster

(a) A firearm shall be deemed to satisfy the requirements of subdivision (a) of Section 32015 if another firearm made by the same manufacturer is already listed and the unlisted firearm differs from the listed firearm only in one or more of the following features:

(1) Finish, including, but not limited to, bluing, chrome-plating, oiling, or engraving.

(2) The material from which the grips are made.

(3) The shape or texture of the grips, so long as the difference in grip shape or texture does not in any way alter the dimensions, material, linkage, or functioning of the magazine well, the barrel, the chamber, or any of the components of the firing mechanism of the firearm.

(4) Any other purely cosmetic feature that does not in any way alter the dimensions, material, linkage, or functioning of the magazine well, the barrel, the chamber, or any of the components of the firing mechanism of the firearm.

(b) Any manufacturer seeking to have a firearm listed under this section shall provide to the Department of Justice all of the following:

(1) The model designation of the listed firearm.

(2) The model designation of each firearm that the manufacturer seeks to have listed under this section.

(3) A statement, under oath, that each unlisted firearm for which listing is sought differs from the listed firearm only in one or more of the ways identified in subdivision (a) and is in all other respects identical to the listed firearm.

(c) The department may, in its discretion and at any time, require a manufacturer to provide to the department any model for which listing is sought under this section, to determine whether the model complies with the requirements of this section.

PENAL CODE
Part 6.  Control of Deadly Weapons
Title 4.  Firearms
Division 10.  Special Rules Relating to Particular Types of Firearms or
Firearm Equipment
Chapter 4.  Handguns and Firearm Safety
Article 6.  Exceptions to Rules Governing Unsafe Handguns

## Cal Pen Code § 32100 (2015)

§ 32100.  Exceptions for certain single-action revolvers

(a) Article 4 (commencing with Section 31900) and Article 5 (commencing with Section 32000) shall not apply to a single-action revolver that has at least a five-cartridge capacity with a barrel length of not less than three inches, and meets any of the following specifications:

(1) Was originally manufactured prior to 1900 and is a curio or relic, as defined in Section 478.11 of Title 27 of the Code of Federal Regulations.

(2) Has an overall length measured parallel to the barrel of at least seven and one-half inches when the handle, frame or receiver, and barrel are assembled.

(3) Has an overall length measured parallel to the barrel of at least seven and one-half inches when the handle, frame or receiver, and barrel are assembled and that is currently approved for importation into the United States pursuant to the provisions of paragraph (3) of subsection (d) of Section 925 of Title 18 of the United States Code.

(b) Article 4 (commencing with Section 31900) and Article 5 (commencing with Section 32000) shall not apply to a single-shot pistol with a break top or bolt action and a barrel length of not less than six inches and that has an overall length of at least 10 1/2 inches when the handle, frame or receiver, and barrel are assembled. However, Article 4 (commencing with Section 31900) and Article 5 (commencing with Section 32000) shall apply to a semiautomatic pistol that has been temporarily or permanently altered so that it will not fire in a semiautomatic mode.

# Cal Pen Code § 32105 (2015)

§ 32105. Legislative finding; Pistols designed for Olympic target shooting

(a) The Legislature finds a significant public purpose in exempting pistols that are designed expressly for use in Olympic target shooting events. Therefore, those pistols that are sanctioned by the International Olympic Committee and by USA Shooting, the national governing body for international shooting competition in the United States, and that were used for Olympic target shooting purposes as of January 1, 2001, and that fall within the definition of "unsafe handgun" pursuant to paragraph (3) of subdivision (b) of Section 31910 shall be exempt, as provided in subdivisions (b) and (c).

(b) Article 4 (commencing with Section 31900) and Article 5 (commencing with Section 32000) shall not apply to any of the following pistols, because they are consistent with the significant public purpose expressed in subdivision (a): Click here to view image.[1]

(c) The department shall create a program that is consistent with the purpose stated in subdivision (a) to exempt new models of competitive firearms from Article 4 (commencing with Section 31900) and Article 5 (commencing with Section 32000). The exempt competitive firearms may be based on recommendations by USA Shooting consistent with the regulations contained in the USA Shooting Official Rules or may be based on the recommendation or rules of any other organization that the department deems relevant.

