15-15449

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**IVAN PEÑA, ROY VARGAS, DOÑA CROSTON, BRETT THOMAS, SECOND AMENDMENT FOUNDATION, INC. and THE CALGUNS FOUNDATION, INC.,**

Plaintiffs and Appellants,

**v.**

**STEPHEN LINDLEY, CHIEF OF THE CALIFORNIA DEPARTMENT OF JUSTICE BUREAU OF FIREARMS,**

Defendant and Appellee.

---

On Appeal from the United States District Court
for the Eastern District of California

No. 2:09-cv-01185-KJM-CKD
Hon. Kimberly J. Mueller, Judge

**APPELLEE'S ANSWERING BRIEF**

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General

ANTHONY R. HAKL
Deputy Attorney General
State Bar No. 197335
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 322-9041
Fax: (916) 324-8835
Email: Anthony.Hakl@doj.ca.gov
*Attorneys for Defendant-Appellee*
*Stephen Lindley*

# TABLE OF CONTENTS

**Page**

Introduction .................................................................. 1

Jurisdictional Statement .................................................. 2

Statement of Issues ........................................................ 3

Statement of the Case ..................................................... 3

    I.    California's Unsafe Handgun Act .......................... 3

        A.    Definition of "Unsafe Handgun" .................... 4

        B.    The Roster of Handguns Certified for Sale ................... 7

    II.    Procedural History ..................................................... 9

        A.    Plaintiffs File Suit Challenging the Unsafe Handgun Act .................................................. 9

        B.    The Parties ............................................... 9

            1.    Defendant Lindley ............................... 9

            2.    Plaintiffs ................................................ 10

                a.    Organizational Plaintiffs .......................... 10

                b.    Individual Plaintiffs .................................. 10

                      (1)    Mr. Peña ......................................... 10

                      (2)    Mr. Vargas .................................... 11

                      (3)    Ms. Croston .................................... 13

                      (4)    Mr. Thomas .................................... 14

        C.    Plaintiffs' Claims ...................................... 15

        D.    The District Court Grants Defendant's Motion for Summary Judgment, Rejecting Plaintiffs' Second Amendment and Equal Protection Claims ................... 16

Summary of the Argument ............................................. 19

Standard of Review ....................................................... 19

Argument .................................................................... 20

# TABLE OF CONTENTS
## (continued)

Page

I.    The Unsafe Handgun Act Does Not Violate the Second
      Amendment ............................................................... 20

      A.    The Second Amendment and the Supreme Court's
            Decisions in Heller and McDonald.............................. 20

II.   The Two-Step Inquiry Applicable to Second Amendment
      Challenges in the Ninth Circuit............................................. 24

      A.    Step One: The UHA Does Not Burden Conduct
            Protected by the Second Amendment........................... 25

      B.    Step Two: The UHA Survives Constitutional
            Scrutiny ........................................................... 34

            1.    Intermediate Scrutiny Applies........................... 34

            2.    The UHA Reasonably Advances Important
                  Public Interests .................................... 36

III.  The Unsafe Handgun Act Does Not Violate Equal
      Protection ............................................................... 40

Conclusion ................................................................. 45

Statement of Related Cases.................................................... 46

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Adcock v. Chrysler Corp.*
   166 F.3d 1290 (9th Cir. 1999) .................................................. 19

*Children's Hosp. Med. Ctr. v. California Nurses Ass'n*
   283 F.3d 1188 (9th Cir. 2002) ................................................. 19

*City of Cleburne, Tex. v. Cleburne Living Center*
   473 U.S. 432 (1985) ......................................................... 43, 44

*Coal. Of New Jersey Sportsmen, Inc. v. Whitman*
   44 F. Supp. 2d 666 (D. N.J. 1999) .......................................... 42

*District of Columbia v. Heller*
   554 U.S. 570 (2008) ...................................................... *passim*

*Draper v. Healey*
   No. CIV.A. 14-12471-NMG, 2015 WL 997424 (D. Mass.
   Mar. 5, 2015) .............................................................. 27, 28

*Fiscal v. City and County of San Francisco*
   158 Cal. App. 4th 895 (Ct. App. 2008) ........................... *passim*

*Freeman v. City of Santa Ana*
   68 F.3d 1180 (9th Cir. 1995) ............................................ 40, 43

*Fyock v. Sunnyvale*
   779 F.3d 991 (9th Cir. 2015) ............................................ 34, 37

*Heller v. Dist. of Columbia*
   670 F.3d 1244 (D.C. Cir. 2011) ............................................. 27

*Jackson v. City & Cnty of San Francisco*
   764 F.3d 953 (9th Cir. 2014) ......................................... *passim*

*Kampfer v. Cuomo*
993 F. Supp. 2d 188 (N.D. N.Y. 2014) ................................................. 28

*Kwong v. Bloomberg*
723 F.3d 160 (2d Cir. 2013) .................................................... 36

*McDonald v. City of Chicago*
561 U.S. 742 (2010)............................................................ 23

*McGowan v. Maryland*
366 U.S. 420 (1961)............................................................ 43

*Peruta v. Cnty. of San Diego*
742 F.3d 1144 (9th Cir. 2014) ................................................. 17

*Peterson v. LaCabe*
783 F. Supp. 2d 1167 (D. Colo. 2011) .................................... 42

*Schenck v. Pro-Choice Network of W. N.Y.*
519 U.S. 357 (1997)............................................................ 36

*Silveira v. Lockyer*
312 F.3d 1052 (9th Cir. 2002) ......................................... 42, 44

*Turner Broad. Sys., Inc. v. FCC*
520 U.S. 180 (1997)............................................................ 37

*United States v. Chester*
628 F.3d 673 (4th Cir. 2010) ................................................. 24

*United States v. Chovan*
735 F.3d 1127 (9th Cir. 2013) ..................................... *passim*

*United States v. Marzzarella*
614 F.3d 85 (3d Cir. 2010) ......................................... *passim*

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Miller*
307 U.S. 174 (1939) ................................................................. 29

*United States v. Salerno*
481 U.S. 739 (1987) ................................................................. 36

*United States v. Skoien*
614 F.3d 638 (7th Cir. 2010) .................................................. 36

*United States v. Tribunella*
749 F.2d 104 (2d Cir. 1984) ......................................................6

*United States v. Vongxay*
594 F.3d 1111 (9th Cir. 2010) ................................................ 26

**STATUTES**

26 U.S.C. § 5842 ..................................................................... 33

28 U.S.C. § 1291 .......................................................................3

28 U.S.C. § 1331 .......................................................................2

42 U.S.C. § 1983 .......................................................................9

National Firearms Act of 1934. National Firearms Act, Chapter
757, § 8(a), 48 Stat. 1236 (1934) ........................................... 33

Penal Code

§ 16380 ................................................................................ 5, 43
§ 16900 ......................................................................................5
§ 17140 ......................................................................................6
§ 24510 ....................................................................................30
§ 31905 ......................................................................................5
§ 31910 ......................................................................................4
§ 31910(a)(1) ..............................................................................5
§ 31910(b)(1) ..............................................................................5
§ 31910(b)(4) ..............................................................................5
§ 31910(b)(5) ..............................................................................6
§ 31910(b)(6) ..............................................................................6
§ 31910(b)(7)(A) ................................................................... 6, 33
§ 32000(a) ............................................................................. 4, 42
§ 32000(b) ..................................................................................7
§ 32000(b)(3) ................................................................... 7, 41, 43
§32000(b)(4) ...............................................................................7
§ 32010 ......................................................................................8
§ 32010(d)(1)–(2) ......................................................................43
§ 32015(a) ..................................................................................8
§ 32015(b)(1) ..............................................................................8
§ 32015(b)(2) ..............................................................................8
§ 32030 ......................................................................................8
§ 32100 ......................................................................................7
§ 32105 ......................................................................................7
§ 32110 ......................................................................................7
§ 32110(a) ..................................................................................7
§ 32110(f) ...................................................................................7
§ 32110(h) ................................................................................43
§ 32310 ....................................................................................30
§ 33410 ....................................................................................30