---

[1] The image is a list of the particular exempted firearms by make and model.

# Cal Pen Code § 32110 (2015)

§ 32110.  Exception for certain sales, loans and transfers

Article 4 (commencing with Section 31900) and Article 5 (commencing with Section 32000) shall not apply to any of the following:

(a) The sale, loan, or transfer of any firearm pursuant to Chapter 5 (commencing with Section 28050) of Division 6 in order to comply with Section 27545.

(b) The sale, loan, or transfer of any firearm that is exempt from the provisions of Section 27545 pursuant to any applicable exemption contained in Article 2 (commencing with Section 27600) or Article 6 (commencing with Section 27850) of Chapter 4 of Division 6, if the sale, loan, or transfer complies with the requirements of that applicable exemption to Section 27545.

(c) The sale, loan, or transfer of any firearm as described in paragraph (3) of subdivision (b) of Section 32000.

(d) The delivery of a pistol, revolver, or other firearm capable of being concealed upon the person to a person licensed pursuant to Sections 26700 to 26915, inclusive, for the purposes of the service or repair of that firearm.

(e) The return of a pistol, revolver, or other firearm capable of being concealed upon the person by a person licensed pursuant to Sections 26700 to 26915, inclusive, to its owner where that firearm was initially delivered in the circumstances set forth in subdivision (a), (d), (f), or (I).

(f) The delivery of a pistol, revolver, or other firearm capable of being concealed upon the person to a person licensed pursuant to Sections 26700 to 26915, inclusive, for the purpose of a consignment sale or as collateral for a pawnbroker loan.

(g) The sale, loan, or transfer of any pistol, revolver, or other firearm capable of being concealed upon the person listed as a curio or relic, as

defined in Section 478.11 of Title 27 of the Code of Federal Regulations.

(h) The sale, loan, or transfer of any semiautomatic pistol that is to be used solely as a prop during the course of a motion picture, television, or video production by an authorized participant therein in the course of making that production or event or by an authorized employee or agent of the entity producing that production or event.

(i) The delivery of a pistol, revolver, or other firearm capable of being concealed upon the person to a person licensed pursuant to Sections 26700 to 26915, inclusive, where the firearm is being loaned by the licensee to a consultant-evaluator.

(j) The delivery of a pistol, revolver, or other firearm capable of being concealed upon the person by a person licensed pursuant to Sections 26700 to 26915, inclusive, where the firearm is being loaned by the licensee to a consultant-evaluator.

(k) The return of a pistol, revolver, or other firearm capable of being concealed upon the person to a person licensed pursuant to Sections 26700 to 26915, inclusive, where it was initially delivered pursuant to subdivision (j).

TITLE 11.  LAW
DIVISION 5.  FIREARMS REGULATIONS
CHAPTER 5.  LABORATORY CERTIFICATION AND HANDGUN
TESTING
ARTICLE 4.  OPERATIONAL REQUIREMENTS: ABSENCE OF
CONFLICT OF INTEREST; SECURITY AND SAFETY
REQUIREMENTS; LICENSING/MINIMUM STANDARDS
COMPLIANCE; WHICH HANDGUNS MUST BE TESTED, WHO MAY
SUBMIT HANDGUNS, SUBMISSION REQUIREMENTS; TESTING
PROCEDURES; TEST REPORTING; REQUIRED RECORDS,
RETENTION PERIODS, REPORTING CHANGES; OFF-SITE
LOCATIONS; INSPECTIONS

**11 CCR 4059 (2015)**

§ 4059.  Which Handguns Must Be Tested, Who May Submit
Handguns, Submission Requirements

(a) Pursuant to Penal Code section 32010, subdivision (a), any pistol,
revolver, or other firearm capable of being concealed upon the person
manufactured in this state, imported into the state for sale, kept for
sale, or offered or exposed for sale, shall be tested by a DOJ-Certified
Laboratory. The handguns submitted for testing shall not be modified
in any way from those that would be sold if certification is granted. If it
is determined by the DOJ that the handguns submitted for testing are
modified in any way from those that are being sold after certification
has been granted, that model will be immediately removed from the
Roster of Certified Handguns.