CONSTITUTIONAL PROVISIONS

United States Constitution, Amendment II...............................20

# TABLE OF AUTHORITIES
## (continued)

Page

COURT RULES

Federal Rule of Appellate Procedure 4(a)(1)(A) ............................................3

Federal Rule of Civil Procedure 56(c) ........................................................ 19

OTHER AUTHORITIES

Allen Rostron, *High-Powered Controversy: Gun Control, Terrorism, and the Fight Over .50 Caliber Rifles*, 73 U. Cin. L. Rev. 1415, 1469 n. 12 (2005) ................................................................6

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. 1443, 1455–56 (2009) .................. 34

James T. Dixon, *On Lemon Squeezers and Locking Devices: Consumer Product Safety and Firearms, A Modest Proposal*, 47 Case W. Res. L. Rev. 979, 993 (1997) ............................. 32

Jonathan E. Lowy, *Litigating Against Gun Manufacturers*, 36 Trial 43 (Nov. 2000) ............................................................... 31

Kathryn E. Carso, *Comment, Amending the Illinois Postconviction Statute to Include Ballistics Testing*, 56 DePaul L. Rev. 695, 721 (2006) ............................................... 33

Vernick & Teret, *New Courtroom Strategies Regarding Firearms: Tort Litigation Against Firearm Manufacturers and Constitutional Challenges to Gun Laws*, 36 Hous. L. Rev. 1713, 1738 (1999) ........................................................ 32

**INTRODUCTION**

Plaintiffs – a group of individuals and organizations promoting the right to bear arms – claim that California's Unsafe Handgun Act ("UHA" or "the Act") violates the Second Amendment under the landmark decision of *District of Columbia v. Heller*, 554 U.S. 570 (2008). Their claim is based on the exaggerated premise that the UHA is a "massive ban on handguns." (Appellants' Opening Brief ("AOB") at 25.) Unlike the law at issue in *Heller*, the UHA is not a handgun ban. Handguns are ubiquitous in California, and are widely available for purchase and possession. Plaintiffs themselves admit that they already possess handguns suitable for self defense, and that they could purchase additional handguns. To prevail, plaintiffs would have to establish a constitutional right to purchase any handgun of one's choice from whomever one chooses. No such right exists.

Also unlike *Heller*, the UHA does not concern handgun possession and use. Rather, it regulates commercial sales. The UHA is the kind of law *Heller* expressly indicated is presumptively lawful. And while *Heller* does contain language indicating that the Second Amendment extends to handguns in general because they are "in common use" for "lawful purposes," 554 U.S. at 624–27, unlike the law assessed in *Heller* the UHA is not a blanket restriction on handguns as an entire class. The Act requires

1

only that certain handguns have certain safety features as a condition of being offered for commercial sale.

Thus, the district court properly concluded that the UHA does not burden conduct protected by the Second Amendment, and correctly ended its analysis at this first step of the two-step approach applicable to Second Amendment cases in the Ninth Circuit. *See United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *Jackson v. City & Cnty of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014). Even if the Second Amendment is implicated, the UHA would survive intermediate scrutiny because there is a reasonable fit between its provisions and the important public interests of improving consumer safety and reducing crime. Finally, the district court properly rejected plaintiffs' equal protection claim because the UHA does not treat similarly-situated people differently.

For these reasons, and as explained in detail below, this Court should affirm the judgment of the district court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiffs' claims under 28 U.S.C. § 1331. On February 26, 2015, the district court granted defendant's motion for summary judgment on plaintiffs' Second Amendment and equal protection claims, and denied plaintiffs' motion for

summary judgment. Excerpts of Record ("ER") 2–29. In its Order, the

court upheld the constitutionality of California's Unsafe Handgun Act. *Id*.

On the same day, the court entered judgment in favor of defendant. ER1.

Plaintiffs appealed. ER30; *see* Fed. R. App. P. 4(a)(1)(A). This Court has

jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the UHA burdens any conduct protected by the Second

Amendment by requiring certain handguns offered for commercial sale

include features to improve consumer safety and reduce crime?

2. If so, whether the UHA reasonably advances the important public

interests of improving consumer safety and reducing crime?

3. Whether the UHA treats similarly situated classes of persons

differently such that equal protection review is even triggered?

## STATEMENT OF THE CASE

### I.  CALIFORNIA'S UNSAFE HANDGUN ACT

The UHA prohibits the manufacture or sale of any "unsafe handgun" in

California, making a violation punishable by imprisonment in a county jail

for not more than one year.  Cal. Penal Code § 32000(a).[1]  The California

Legislature enacted the UHA in 1999 "in response to the proliferation of

local ordinances banning low cost, cheaply made handguns known as

'Saturday Night Specials,' which called to the Legislature's attention the

need to address the issue of handguns sales in a more comprehensive

manner."  *Fiscal v. City and County of San Francisco*, 158 Cal. App. 4th

895, 912 (Ct. App. 2008) (citing Stricker, *Gun Control 2000: Reducing the

Firepower* (2000) 31 McGeorge L. Rev. 293, 313 (Gun Control 2000)).

According to its legislative history, the Act was aimed at reducing handgun

crime as well as promoting handgun consumer safety.  *Id*. at 913–14.  The

Act took effect on January 1, 2001.  § 32000(a).

### A.    Definition of "unsafe handgun"

Under the Act, an unsafe handgun is "any pistol, revolver, or other

firearm capable of being concealed upon the person" which does not have a

specified safety device, fails to meet certain firing criteria, or does not meet

drop safety requirements.  § 31910.  *See Fiscal*, 158 Cal. App. 4th at 912

("[T]he UHA requires that all models of handguns meet certain quality

assurance tests and other standards before being approved for sale in this

---

[1] Further statutory references are to the California Penal Code unless otherwise indicated.

state, including specified standards relating to the safe firing of the handgun and the ability to drop the handgun without it firing accidentally."). Sections 31910(a)(1) and 31910(b)(1), respectively, specify the required safety devices for revolvers and pistols. Section 31905 lists the firing criteria of the Act. Sections 31900 specifies the drop safety requirements.[2]

Additional qualifications have been added in the last decade. As of January 1, 2006, an unsafe handgun includes a center fire semiautomatic pistol not already listed on the California Department of Justice (DOJ) roster of approved firearms, which is discussed below, that "does not have either a chamber load indicator, or a magazine disconnect mechanism."[3] § 31910(b)(4). As of January 1, 2007, it includes a center fire semiautomatic pistol not already listed on DOJ's roster that "does not have

_____

[2] On appeal, plaintiffs' have abandoned their challenges to the UHA's safety device, firing safety, and drop safety requirements. (*See* Appellants' Opening Brief ("AOB") at 5.) The chamber load indicator, magazine disconnect mechanism, and microstamping requirements – discussed below – remain at issue. (*See id*. at 5 & 9.)