(b) Pursuant to Penal Code section 32030, a handgun model shall be
deemed not to be unsafe if another handgun model has already been
determined not to be unsafe and the untested handgun differs from the
tested handgun only as specified in subdivision (a) of that section. Such
handguns will be reviewed on a case-by-case basis by the DOJ to
determine whether or not a new test will be required.

(c) Other than the DOJ, only the manufacturer/importer of a handgun
model is authorized to submit that handgun model to a DOJ-Certified

Laboratory for testing.

(d) Three handguns of each model to be tested shall be submitted to the DOJ-Certified Laboratory. Manufacturers/Importers may supply any information that they believe may be needed by the laboratory for proper and safe operation of the handgun. The following information shall be supplied in the English language with each handgun model submitted for testing:

(1) Instructions for field disassembly/assembly and diagram(s) identifying all parts.

(2) Cleaning instructions. These may be different from and in addition to the instructions that are provided when the handgun model is sold.

(3) A description of each safety feature designed into the handgun, how each safety feature is intended to function, and for those under shooter control, how the shooter should operate (activate/deactivate) each safety feature.

(4) A statement regarding the ammunition the manufacturer/importer markets and/or recommends that the handgun being tested is designed to handle. This may also include information on ammunition known to be beyond the design limits of the handgun and/or known not to function in the handgun.

(5) On or after January 1, 2010, upon DOJ's certification that the microstamping technology described in Penal Code section 31910, subdivision (b)(7) is available to more than one manufacturer unencumbered by any patent restrictions, a statement by the manufacturer indicating that for each handgun of the make and model of semiautomatic pistol submitted for testing: (i) the pistol is designed and equipped with a FIN etched or otherwise imprinted in two or more places on the interior surface or internal working parts of the pistol that are transferred by imprinting on each cartridge case expended from the pistol when the pistol is fired; and (ii) the pistol's complete FIN can be identified from the one or more etchings on each cartridge casing.

(6) On or after January 1, 2010, upon DOJ's certification that the microstamping technology described in Penal Code section 31910, subdivision (b)(7) is available to more than one manufacturer unencumbered by any patent restrictions, the FIN for each handgun of

the make and model of semiautomatic pistol to be tested. The FIN shall also be displayed or recorded on the manufacturer's packaging of any semiautomatic pistol which is manufactured, caused to be manufactured, imported into the state for sale, kept for sale, offered or exposed for sale, given, or lent in the state and subject to the microstamping requirement set forth in Penal Code section 31910, subdivision (b)(7). The FIN must be clearly marked as the FIN wherever the serial number of the pistol is displayed or recorded on the packaging of such a pistol.

(e) The manufacturer/importer shall be allowed, but not required, to provide the standard ammunition to be used during the firing test provided that, if applicable, it is the more powerful cartridge marketed/recommended by the manufacturer/importer. The manufacturer/importer shall be allowed to inspect any laboratory supplied standard ammunition before testing begins. The manufacturer/importer or DOJ-Certified Laboratory shall indicate the ammunition lot number on the Compliance Test Report. Notwithstanding the above, the DOJ may allow a handgun to be tested with newly designed non-standard ammunition that is not yet "available for purchase at consumer-level retail outlets." Any such ammunition shall be commercially produced and factory loaded.