[3] A "chamber load indicator" is "a device that plainly indicates that a cartridge is in the firing chamber." § 16380. A "magazine disconnect mechanism" is "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." § 16900.

both a chamber load indicator and if it has a detachable magazine, a

magazine disconnect mechanism." § 31910(b)(5). As of January 1, 2006,

an unsafe handgun includes a rimfire semiautomatic pistol not already on the

roster that "does not have a magazine disconnect mechanism, if it has a

detachable magazine." § 31910(b)(6).[4]

As of January 1, 2010, an unsafe handgun also includes "all

semiautomatic pistols that are not already listed on the roster . . . [and are]

not designed and equipped with a microscopic array of characters that

identify the make, model, and serial number of the pistol, etched or

otherwise imprinted in two or more places on the interior surface or internal

working parts of the pistol, and that are transferred by imprinting on each

cartridge case when the firearm is fired[.]" § 31910(b)(7)(A). As one court

---

[4] A "semiautomatic pistol" is defined as "a pistol . . . the operating mode of which uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of the trigger." § 17140. With respect to the "center-fire" and "rimfire" distinction, in center-fire ammunition, the primer that ignites the gunpowder and causes the cartridge to fire is located in the center of the base of the cartridge. In rimfire ammunition, the primer is located inside a soft outer rim around the edge at the base of the cartridge. Center-fire firearms are generally more powerful because center-fire cartridges are stronger and can withstand higher pressures than rimfire cartridges. *See generally United States v. Tribunella*, 749 F.2d 104, 107 (2d Cir. 1984) (describing center fire weapons); Allen Rostron, *High-Powered Controversy: Gun Control, Terrorism, and the Fight Over .50 Caliber Rifles*, 73 U. Cin. L. Rev. 1415, 1469 n.12 (2005) (explaining rimfire and center fire design).

has explained, "[t]his new technology, identified as microstamping, will provide important investigative leads in solving gun-related crimes by allowing law enforcement personnel to quickly identify information about the handgun from spent cartridge casings found at the crime scene." *Fiscal*, 158 Cal. App. 4th at 914. Similar to the original provisions of the UHA, the micro-stamping amendment "deals with crime prevention and criminal apprehension." *Id.*

Finally, there are exceptions to the definition of an unsafe handgun. *See* §§ 32000(b), 32105, 32110, 32100. For example, firearms sold to law enforcement officials and certain curios or relics are exempt. § 32000(b)(3) & (4). Pistols used in Olympic target shooting are exempt, *see* § 32105, as are certain single action revolvers and single shot pistols, *see* § 32100. Other exemptions include firearms transferred between private parties, § 32110(a), and firearms delivered for consignment sale or as collateral for a pawnbroker loan, § 32110(f).

## B. The Roster of Handguns Certified for Sale

The UHA directs that DOJ "shall compile, publish, and thereafter maintain a roster listing all of the pistols, revolvers, and other firearms capable of being concealed upon the person that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns,

and may be sold in this state pursuant to this title." § 32015(a). *See Fiscal*, 158 Cal. App. 4th at 912; § 32010 (mandatory testing of handguns to determine if they meet safety device, firing, and drop safety standards).

The Act allows DOJ to collect an annual fee from manufacturers or sellers to cover the costs of maintaining the roster and other costs necessary to implement the Act. § 32015(b)(1). DOJ may exclude a firearm from the roster if the manufacturer or seller fails to pay the annual fee. § 32015(b)(2).

Under the Act, a firearm shall be deemed to satisfy the roster requirements if a similar firearm is already listed. Specifically, a firearm shall satisfy the requirements if another firearm made by the same manufacturer is already listed and the unlisted firearm differs from the listed firearm only in one or more of the following features: (1) finish; (2) the material from which the grips are made; (3) the shape or texture of the grips, so long as the difference "does not in any way alter the dimensions, material, linkage, or functioning of the magazine well, the barrel, the chamber, or any of the components of the firing mechanism of the firearm"; and (4) "[a]ny other purely cosmetic feature" that does not result in such an alteration. § 32030.

## II.  PROCEDURAL HISTORY

### A.  Plaintiffs File Suit Challenging the Unsafe Handgun Act

Plaintiffs initiated this action in the district court under 42 U.S.C. section 1983 by filing a complaint, and soon thereafter an amended complaint, in mid-2009.  ER249–50.

Early in the case the district court stayed the matter in its entirety pending the Ninth Circuit's decision in the case *Nordyke v. King*, 07-15763. ER252.  It was expected that the decision in *Nordyke* would impact the district court's analysis of the law in this case.

Following the resolution of *Nordyke*, which did not result in a controlling standard of review for Second Amendment cases, the parties agreed that the district court should lift the stay, which it did.  The parties engaged in some discovery, and in 2013 the parties stipulated to the filing of a second amended complaint.  ER235–46.

### B.  The Parties

#### 1.  Defendant Lindley

As Chief of the California Department of Justice Bureau of Firearms, Lindley was the sole defendant in the district court.  ER236.  Plaintiffs sued him in his official capacity only.  *Id*.

### 2. Plaintiffs

#### a. Organizational Plaintiffs

The plaintiffs included two gun rights advocacy groups: the Second Amendment Foundation, Inc., a Washington non-profit corporation, and The Calguns Foundation, Inc., a California non-profit. ER236.

#### b. Individual Plaintiffs

There were four individual plaintiffs in the district court: Ivan Peña, Roy Vargas, Doña Croston, and Brett Thomas. ER235–36. Each is a member of Second Amendment Foundation. *Id*. Peña and Thomas are Calguns board members. *Id*. Vargas and Croston are Calguns supporters. ER236.

##### (1) Mr. Peña

Peña sued Lindley because he could not purchase a particular handgun described as a "Para USA (Para Ordnance) P1345SR/ Stainless Steel .45 ACP 4.25" because, while the handgun was listed on California's Handgun Roster until December 31, 2005, "it was discontinued and its listing not renewed." ER242; ER9; Supplemental Excerpts of Record ("SER") 0123.

As plaintiffs' description of the gun suggests, it is a semiautomatic pistol manufactured by Para Ordnance that is chambered for .45 caliber Automatic Colt Pistol (ACP), or ".45 Auto," ammunition. ER209–10.

Its barrel length is 4.25 inches. *Id*. According to the record, the gun Peña

wants is not new, but is currently owned by an individual in Washington,

and is being offered for sale by PRK Arms, a firearms dealer in Fresno. *Id*.

While Peña wanted to purchase the Para .45, in the district court he

admitted that he already owns "at least one fully functional handgun" that is

suitable for self defense. SER0010. He did attempt to qualify that the

handgun(s) he already owns "*may* be suitable for self-defense purposes in

certain circumstances, but *may not* be suitable for self-defense purposes in

other circumstances." *Id*. (italics added). Yet Peña also admitted, without

qualification, that he is "able to purchase an operable handgun that is

suitable for self-defense." *Id*.

### (2) Mr. Vargas

Vargas wanted to buy a different type of handgun – a "Glock 21 SF

with an ambidextrous magazine release" – but he could not because the

handgun is not on the roster. ER242. The "Glock 21 SF-STD is listed on

the California Handgun Roster," but Vargas claimed below that the

Glock 21 SF with an ambidextrous magazine release "is better suitable" for

left-handed shooters like Mr. Vargas, who "was born without an arm below

the right elbow." *Id*. While the roster does not list the Glock 21 SF with an

ambidextrous magazine release, Vargas claimed that Glock allows

11

customers "to have their SF21-STD handguns fitted with an ambidextrous release at the Glock factory." *Id.* As the district court found, "Glock attempted to roster the model with the ambidextrous magazine release, but the DOJ determined it was not sufficiently similar to the listed model to be listed without independent testing." ER9; *see also* SER0123.

The record indicates that the handgun at issue with respect to Vargas is a semiautomatic pistol manufactured by Glock that uses .45 caliber ammunition. ER217. It has a 4.6-inch barrel and a short frame, hence the "SF" designation, and is in new condition. ER218. PRK Arms in Fresno apparently is ready to sell Vargas the desired Glock, assuming it can acquire one from a distributor. ER217–218.