TITLE 11.  LAW
DIVISION 5.  FIREARMS REGULATIONS
CHAPTER 5.  LABORATORY CERTIFICATION AND HANDGUN
TESTING
ARTICLE 9.  ROSTER OF CERTIFIED HANDGUNS; ROSTER OF
CERTIFIED HANDGUN LISTING RENEWAL PROCEDURES

## 11 CCR 4070 (2015)

§ 4070.  Roster of Certified Handguns

(a) Within ten (10) days of the receipt of the Compliance Test Report,
Form BOF 021 (Rev. 01/2012), and one prototype handgun, from the
DOJ-Certified Laboratory; and the receipt of the initial annual listing
fee from the manufacturer/importer, the DOJ will determine whether
the handgun is not unsafe and may be sold in California. After the
determination that the model may be listed, the DOJ will add the
handgun model to the Roster of Certified Handguns. The listing will be
valid for one year from the date the model was added to the Roster, and
shall be renewed as set forth in section 4071 of these regulations.

(b) Within ten (10) days of the receipt of the initial annual listing fee
and a request from a manufacturer/importer to have a handgun model
added to the Roster pursuant to Penal Code section 32030, the DOJ
will determine whether the handgun model may be listed without
testing. After the determination that the model may be listed, the DOJ
will add the handgun model to the Roster. The listing will be valid for
one year from the date the model was added to the Roster, and shall be
renewed as set forth in section 4071 of these regulations.

(c) A handgun model may be removed from the Roster for any of the
following reasons:
    (1) If the annual maintenance fee is not paid as set forth in Penal
Code section 32015, subdivision (b).
    (2) If it is determined that the handgun models submitted for testing
were modified in any way from those that were sold after certification
was granted.
    (3) If it is determined that the handgun is in fact unsafe based upon

further testing.

(d) A handgun model may remain on the Roster after a manufacturer/importer discontinues manufacturing/importing the model or goes out of business provided that all of the following requirements are met:

(1) Evidence is provided that the manufacturer/importer has either discontinued manufacturing/importing the handgun model or gone out of business.

(2) The manufacturer/importer is no longer offering the handgun model to licensed firearms dealers.

(3) Either a fully licensed wholesaler, distributor, or dealer submits a written request to continue the listing and agrees to pay the annual maintenance fee as set forth in section 4072 of these regulations. The request shall be submitted to the DOJ stating that all of the above conditions have been met.

(e) A manufacturer/importer or other responsible party may submit a written request to list a handgun model that was voluntarily discontinued or was removed for lack of payment of the annual maintenance fee. The written request must state that no modifications have been made to the model and be submitted to the DOJ together with the annual listing fee as set forth in section 4072 of these regulations. If approved, the listing will be valid for one year from the date the model was added to the Roster, and shall be renewed as set forth in section 4071 of these regulations.

§ 4071.  Roster of Certified Handgun Listing Renewal Procedures

  A handgun model listing on the Roster of Certified Handguns must be renewed prior to expiration in order to remain valid. The following is the procedure for renewal of a listing:

(a) The DOJ will mail a renewal notice to each manufacturer/importer or other responsible person 60 days prior to the expiration of the handgun model listing.

(b) The manufacturer/importer or other responsible person wishing to renew the listing shall submit to the DOJ a copy of the renewal notice with the annual maintenance fee set forth in section 4072 of these regulations.

(c) Once these requirements are met and the request has been processed, the DOJ will send a notification that the listing has been renewed.

(d) If the; manufacturer/importer or other responsible person fails to comply with these renewal requirements, the handgun model listing shall expire by operation of law at midnight on the date of expiration of the listing and the model will be removed from the Roster.

TITLE 11.  LAW
DIVISION 5.  FIREARMS REGULATIONS
CHAPTER 5.  LABORATORY CERTIFICATION AND HANDGUN
TESTING
ARTICLE 10.  FEES FOR THE ROSTER OF CERTIFIED HANDGUNS

**11 CCR 4072 (2015)**

§ 4072.  Fees for the Roster of Certified Handguns

(a) Pursuant to Penal Code section 32015, subdivision (b) the DOJ shall recover the full costs of creating and maintaining the Roster of Certified Handguns by collecting fees from manufacturers/importers of or other parties responsible for handgun models that are listed on the Roster of Certified Handguns.