Like Peña, Vargas admitted that he already owns "at least one fully functional handgun" that is suitable for self defense. SER0014. He also ostensibly qualified that the handgun(s) he already owns "may be suitable for self-defense purposes in certain circumstances, but may not be suitable for self-defense purposes in other circumstances." *Id.* But he also admitted without qualification that he is "able to purchase an operable handgun that is suitable for self-defense." *Id.*

### (3) Ms. Croston

Croston wanted to buy a "Springfield Armory XD-45 Tactical 5" Bi-Tone stainless steel/black handgun in .45 ACP, model number XD9623" but could not because it is not on the roster. ER243. She claimed that "[o]ther models of this identical gun – but in different colors – are listed on the handgun roster and are thus available to Ms. Croston[.]" *Id.* She also claimed that the stainless steel and black one "was not released until after California required newly-listed guns to have a chamber load indicator and magazine disconnect device. While the identical handguns with a different finish were grandfathered, Springfield Armory could not get the XD-45 in .45 ACP and Bi-Tone finish registered given the new listing requirements." *Id.* To be precise, though, the manufacturer has never submitted a XD9623 – Bi-Tone for testing and possible inclusion on the roster. ER10; SER0122.

The Springfield Armory handgun is also a semiautomatic pistol chambered for .45 ACP. ER225. It has a 5-inch barrel and is in new condition. ER226. And as with Vargas, PRK Arms is ready to sell her one, assuming it can acquire one from a distributor. ER225–26.

Like the other individual plaintiffs, Croston admitted below that she already owns "at least one fully functional handgun" that is suitable for self defense, depending on the circumstances. SER0017. And she admitted

13

without qualification that she is nonetheless "able to purchase an operable handgun that is suitable for self-defense." *Id.*

### (4)   Mr. Thomas

Thomas wished to purchase a "High Standard Buntline style revolver" but could not because it is not on the roster.  ER243.[5]  No manufacturer has ever submitted such a revolver to the Department for testing.  ER10; SER0123.  The revolver is chambered for .22 long rifle ammunition. ER201.  Its barrel length is 9.5 inches.  ER202.  It is a used gun, and is currently owned by an individual in Georgia, but is being offered for sale by PRK Arms.  ER201–02.

Finally, Thomas also owns "at least one fully functional handgun" that is suitable for self defense, depending on the circumstances, and he also

---

[5] Plaintiffs apparently chose this gun for its symbolic value.  They claim the revolver is the same model as the gun owned by Dick Heller, the plaintiff in the landmark *Heller* case.  (AOB at 17.)  In this regard, the second amended complaint essentially asserted that in *Heller* the Supreme Court held that a "High Standard Buntline style revolver" is protected under the Second Amendment and not subject to regulation.  ER243.  That of course is a mischaracterization of *Heller*, the issues, analysis and holding of which had nothing to do with a High Standard Buntline style revolver.  That Mr. Heller may have owned such a gun as he litigated his case to the Supreme Court was irrelevant to the Supreme Court's decision – indeed, the Court makes no mention of the make and model of Mr. Heller's gun in the decision – and it is irrelevant here.

admitted that he is "able to purchase an operable handgun that is suitable for self-defense" irrespective of the circumstances.  SER0006.

### C.   Plaintiffs' Claims

The second amended complaint contained two causes of action.  The first alleged that each of the particular firearms the individual plaintiffs wanted to purchase is "an arm whose possession is protected by the Second Amendment."  ER244.  Further, plaintiffs claimed that "[a]rms of the kind in common use today in the United States for traditional lawful purposes, and protected by the Second Amendment, include handguns lacking chamber loaded indicators, magazine disconnect devices, and microstamping technology."  *Id*.  Thus, as plaintiffs put it, by "banning access" to such handguns, defendant violated the Second Amendment.  *Id*.

The second cause of action alleged that the "handgun roster program" violates plaintiffs' equal protection rights under the Fourteenth Amendment, in that defendant "allows some people access to handguns barred to plaintiffs, and otherwise make arbitrary, capricious, irrational, and otherwise unjustifiable distinctions among the handguns that Defendant deigns to allow Plaintiffs in their exercise of fundamental Second Amendment rights." ER245.  Thus, plaintiffs claimed, defendant violated the Fourteenth Amendment.  *Id*.

The prayer for relief is straightforward, although sweeping. It seeks an order permanently enjoining defendant from enforcing the UHA in its entirety. ER245.

**D. The District Court Grants Defendant's Motion for Summary Judgment, Rejecting Plaintiffs' Second Amendment and Equal Protection Claims**

In the court below, this matter was resolved by way of cross-motions for summary judgment. The parties fully briefed the matter and the court heard oral argument on December 16, 2013. ER134. After the hearing, the court directed that the parties file supplemental briefs to answer certain additional questions, which they did. ER258.

In a 28-page written Order issued on February 26, 2015, the Honorable Kimberly J. Mueller rejected plaintiffs' Second Amendment and equal protection claims and upheld the constitutionality of the UHA. ER2–29.

As a preliminary matter, the court satisfied its standing concerns. ER11–15. With respect to the individual plaintiffs, the court found no evidence of injury and expressly did not assume the existence of any injury. ER11–13. Rather, the court found individual standing and the merits to be "inextricably intertwined," and that in such cases courts must address the merits. ER13. With respect to the organizational plaintiffs, on the other

hand, the court concluded that they in fact had direct standing to sue.  ER11–15.

On the Second Amendment issue, the district court followed the two-step approach adopted by this Court in *Chovan*, and subsequently employed in *Jackson.*  The court accurately summarized that the approach involves (1) asking whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, applying an appropriate level of heightened scrutiny.  ER16.[6]

At step one of the Second Amendment inquiry, the district court explained, in sum, that the UHA "impos[es] conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27, and is therefore one of the "presumptively lawful regulatory measures" recognized by the Supreme Court.  *Id*. at 627 n.26.  The court rejected the notion that the UHA operates as any kind of "ban" on handguns because, according to the record, "the commercial sale of firearms proceeds robustly" in California; as of the

---

[6] In the Order, the court also cited the three-judge panel decision in *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014), which the court explained stands for the proposition that it is the rare law that "destroys" the Second Amendment right and therefore requires per se invalidation.  ER16.  The court concluded that the UHA was hardly such a law.  In any event, the 2014 panel decision in *Peruta* is no longer binding authority in light of subsequent en banc proceedings.  *Peruta* (Case No. 10-56971) was re-heard en banc on June 16, 2015, and a decision is pending.

time of the court's decision "the handgun roster included 795 models" available for purchase; and "each individual plaintiff admits to both having obtained and being able to obtain handguns capable of use for self-defense." ER19–22. The Court also emphasized the recognition in *Heller* that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. ER22. In other words, *Heller* did not support plaintiffs' asserted right to access "handguns of their choosing." ER23. Thus, the court concluded that "[t]he UHA does not burden plaintiffs' Second Amendment rights. ER24.

Because the UHA did not burden the Second Amendment at the first step of the inquiry, the court expressly did not proceed to the second step. As the Court stated, "[h]eightened scrutiny is not triggered." ER24.

The court also rejected plaintiffs' equal protection claim. In fact, the Court found that the UHA did not even trigger equal protection review, plaintiffs having failed to identify any similarly situated persons treated disparately under the law. ER25–29.

The court therefore granted Lindley's motion for summary judgment, denied plaintiffs' motion for summary judgment, and upheld the constitutionality of the UHA. Plaintiffs then initiated this appeal.

## SUMMARY OF THE ARGUMENT

The district court correctly decided this case. The Act does not burden any Second Amendment rights of plaintiffs. Even if it does, the Act survives intermediate scrutiny. The UHA does not even trigger equal protection review because it treats all similarly situated persons equally. Thus, the Act does not run afoul of the Second Amendment or the Equal Protection Clause.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision on cross motions for summary judgment. *Children's Hosp. Med. Ctr. v. California Nurses Ass'n*, 283 F.3d 1188, 1191 (9th Cir. 2002). Its review "is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999). The Court "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.*

## ARGUMENT

I. **THE UNSAFE HANDGUN ACT DOES NOT VIOLATE THE SECOND AMENDMENT**[7]

### A. The Second Amendment and the Supreme Court's decisions in *Heller* and *McDonald*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

In *Heller*, the Supreme Court undertook a thorough analysis of the Second Amendment.  In that case, a District of Columbia special police officer sued to invalidate a District law completely banning the possession of a handgun in the home and requiring that any other lawfully owned firearm in the home, such as a registered long gun, be disassembled or otherwise rendered inoperable for immediate use.  554 U.S. at 574.