(b) Standard Fees:
    (1) Initial annual listing fee:      $ 200 for each model
    (2) Annual maintenance fee for listing:    $ 200 for each model


(c) Annual maintenance fees are non-refundable. There is no refund or rebate for discontinuation prior to completion of a full year's listing on the Roster.


**11 CCR 4073 (2015)**

§ 4073.  Annual Retest of up to 5 Percent of Certified Handgun Models

(a) Handguns may be selected for retesting randomly, or in instances where the DOJ has reason to believe, or the DOJ has received a substantiated written expressed concern, that a handgun may not be compliant with the law, the DOJ may independently choose a model for retesting. The DOJ will randomly select a laboratory to conduct retesting. The selected laboratory will be in good standing and will not have conducted the original test that resulted in the selected handgun's approval.

(b) All three handgun samples selected for retesting shall be identical to the model originally submitted to the DOJ for approval, including, but not limited to: caliber, finish, sights, magazine, and grips. The DOJ will pay all costs associated with the retest under section 4073 of these regulations.

(c) If a handgun model fails retesting, the DOJ shall remove the handgun model from the Roster of Certified Handguns within 48 hours of receipt and review of the Retest Compliance Test Report (on a form prescribed by the DOJ).

  (1) If a handgun model selected for retesting fails, and that model was originally tested under Penal Code sections 31905 and 31900, all other handguns that were approved as "similars" under Penal Code section 32030 based on the results of that original test, will simultaneously be removed from the Roster.

  (2) If a handgun model selected for retesting fails, and that model was originally approved as a "similar" under Penal Code section 32030, the handgun originally submitted for testing under Penal Code sections 31905 and 31900, as well as all other handguns that were approved as "similars" based on the original test, will simultaneously be removed from the Roster.

(d) Upon receipt and review of a Retest Compliance Test Report showing a handgun failing the testing procedure, a Notice of Removal will be sent by DOJ within 48 hours to the manufacturer or importer who originally submitted the handgun for testing or listing.

(e) Handguns removed from the Roster as a result of failed retesting will not be credited or refunded any fees, including, but not limited to, initial annual listing fees and annual maintenance fees.

§ 4074. Reinstatement of Handguns Removed from the Roster of Certified Handguns

(a) The DOJ will only recognize reinstatement testing requests made by a responsible party. The requestor will be responsible for the reinstatement testing costs and the annual maintenance fee as set forth in section 4072 of these regulations. Reinstatement testing costs must be paid prior to testing.

(b) Reinstatement testing will be conducted in accordance with section 4073 of these regulations. Reinstatement testing shall be conducted by the same laboratory that performed the original retest, using the same ammunition brand and cartridge, and test personnel, unless otherwise authorized by the DOJ.

(c) Upon the successful reinstatement of a handgun the DOJ may, on a case-by-case basis, reinstate "similar" handguns without retesting in accordance with Penal Code section 32030.

(d) If a handgun model has passed the required reinstatement testing, the DOJ-Certified Laboratory shall submit to the DOJ a completed Reinstatement Test Compliance Report (on a form prescribed by the DOJ) and one of the tested handguns within ten (10) working days of the completion of the testing. The Reinstatement Compliance Report shall require all of the information identified in section 4062, subdivision (a) of these regulations, and be signed by the person authorized to sign on behalf of the DOJ-Certified Laboratory. Failure to submit the required Reinstatement Compliance Test Report to the DOJ within the time frame above shall not invalidate the results. However, the DOJ-Certified Laboratory may be subject to inspection by the DOJ to determine whether grounds exist to revoke the DOJ-Certification.

(e) If the handgun model fails reinstatement testing, the DOJ-Certified Laboratory shall provide to the DOJ a Reinstatement Test Compliance Report (on a form prescribed by the DOJ) within ten (10) working days of the completion of the testing. Failure to submit the required

Reinstatement Compliance Test Report to the DOJ within the time frame above shall not invalidate the results. However, the DOJ-Certified Laboratory may be subject to inspection by the DOJ to determine whether grounds exist to revoke the DOJ-Certification.