The Court held that the Second Amendment protects an individual right, not a collective one: "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to

---

[7] Plaintiffs' complaint alleged Second Amendment and equal protection claims both "facially and as applied against the individual plaintiffs."  ER244–45.  But plaintiffs' "facial" and "as applied" challenges are indistinguishable.  The district court's analysis comports with this view.  ER9.

keep and bear arms." *Heller*, 554 U.S. at 595. But critically, in what has

become well-known and often-cited language, the Court further held that

"[l]ike most rights, the right secured by the Second Amendment is not

unlimited. From Blackstone through the 19th-century cases, commentators

and courts routinely explained that the right was not a right to keep and carry

any weapon whatsoever in any manner whatsoever and for whatever

purpose." *Id*. at 626 (citations omitted). Thus, while *Heller* did uphold the

invalidation of a very strict law of the District of Columbia that generally

prohibited the possession of handguns, *id*. at 576, 636, *Heller* took care to

provide an expressly non-exhaustive list of "presumptively lawful regulatory

measures," *id*. at 627 n.26 – "a variety of tools" that "the Constitution leaves

. . . for combating" the problem of firearm violence in the United States. *Id*.

at 636. That list includes prohibitions on the possession of "weapons not

typically possessed by law-abiding citizens for lawful purposes, such as

short-barreled shotguns," *id*. at 625, and "M-16 rifles and the like," *id*. at

627, as well as "longstanding prohibitions on the possession of firearms by

felons and the mentally ill, or laws forbidding the carrying of firearms in

sensitive places such as schools and government buildings, or laws imposing

conditions and qualifications on the commercial sale of arms." *Id*. at 626–

27. Likewise, *Heller* indicated that gunpowder storage laws "do not

remotely burden the right of self-defense . . . ." *Id.* at 632. "Nor . . . does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents." *Id.*

Key to *Heller*'s analysis of the District's regulations was the observation that "the law totally bans handgun possession in the home. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Heller*, 554 U.S. at 628. In finding the total ban on handguns unconstitutional, the Court explained:

> [T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," would fail constitutional muster.

*Id.* at 628–29 (footnote and citation omitted). Addressing the requirement that firearms in the home be rendered and kept inoperable at all times, the Court similarly explained that the requirement was unconstitutional because "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense[.]" *Id.* at 630.

Because the District's law was unconstitutional under any level of constitutional scrutiny, *Heller* declined to indicate precisely what standard of review would apply to Second Amendment challenges. *Id*. at 628 n.27. Nor did *Heller* reach the issue of whether the Second Amendment is incorporated by the Fourteenth Amendment and therefore applicable to the States, *id*. at 620 n.23, although the Court would later address that issue in *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

In *McDonald*, the Supreme Court held that the Second Amendment is fully incorporated against the States via the Fourteenth Amendment. 561 U.S. at 777 –78. Yet the Court explained that "incorporation does not imperil every law regulating firearms." *Id*. at 786. In doing so, the Court was careful to re-state the critical language from *Heller*:

> It is important to keep in mind that *Heller*, while striking down
> a law that prohibited the possession of handguns in the home,
> recognized that the right to keep and bear arms is not "a right to
> keep and carry any weapon whatsoever in any manner
> whatsoever and for whatever purpose." [Citation.] We made it
> clear in *Heller* that our holding did not cast doubt on such
> longstanding regulatory measures as "prohibitions on the
> possession of firearms by felons and the mentally ill," "laws
> forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing conditions
> and qualifications on the commercial sale of arms." [Citation.]
> We repeat those assurances here.

*Id.* (italics added).  In *McDonald*, the Court also declined to address the applicable standard of review, leaving the lower courts to grapple with the question of the standard to apply to laws that arguably implicate the Second Amendment.

## II.    THE TWO-STEP INQUIRY APPLICABLE TO SECOND AMENDMENT CHALLENGES IN THE NINTH CIRCUIT

In *Chovan*, this Court held that a specific two-step analytical framework applies to Second Amendment challenges.  After considering the approach of other circuits, the court decided to "adopt the two-step Second Amendment inquiry undertaken by the Third Circuit in [*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)], and the *Fourth Circuit* in [*United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)], among other circuits."  *Chovan*, 735 F.3d at 1136.

The two-step Second Amendment inquiry "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny."  *Chovan*, 735 F.3d at 1136.  The Court explained that "this two-step inquiry reflects the Supreme Court's holding in *Heller* that, while the Second Amendment protects an individual right to keep and bear arms, *the scope of that right is not unlimited*."  *Id.* (citing *Heller*, 554 U.S. at 626–27) (italics added).  The

Court also explained that the two-step inquiry is "consistent with the approach taken by other circuits considering various firearms restrictions post-*Heller*." *Id*. (citing cases); *see also Jackson*, 746 F.3d at 960 (applying two-step inquiry and upholding San Francisco regulations governing handgun storage and prohibiting certain ammunition sales).

As explained below, the UHA does not burden any conduct protected by the Second Amendment. Thus, this Court, like the district court, should end its analysis at step one of the inquiry. But even if this Court were to engage in step two of the inquiry, the UHA would survive constitutional scrutiny.

## A. Step One: The UHA does not burden conduct protected by the Second Amendment.

The district court correctly concluded that the UHA does not burden the Second Amendment rights of plaintiffs. As the record below demonstrated, handguns are widely available in this state. There have been well over one million handgun transactions in California since plaintiffs filed this lawsuit, and that number continues to grow at a rate of hundreds of thousands of handgun transactions annually. SER076. The handgun roster itself lists almost one thousand different makes and models of handguns available for purchase. SER0079–0112. The individual plaintiffs in this case admit to

already owning handguns suitable for self-defense.  And they admit to being able to acquire still more handguns suitable for self-defense.  SER0006, 0010, 0014, & 0017.  These facts showed that the UHA does not burden "'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'"  *Chovan*, 735 F.3d at 1138 (quoting *Heller*, 554 U.S. at 635).

The district court also correctly observed that the UHA, which concerns handgun *sales*, is nothing like the total firearm prohibition struck down in *Heller*, which concerned "the possession of usable handguns in the home." *Heller*, 554 U.S. at 627.  Indeed, the UHA is like those firearms regulations that *Heller* endorsed because they do not burden the Second Amendment right.  More specifically, on its face the UHA is a "law[] imposing conditions and qualifications on the commercial sale of arms," and therefore presumptively lawful."  *Id.* at 626–27; *see also United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (upholding federal felon-in-possession statute because it is "presumptively lawful").  The safety feature requirements of the UHA are also akin to the safety laws that *Heller* permits – laws like gunpowder-storage laws, which "do not remotely burden the right of self-defense," and "laws regulating the storage of firearms to prevent

accidents." *Heller*, 554 U.S. at 632. The UHA simply does not prohibit the possession or use of firearms in any fashion.

The UHA is also similar to other firearms regulations that other circuits have upheld because they do not burden the Second Amendment right and leave individuals with alternatives for acquiring firearms for self-defense. *See*, *e.g.*, *Marzzarella*, 614 F.3d at 97 (regulation prohibiting obliterated serial numbers "does not severely limit the possession of firearms" because "[i]t leaves a person free to possess any otherwise lawful firearm"); *Heller v. Dist. of Columbia* ("*Heller II*"), 670 F.3d 1244, 1251–58 (D.C. Cir. 2011) (upholding gun registration, assault weapon and large capacity magazine regulations where individuals could still possess other firearms for self defense). Again, the evidence before the district court demonstrated that plaintiffs already possess handguns and have alternatives for acquiring additional handguns.