(f) Reinstatement testing fees are not refundable regardless of test results.

(g) Handguns reinstated to the Roster upon successful completion of the reinstatement process will be subject to renewal at the annual expiration date established prior to removal from the Roster.

# TITLE 11.  LAW
## DIVISION 5.  FIREARMS REGULATIONS
### CHAPTER 5.  LABORATORY CERTIFICATION AND HANDGUN TESTING
### ARTICLE 11.  APPROVAL BY THE ATTORNEY GENERAL OF ALTERNATIVE METHOD OF MICROSTAMPING TECHNOLOGY

## 11 CCR 4075 (2015)

§ 4075.  Application for Approval of Alternative Method of Microstamping Technology

(a) On or after January 1, 2010, upon DOJ's certification of a microstamping technology pursuant to Penal Code section 31910, subdivision (b)(7) any person or corporation may apply to the Attorney General for approval of an alternative method of microstamping technology.

(b) The application for such approval must be in writing, and must include the following information:

  (1) A description of the alternative method of microstamping technology, including a statement explaining how the alternative microstamping method identifies the specific serial number of a pistol from spent cartridge casings discharged by that pistol.

  (2) Verification that the alternative method of microstamping technology is unencumbered by any patent restrictions. For purposes of this paragraph, "verification" includes, but is not limited to, the following information: A search, initiated, and paid for by the applicant and conducted by a licensed patent attorney, of the United States Patent Office records within the past 30 days indicating that the alternative method of microstamping technology is unencumbered by any patent restrictions.

  (3) A report from a DOJ-Certified Laboratory indicating that the alternative method of microstamping technology has been tested by the DOJ-Certified Laboratory as follows:

    (A) The DOJ-Certified Laboratory conducted a firing test as described in Penal Code section 31905 and complied with section 4060, subdivisions (e) and (g) of these regulations for each of the pistols.

(B) The DOJ-Certified Laboratory examined the first two and last two expended cartridge casings from each pistol (collected pursuant to section 4060, subdivisions (e) and (g) of these regulations) and, using a stereo zoom microscope described in section 4052 of these regulations, was able to identify the specific serial number of the firing pistol on each expended cartridge.

(C) The DOJ-Certified Laboratory took digital photographs sufficient to adequately document the markings made on the cartridge cases by the microstamp and included such photographs in the application for certification of an alternative microstamping method.

(c) Upon receipt of a complete application, the Attorney General shall determine both of the following in order to approve the alternative method of microstamping:

(1) That the alternative method of microstamping technology is a method of equal or greater reliability and effectiveness than the method of microstamping described in Section 4060, subdivision (h) of these regulations based upon findings that (1) the method satisfies the requirements of paragraphs (1) and (2) of subdivision (b) of this section; (2) the method utilizes a unique identifier that can be used to ascertain the serial number of the firing pistol; and (3) the method permits the firing weapon to be identified after examination of the spent cartridge casings through AFS.

(2) Certification that the alternative method of microstamping technology is unencumbered by any patent restrictions.

(d) The Attorney General shall notify the applicant in writing of the intent to approve, or the denial of any application for approval of alternative method of microstamping, within 90 days of receiving a complete application. However, notification of the intent to approve an alternative method of microstamping shall not constitute approval by the Attorney General of that alternative method of microstamping technology.

(e) If the approval or denial determinations are delayed by circumstances beyond the control of the Attorney General, the Attorney General shall notify the applicant in writing about when the approval or denial determinations are expected to be made.

(f) Certification and approval of an alternative method of microstamping technology by the Attorney General shall only be made by notice via regulations adopted by the Attorney General for purposes of implementing the alternative method of microstamping technology.

# CERTIFICATE OF SERVICE

On this, the 20th day of July, 2015, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on July 20, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 20th day of July, 2015.

/s/ Alan Gura
Alan Gura