Even more on point, a Massachusetts district court has recently rejected a Second Amendment challenge to that state's regulation requiring "a load indicator or magazine safety disconnect in handguns sold or transferred in the Commonwealth." *Draper v. Healey*, No. CIV.A. 14-12471-NMG, 2015 WL 997424, at *7 (D. Mass. Mar. 5, 2015) Like the district court here, that court reasoned that "[t]he regulation fits comfortably among the categories

of regulation that *Heller* suggested would be 'presumptively lawful' because it 'impos[es] conditions and qualifications on the commercial sale of arms.' [Citation.]." *Id*. The court also explained that "[t]he regulation does not substantially burden the right to bear arms in self-defense in one's home because the ban on two kinds of Glock pistols in no way prevents citizens from obtaining a wide array of firearms." *Id*; *see also Kampfer v. Cuomo*, 993 F. Supp. 2d 188, 196 (N.D. N.Y. 2014) (dismissing constitutional challenge to state statute, stating that "because the provisions at issue attempt only to decrease in number certain firearms deemed particularly dangerous by the legislature for the sake of public safety, which interests are clearly advanced by the legislation, they do not infringe the Second Amendment right to keep and bear arms").

Plaintiffs' argument in the court below in support of their Second Amendment claim was that the UHA is unlawful because the Second Amendment categorically protects handguns, a kind of weapon that is "in common use" for "lawful purposes." *Heller*, 554 U.S. at 624. Plaintiffs continue on appeal: "The Second Amendment guarantees the right to acquire arms of the kind in common use for traditional lawful purposes. Period, full stop." (AOB at 24.) This argument is flawed.

Even if plaintiffs had been able to show that the guns they desire are in "common use" – which the record presented by plaintiffs did not show and the district court did not find – they would not have been entitled to judgment. Regarding the so-called "common use" test upon which plaintiffs rely, *Heller* stated: "We also recognize another important limitation on the right to keep and carry arms. [*United States v. Miller*, 307 U.S. 174 (1939)] said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.'" *Heller*, 554 U.S. at 627. Thus, the "common use" test is actually a *limitation* on the Second Amendment right. And there are other limitations (e.g., laws imposing conditions and qualifications on the commercial sale of arms).

Plaintiffs' "common use" argument also depends on a reading of the UHA that is too broad. The UHA's focus is narrower than handguns as an entire class of firearms; its focus is certain handgun features. To be even more precise, the UHA encompasses handgun safety devices, firing requirements, drop safety requirements, chamber load indicators, magazine disconnect mechanisms and microstamping. Thus, plaintiffs are arguing that they have a constitutional right to purchase a handgun without these safety features. But no court has recognized a constitutional right to purchase any handgun of one's choice regardless of its features.

Indeed, taken to its logical conclusion, plaintiffs' position would require constitutional protection for any firearm that might be called a "handgun," even if it had features allowing for a large-capacity magazine or sound suppressor (i.e., a silencer), or features disguising it as something other than a handgun, for example. These features are generally unlawful in California. *See* Cal. Penal Code § 32310 (prohibition on large-capacity magazines); § 33410 (prohibition on silencers); § 24510 (unlawful to possess firearm not immediately recognizable as firearm).

Plaintiffs' argument is also similar to the argument rejected by the Third Circuit in *Marzzarella*, which upheld the federal law requiring firearms to have serial numbers. In that case, *Marzzarella* argued that the Second Amendment protects weapons without serial numbers because they were "in common use" at the time of ratification. 614 F.3d at 93. But the court explained: "[That] argument rests on the conception of unmarked firearms as a constitutionally recognized class of firearms, in much the same way handguns constitute a class of firearms. That premise is unavailing." *Id*. The same can be said here. While handguns in general may be a constitutionally recognized class of firearms under *Heller*, handguns without chamber load indicators have not been so recognized. Nor have handguns

without safety devices.  Nor have handguns without magazine disconnect mechanisms, and so on.

Plaintiffs acknowledge the Supreme Court's recognition of "presumptively lawful regulatory measures."  But they suggest that it applies only to those measures in existence during the "Framing Era."  (*See* AOB at 34 ["The Framing Era saw nothing approaching California's handgun rostering scheme."]  That argument is baseless.  *See Heller*, 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment."); *Marzzarella*, 614 F.3d at 93–94 (rejecting argument that firearms without serial numbers are protected because "firearms in common use in 1791 did not possess serial numbers").

Plaintiffs also wrongly argue that there is no historical precedent for California's Unsafe Handgun Act."  (AOB at 34.)  The legislative history submitted to the district court by *plaintiffs* shows that chamber load indicators date to the 1800's.  ER160 ("there have been patents on file in the United States for chamber load indicators for handguns since the late 1800's").  Magazine disconnect devices have been around for more than a century.  *See* Jonathan E. Lowy, *Litigating Against Gun Manufacturers*, 36 Trial 43 (Nov. 2000) ("The feature was designed in 1910 because of the

dangerous scenario – common even then – that occurs when someone

removes a pistol's magazine and then assumes that the gun is unloaded,

unaware of the live round in the chamber."); Vernick & Teret, *New

Courtroom Strategies Regarding Firearms: Tort Litigation Against Firearm

Manufacturers and Constitutional Challenges to Gun Laws*, 36 Hous. L.

Rev. 1713, 1738 (1999) ("patents for magazine safeties were first issued

around the turn of the twentieth century").  In general, devices to reduce

firearm accidents have been around for generations.  (*See* James T. Dixon,

*On Lemon Squeezers and Locking Devices: Consumer Product Safety and

Firearms, A Modest Proposal*, 47 Case W. Res. L. Rev. 979, 993 (1997)

(stating that the idea of producing a child-proof firearm is over a century old

as evidenced by the "lemon squeezer" gun).

There is also historical precedent for the microstamping requirement.

*See Jackson*, 746 F.3d at 962 (considering whether regulation "resemble[s]"

prohibitions discussed in historical evidence).  For example, ammunition

components have had markings such as etches and striations ever since

ammunition has been loaded into firearms and subjected to the firing

process, which has been occurring for centuries.  SER0115; *Heller*, 554 U.S.

570, 581–84 (2008) (Americans have been using firearms for centuries).  As

one commenter has observed, "[b]allistics testing is over one hundred years

old." Kathryn E. Carso, *Comment, Amending the Illinois Postconviction Statute to Include Ballistics Testing*, 56 DePaul L. Rev. 695, 721 (2006). The use of serial numbers on firearms has occurred for more than 150 years. *See Marzzarella*, 614 F.3d at 93 n.11 (upholding regulation prohibiting obliterated serial numbers). And federal law has *required* serial numbers since at least the passage of the National Firearms Act of 1934. National Firearms Act, ch. 757, Sec. 8(a), 48 Stat. 1236 (1934) ("[e]ach manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner"); *see* 26 U.S.C. § 5842 ("[e]ach manufacturer and importer and anyone making a firearm shall identify each firearm . . . manufactured, imported, or made by a serial number"). Requiring microstamping is very similar to requiring serial numbers. Indeed, the microstamping process simply involves the transference of the serial number of the pistol, along with the make and model, on to a component of the ammunition. § 31910(b)(7)(A).

The UHA is presumptively lawful under *Heller* because it simply regulates the commercial sale of handguns. Its requirements are also supported by historical precedent. And as discussed above, handguns

remain widely available in California and plaintiffs remain free to defend

themselves irrespective of the UHA's requirements. *See* Eugene Volokh,

*Implementing the Right to Keep and Bear Arms for Self-Defense: An*

*Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. 1443,

1455–56 (2009) ("tracking regulations" like serial number and

microstamping requirements "are not much of a burden on self-defense").

Accordingly, the district court correctly concluded that the UHA and its

safety feature requirements do not burden the Second Amendment right.

The Court should affirm the district court's judgment.

### B.  Step Two: The UHA Survives Constitutional Scrutiny

### 1.  Intermediate Scrutiny Applies

If the Court finds that the UHA burdens Second Amendment rights and

proceeds to step two, the level of scrutiny is determined by "(1) 'how close

the law comes to the core of the Second Amendment right,' and (2) 'the

severity of the law's burden on the right.'" *Chovan*, 735 F.3d at 1138

(quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)).

"Intermediate scrutiny is appropriate if the regulation at issue does not

implicate the core Second Amendment right *or* does not place a substantial

burden on that right." *Fyock v. Sunnyvale*, 779 F.3d 991, 998–99 (9th Cir.

2015).

The UHA does not implicate the core of the Second Amendment. It does not concern possession and use of firearms generally, much less possession and use in the home. *See Heller*, 554 U.S. at 635 (core of Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). Nor does the UHA substantially burden the Second Amendment right. Unlike the circumstances in *Chovan*, for example, it does not prohibit a class of people from using or possessing firearms for life. On the contrary, under the UHA plaintiffs already lawfully possess and use handguns and, like all law-abiding Californians, plaintiffs remain free to purchase and use additional handguns for self defense. Thus, even if the UHA imposes some burden on Second Amendment rights, at most intermediate scrutiny applies.[8] *See Chovan*, 735 F.3d at 1138 (directing courts to apply "an *appropriate* level of scrutiny" if challenged law burdens Second Amendment)(italics added).

_____

[8] Plaintiffs argue for the application of strict scrutiny. But no court in this circuit has required the application of strict scrutiny to a firearms regulation. And as the discussion in *Chovan* demonstrates, the overwhelming majority of Second Amendment cases post-*Heller* have rejected strict scrutiny. *See Chovan*, 735 F.3d at 1134–36. Also, as the *Heller* dissent and others have noted, *Heller*'s list of presumptively lawful regulatory measures is itself inconsistent with strict scrutiny. *See Heller*, 554 U.S. at 688 (Breyer, J., dissenting) ("the majority implicitly, and appropriately, reject[ed]" a strict scrutiny standard through its list of presumptively lawful regulatory measures).

### 2. The UHA reasonably advances important public interests

The UHA's handgun safety feature requirements advance the interests of improving public safety by reducing firearm violence and reducing crime. These are significant, substantial and important government interests. *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (public safety is a significant government interest); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (crime prevention is a compelling government interest). And courts have recognized them as such in the context of considering challenges to gun laws. *See*, *e.g.*, *Jackson*, 746 F.3d 965–66 ("reducing the number of gun-related injuries and deaths" is significant government interest); *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) ("governmental interests in public safety and crime prevention" are "substantial, indeed compelling"); *Marzzarella*, 614 F.3d at 98 ("preserving the ability of law enforcement to conduct serial number tracing – effectuated by limiting the availability of untraceable firearms – constitutes a substantial or important interest"); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) ("preventing armed mayhem" is "an important governmental objective").

The fit between the UHA and these objectives also is reasonable.  In this regard, the State need only show that its regulation "promotes a 'substantial government interest that would be achieved less effectively absent the regulation,'" not that its regulation is the "least restrictive means" of achieving the State's interest.  *Fyock*, 779 F.3d at 1000 (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998)); *see also Marzzarella*, 614 F.3d at 98 (fit need only "be reasonable, not perfect").  In making these determinations, courts "must accord substantial deference to the predictive judgments" of legislative bodies, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997), and the State must be given "'a reasonable opportunity to experiment with solutions to admittedly serious problems.'" *Jackson*, 746 F.3d at 966 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

The face of the UHA, its legislative history and common sense show a "reasonable fit" between the relevant interests and the Act's handgun safety feature requirements.  In enacting the provisions regarding safety devices, firing requirements, and drop safety requirements, the California Legislature was targeting the connection between cheaply made, unsafe handguns and injuries to firearms operators and crime.  The legislative history shows that reducing the number of cheaply made guns protects firearm owners and

innocent bystanders from a product that may inadvertently injure them and reduces gun availability to criminals, thereby reducing crime. *See* SER0035–41 (Assem. Com. on Public Safety, Analysis of Senate Bill No. 15 (1999-2000 Reg. Sess.) June 8, 1999); SER0042–51 (Senate Com. on Public Safety, Analysis of Senate Bill No. 15 (1999-2000 Reg. Sess.) April 6, 1999). California courts have relied on this legislative history. *See Fiscal*, 158 Cal. App. 4th at 913 ("one of the goals of the UHA included curbing handgun crime, as well as promoting gun safety.").

The legislative history, and the academic studies mentioned therein, also show that chamber load indicators and magazine disconnect mechanisms are important safety features that help prevent accidental discharges and injuries. *See* SER0023–24 (Assem. Com. on Appropriations, Analysis of Senate Bill No. 489 (2002-2003 Reg. Sess.) August 20, 2003); SER0026–31 (Assem. Com. on Public Safety, Analysis of Senate Bill No. 489 (2002-2003 Reg. Sess.) July 1, 2003).

It has also been recognized that microstamping is an important crime-fighting tool because it allows law enforcement officials to trace spent cartridges found at crime scenes, thereby reducing crime and increasing public safety. In passing the microstamping law, the Legislature recognized that "California has an enormous and diverse problem of unsolved

homicides committed with handguns." SER0057 (Senate Com. on Public Safety, Analysis of Assembly Bill No. 1471 (2007-2008 Reg. Sess.) June 26, 2007 at H). Microstamping technology "give[s] law enforcement a tool that will provide evidence to help investigate, arrest and convict more people who use semiautomatic handguns in crimes. It will provide rapid leads in the first crucial hours after a homicide." SER0058. *See also* SER0067 – 0068 (Assem. Com. on Appropriations, Analysis of Assembly Bill No. 1471 (2007-2008 Reg. Sess.) May 16, 2007); SER0070 –0074 (Assem. Com. on Public Safety, Analysis of Assembly Bill No. 1471 (2007-2008 Reg. Sess.) April 17, 2007). California courts have also recognized the importance of microstamping. *See Fiscal*, 158 Cal. App. 4th at 914 (microstamping "will provide important investigative leads in solving gun-related crimes by allowing law enforcement personnel to quickly identify information about the handgun from spent cartridge casings found at the crime scene"). The Third Circuit similarly has acknowledged the importance of firearm serial numbers. *Marzzarella*, 614 F.3d at 98 (prohibiting obliterated serial number is substantially related to "preserving the ability of law enforcement to conduct serial number tracing – effectuated by limiting the availability of untraceable firearms").

For these reasons, even if the Court reaches step two in the relevant analysis, the UHA would survive intermediate scrutiny: there is a reasonable fit between the UHA's handgun safety feature requirements and the important government interests of improving public safety by reducing firearm violence and reducing crime.  Accordingly, this Court should affirm the judgment of the district court.

## III.  THE UNSAFE HANDGUN ACT DOES NOT VIOLATE EQUAL PROTECTION

The district court also properly rejected plaintiffs' equal protection claim.  "'The first step in equal protection analysis is to identify the [defendant's] classification of groups.'"  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (quoting *Country Classic Dairies, Inc. v. State of Montana, Dep't of Commerce Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988)).  "Once the plaintiff establishes governmental classification, it is necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared. . . . 'The goal of identifying a similarly situated class . . . is to isolate the factor allegedly subject to impermissible discrimination.  The similarly situated group is the control group.'"  *Freeman*, 68 F.3d at 1187 (citations omitted).

Plaintiffs have failed to identify a similarly situated class that the Act treats differently. At any given point in time, the roster of handguns certified for sale either makes a particular handgun available for purchase, or it does not. For example, Peña desires to purchase a "Para USA (Para Ordnance) P1345SR / Stainless Steel .45 ACP 4.25," but he cannot because, while it was listed on the roster until December 31, 2005, its listing was not renewed. ER242. Yet Peña has not shown that someone else in a similar situation is currently able to purchase that handgun. No one similar to Peña can currently purchase the .45 in question. Up until December 31, 2005, any otherwise qualified purchaser, including Peña, could have purchased the handgun. The same can be said with respect to the handgun with an ambidextrous magazine release desired by Vargas, the bi-tonal firearm Croston wants to buy, and the revolver desired by Thomas. A handgun is available for purchase if it is on the roster, or if it is subject to one of the exceptions, or it is not. Because the UHA treats similarly situated people the same, it fails to trigger equal protection review at all.

Plaintiffs brief suggests that for purposes of the equal protection analysis they are similarly situated to law enforcement officials, who are authorized to buy "off-roster" handguns under one of the exceptions of the UHA. *See* Cal. Penal Code § 32000(b)(3). This suggestion is unavailing.

In light of their experience, training, and special needs for firearms, law enforcement officers are not similarly situated to plaintiffs. *Silveira v. Lockyer*, 312 F.3d 1052, 1089 (9th Cir. 2002), *abrogated on other grounds by Heller*, 554 U.S. 570 ("It is manifestly rational for at least most categories of peace officers to possess and use firearms more potent than those available to the rest of the populace in order to maintain public safety."); *see also Coal. Of New Jersey Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 686–87 (D. N.J. 1999) (upholding assault weapons ban exception for law enforcement officers).

Plaintiffs also suggest that they are being treated differently from out-of-state individuals. This comparison is also unavailing. First, the UHA treats residents and non-residents alike. Like nonresidents, who retain their right to own off-roster handguns even after moving into the state, *see* Cal. Penal Code § 32000(a), nothing in the Act requires plaintiffs to relinquish any off-roster handgun they own. As discussed above, the Act's focus is the commercial sale of firearms, not possession or use. Second, plaintiffs have not shown how they are similarly situated to nonresidents, which they are not. *See Peterson v. LaCabe*, 783 F. Supp. 2d 1167, 1178 (D. Colo. 2011) (rejecting equal protection challenge to concealed handgun licensing requirements because residents and non-residents not similarly situated).

Despite plaintiffs' claim to the contrary, the district court also correctly found that "curios" and "relics" are not subject to equal protection. As the court explained, equal protection guarantees only "that all persons similarly situated . . . be treated alike," *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); it "relates to equality between persons as such," *McGowan v. Maryland*, 366 U.S. 420, 427 (1961). Of course, the provisions of the UHA exempting curios and relics pertain to objects, not persons; and those provisions apply equally to all persons. *See* §§ 32000(b)(3), 32010(d)(1)–(2), 16380.

The district court also correctly rejected the notion that the UHA's exception for movie and television production violates equal protection. As the court explained, *see* ER27, the relevant provision states only that it "shall not apply to . . . [t]he sale loan or transfer of any semiautomatic pistol that is to be used solely as a prop during the course of a motion picture, television or video production by an authorized participant therein." § 32110(h). But it does not dictate who may or may not be such a participant. The district court properly relied on this distinction. Equal protection is concerned only with "law [being] applied in a discriminatory manner or impos[ing] different burdens on different classes of people." *Freeman*, 68 F.3d at 1187. Thus,

the exception for movie and television production does not trigger equal protection review either.

Finally, even if equal protection review were triggered, the UHA would withstand equal protection review. "[I]f a legislative act neither affects the exercise of a fundamental right, nor classifies persons based on protected characteristics, then that statute will be upheld 'if the classification drawn by the statute is rationally related to a legitimate state interest.'" *Silveira*, 312 F.3d at 1088 (quoting *Schweiker v.Wilson*, 450 U.S. 221, 230 (1981)). The UHA does not discriminate on the basis of a suspect class. And as shown above, the UHA does not even infringe on the Second Amendment right recognized in *Heller*, which concerned the possession of a handgun in the home for self-defense. Rather, the Act simply involves the regulation of commercial handgun sales. *See City of Cleburne*, 473 U.S. at 440 ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude[.]").

For purposes of rational basis review, as discussed above, public safety, consumer safety, and reducing crime are clearly legitimate state interests. And the UHA's requirement that handguns be equipped with certain safety features is rationally related to those interests.

Therefore, even assuming a governmental classification and different treatment of a similarly situated class, the UHA withstands rational basis review and does not run afoul of equal protection.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: September 21, 2015          Respectfully submitted,


KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General


*S/ ANTHONY HAKL*
ANTHONY R. HAKL
Deputy Attorney General
*Attorneys for Defendant-Appellant*

SA2015104401
Appellees Answering Brief.doc

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**IVAN PEÑA, ROY VARGAS, DOÑA CROSTON, BRETT THOMAS, SECOND AMENDMENT FOUNDATION, INC. and THE CALGUNS FOUNDATION, INC.,**

Plaintiffs and Appellants,

**v.**

**STEPHEN LINDLEY, CHIEF OF THE CALIFORNIA DEPARTMENT OF JUSTICE BUREAU OF FIREARMS,**

Defendant and Appellee.

## STATEMENT OF RELATED CASES

To the best of our knowledge, there are no related cases.

Dated: September 21, 2015    Respectfully submitted,

Kamala D. Harris
Attorney General of California
Douglas J. Woods
Senior Assistant Attorney General
Stepan A. Haytayan
Supervising Deputy Attorney General


*s/ Anthony Hakl*
Anthony R. Hakl
Deputy Attorney General
*Attorneys for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1
### FOR «Matter Primary Court Case #»

I certify that:  (check (x) appropriate option(s))

**[X]**  1.  Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached **opening/answering/reply/cross-appeal** brief is

    **[X]**  Proportionately spaced, has a typeface of 14 points or more and contains 10,324 words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words

or is

    **[ ]**  Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

**[ ]**  2.  The attached brief is **not** subject to the type-volume limitations of Fed.R.App.P. 32(a(7)(B) because

    **[ ]**  This brief complies with Fed.R.App.P 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages.

or

    **[ ]**  This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

    **[ ]**  Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

or is

    **[ ]**  Monospaced, has 10.5 or fewer characters per inch and contains __ pages or __ words or __ lines of text.

**[ ]**  3.  Briefs in **Capital Cases**.
This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 and is

    **[ ]**  Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words).

or is

    **[ ]**  Monospaced, has 10.5 or fewer characters per inch and contains __ words or __ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

☐ 4. **Amicus Briefs**.

☐ Pursuant to Fed.R.App.P 29(d) and 9th Cir.R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

or is

☐ Monospaced, has 10.5 or few characters per inch and contains not more than either 7,000 words or 650 lines of text,

or is

☐ Not subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed.R.App.P. 32 (a)(1)(5).

September 21, 2015
_____
Dated

_s/  Anthony R. Hakl_
_____
Anthony R. Hakl
Deputy Attorney General

# CERTIFICATE OF SERVICE

Case Name: **Ivan Pena, et al. v. Stephen**     No.    **15-15449**
**Lindley, Chief of Dept of Justice**
**Bureau of Firearms  [APPEAL]**

_____

I hereby certify that on <u>September 21, 2015</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**APPELLEE'S ANSWERING BRIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>September 21, 2015</u>, at Sacramento, California.

|  |  |
|---|---|
| Tracie L. Campbell | s/  Tracie L. Campbell |
| Declarant | Signature |

SA2015104401
POS.doc