# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

IVAN PEÑA, DOÑA CROSTON, ROY VARGAS, BRETT STEWART, SECOND AMENDMENT FOUNDATION, INC., AND THE CALGUNS FOUNDATION, INC.

*Plaintiffs-Appellants*,

v.

STEPHEN LINDLEY, Chief of the California Department of Justice Bureau of Firearms,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Eastern District of California

Case No. 2:09-CV-01185-KJM-CKD

The Honorable Kimberly J. Mueller, District Judge

## BRIEF OF *AMICUS CURIAE* LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

David H. Fry
Grace R. DiLaura
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Fax: (415) 512-4077

Attorneys for *Amicus Curiae* Law Center to Prevent Gun Violence

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..........................................................1

STATEMENT OF IDENTITY OF *AMICUS CURIAE*, INTEREST, AND AUTHORITY TO FILE ..........................................................2

ARGUMENT ..........................................................3

I. INTRODUCTION ..........................................................3

II. BACKGROUND ..........................................................5

    A. The Need for the UHA ..........................................................5

    B. State Regulation of Gun Safety Effectively Fills a Dangerous Legislative Gap ..........................................................5

    C. The UHA's Provisions ..........................................................8

        1. Safety Features and Testing ..........................................................8

        2. Microstamping ..........................................................10

        3. Exceptions ..........................................................11

    D. The UHA Is Not a Handgun Ban ..........................................................11

III. AS A LAW PLACING "CONDITIONS AND QUALIFICATIONS ON THE COMMERCIAL SALE OF ARMS," THE UHA DOES NOT BURDEN CONDUCT WITHIN THE SCOPE OF THE SECOND AMENDMENT ..........................................................12

    A. The Ninth Circuit Properly Reads *Heller*'s Enumerated Categories of Firearm Regulations As Falling Outside the Scope of the Second Amendment ..........................................................13

    B. The UHA Is a Law Imposing Conditions and Qualifications on the Commercial Sale of Arms ..........................................................18

    C. *Jackson* Recognizes That Individual Laws Falling into *Heller*'s Enumerated Exceptions Need Not Be Independently "Longstanding" ..........................................................20

IV. THERE IS NO SECOND AMENDMENT RIGHT TO PURCHASE UNSAFE HANDGUNS ..........................................................25

# TABLE OF CONTENTS
## (continued)

V.   EVEN IF HEIGHTENED REVIEW WERE PROPER, INTERMEDIATE SCRUTINY WOULD BE THE APPROPRIATE STANDARD...............................................................................27

    A.   The UHA Does Not Affect the Core of the Second Amendment.......28

    B.   The UHA Does Not Substantially Burden Second Amendment Rights................................................................................29

VI.  CONCLUSION....................................................................32

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Bauer v. Harris*,
No. 1:11-cv-1440-LJO-MSJ, 2015 WL 881515 (E.D. Cal. Mar. 2, 2015) ........20

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) ........................................................................14

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ....................................................................................*passim*

*Draper v. Healey*,
No. 14-12471-NMG, 2015 WL 997424 (D. Mass. Mar. 5, 2015) ..............19, 31

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ....................................................................26, 30

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ..............................................................................31

*Fyock v. City of Sunnyvale*,
779 F.3d 991 (9th Cir. 2015) ..............................................................22, 26, 30

*Heller v. Dist. of Columbia (Heller II)*,
670 F.3d 1244 (D.C. Cir. 2011) ............................................................23, 26, 32

*Jackson v. City & Cnty. of San Francisco*,
746 F.3d 953 (9th Cir. 2014) ....................................................................*passim*

*Kachalsky v. Cnty. of Westchester*,
701 F.3d 81 (2d Cir. 2012) ................................................................................23

*Kampfer v. Cuomo*,
993 F. Supp. 2d 188 (N.D.N.Y. 2014) ................................................................31

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ..............................................................................................2

*Miller v. California*,
413 U.S. 15 (1973) ..............................................................................................17

*Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms &*
*Explosives*,
700 F.3d 185 (5th Cir. 2012) ..........................................................20, 27, 28, 31

*Nordyke v. King*,
681 F.3d 1041 (9th Cir. 2012) ....................................................................19, 22

*Teixeira v. Cnty. of Alameda*,
No. 12-CV-03288-WHO, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013)...........20

*United States v. Barton*,
633 F.3d 168 (3d Cir. 2011) ................................................................14, 18, 23

*United States v. Booker*,
644 F.3d 12 (1st Cir. 2011)........................................................................23, 24

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) ....................................................................*passim*

*United States v. Decastro*,
682 F.3d 160 (2d Cir. 2012) ......................................................................31, 32

*United States v. Dugan*,
657 F.3d 998 (9th Cir. 2011) .............................................................................14

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) ........................................................................*passim*

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) .............................................................................24

*United States v. Vongxay*,
594 F.3d 1111 (9th Cir. 2010) ......................................................14, 16, 21, 24

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)............................................................................................32

**TABLE OF AUTHORITIES**
(continued)

Page

STATE CASES

*Commonwealth v. McGowan*,
   982 N.E.2d 495 (Mass. 2013).....................................................................14, 16

*Fiscal v. City & Cnty. of San Francisco*,
   158 Cal. App. 4th 895 (2008) ............................................................................5

FEDERAL STATUTES

15 U.S.C. § 2052(a)(5)(E)...........................................................................................6

18 U.S.C. § 922(g)(1)..........................................................................................21, 24

18 U.S.C. § 922(g)(9)..........................................................................................24, 27

18 U.S.C. § 925(d)(3)...................................................................................................6

STATE STATUTES

720 Ill. Comp. Stat. 5/24-3(A)(h) .............................................................................7

Cal. Penal Code § 16380.............................................................................................9

Cal. Penal Code § 16900.............................................................................................9

Cal. Penal Code § 31900.............................................................................................9

Cal. Penal Code § 31905.............................................................................................9

Cal. Penal Code § 31910...................................................................................8, 9, 10

Cal. Penal Code § 32000(a) .......................................................................................8

Cal. Penal Code § 32015.............................................................................................8

Cal. Penal Code § 32100...........................................................................................11

Cal. Penal Code § 32105...........................................................................................11

Cal. Penal Code § 32110...........................................................................................11

# TABLE OF AUTHORITIES
## (continued)

**Page**

D.C. Code Ann. § 7-2505.04 ................................................................6

Haw. Rev. Stat. Ann. § 134-15(a) .......................................................7

Mass. Gen. Laws ch. 140, § 123 .........................................................6

Mass. Gen. Laws ch. 140, § 131¾ .......................................................6

Md. Code Ann., Pub. Safety § 5-405 ...................................................6

Md. Code Ann., Pub. Safety § 5-406 ...................................................6

Minn. Stat. § 624.712 ..........................................................................7

Minn. Stat. § 624.716 ..........................................................................7

N.Y. Penal Law § 400.00(12-a) ...........................................................6

STATE REGULATIONS

501 Mass. Code Regs. §§ 7.01–7.16 ....................................................6

940 Mass. Code Regs. §§ 16.01–16.06 ................................................6

D.C. Mun. Regs. tit. 24, § 2323 ..........................................................6

N.Y. Comp. Codes R. & Regs. tit. 9, §§ 482.1–482.7 ......................6, 7

LEGISLATIVE MATERIALS

S. Rules Comm., 1999–2000 Leg.-Comm. Analysis of S.B. 15,
  Reg. Sess.  (Cal. Apr. 28, 1999) .......................................................9

OTHER AUTHORITIES

Joseph Blocher, *Categoricalism and Balancing in First and Second
  Amendment Analysis*, 84 N.Y.U.L. Rev. 375 (2009) .......................27

California Department of Justice, Div. of Law Enforcement, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Information Bulletin*, No. 2013-BOF-03 (May 17, 2013), https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/infobuls/2013-BOF-03.pdf ..................................................................................................................10

California Department of Public Health, *Safe and Active Communities Branch Report* (Aug. 18, 2015), http://epicenter.cdph.ca.gov ............................7

Law Center to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* (2013), http://smartgunlaws.org/wp-content/uploads/2013/07/20YearsofSuccess_ ForWebFINAL3.pdf ...................7

Law Center to Prevent Gun Violence, *Design Safety Standards Policy Summary*, http://smartgunlaws.org/gun-design-safety-standards-policy-summary/...........................................................................................................7

Law Center to Prevent Gun Violence, *Microstamping and Ballistic Information Policy Summary* (Dec. 1, 2013), http://smartgunlaws.org/microstamping-ballistic-identification-policy-summary/...........................................................................................................10

Todd E. Lizotte, Orest P. Ohar, *Forensic Firearm Identification of Semiautomatic Handguns Using Laser Formed Microstamping Elements*, 7070 Proc. of SPIE 70700K (2008)....................................................................10

State of California, Dep't of Justice, *Roster of Handguns Certified for Sale*, http://certguns.doj.ca.gov/....................................................................................11

Brent W. Stricker, *Gun Control 2000: Reducing the Firepower*, 31 McGeorge L. Rev. 293 (2000)....................................................................5, 6

U.S. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-Based Injury Statistics Query & Reporting System (WISQARS), 1981–1998 Fatal Injury Report, 1981–1998, http://webappa.cdc.gov/sasweb/ncipc/mortrate9.html (accessed on July 11, 2013) ..............................................................................................................7, 8

**TABLE OF AUTHORITIES**
**(continued)**

Page

U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and
Explosives, ATF Form 4590, *Factoring Criteria for Weapons*,
https://www.atf.gov/file/61591/download ............................................................6

Garen Wintemute, *Ring of Fire: The Handgun Makers of Southern
California*, A Report from the Violence Prevention Research Program,
University of California, Davis (1994),
http://www.ucdmc.ucdavis.edu/vprp/pdf/RingofFire1994.pdf ...........................5

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* has no parent corporation. No publicly held company owns more than 10% of stock in *amicus curiae*.

# STATEMENT OF IDENTITY OF *AMICUS CURIAE*, INTEREST, AND AUTHORITY TO FILE

*Amicus curiae* Law Center to Prevent Gun Violence (the "Law Center") is a non-profit, national law center dedicated to reducing gun violence and the destructive impact it has on communities.[1] The Law Center, which was founded by lawyers after an assault weapon massacre at a San Francisco law firm in 1993, focuses on providing comprehensive legal expertise to promote smart gun laws. These efforts include tracking all Second Amendment litigation nationwide and providing support to jurisdictions facing legal challenges. The Law Center has filed amicus briefs in many Second Amendment cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

The Law Center has worked with state and local governments for twenty years on laws to improve gun safety standards. Accordingly, the Law Center submits this brief pursuant to Rule 29(a) to assist the Court in developing appropriate jurisprudence for Second Amendment challenges to such laws. All parties have consented to *amicus curiae*'s submission of this brief.

---

[1] Per Federal Rule of Appellate Procedure 29(c)(5)(C), *amicus curiae* affirms that no counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

**ARGUMENT**

## I.    <u>INTRODUCTION</u>

Appellants challenge the Unsafe Handgun Act ("UHA"), a California statute imposing basic safety criteria for handguns sold commercially in the State. In challenging this law, Appellants argue that the Second Amendment guarantees their right to buy from a commercial seller *any* handgun of their choosing, including handguns that have not been proven to meet the requisite safety standards.

Both Supreme Court and Ninth Circuit precedent, however, establish that Appellants' claim falls outside the scope of the Second Amendment. The UHA fits squarely into the category of "laws imposing conditions and qualifications on the commercial sale of arms," one of several categorical limits to the Second Amendment right identified by the Supreme Court in *District of Columbia v. Heller*. The Ninth Circuit has expressly held that laws falling into these categories are not covered by the Second Amendment. Therefore, the UHA burdens no conduct protected by the Second Amendment and does not merit heightened review. Moreover, Appellants insist on the ability to purchase individual handguns of their choosing, but this is not the right *Heller* protects. For these reasons, the UHA falls outside the scope of the Second Amendment and Appellants' claim

3

must fail at step one of this Court's established two-part Second Amendment analysis.

Even if it were appropriate for this Court to apply means-ends scrutiny to the UHA, intermediate scrutiny is the proper level of review, and the statute easily satisfies this standard. The UHA in no way impacts the core of the Second Amendment right—which is the right of a law-abiding, responsible citizen to possess an operable firearm in the home for self-defense purposes—and certainly does not substantially burden such conduct. No less than 822 models of handguns are available for commercial sale under the UHA, and more than 1.5 *million* commercial handgun transactions were completed in California just during the time this case was pending in the District Court. It is no surprise, therefore, that Appellants have admitted to "having obtained and being able to obtain handguns capable of use for self-defense" under the UHA. That they may be unable to obtain the *specific* model they desire is not a substantial burden on their Second Amendment rights. As a law designed to ensure that handguns reaching the commercial market function properly and are equipped with life-saving safety features, the UHA is substantially related to the important government interest of protecting public safety. For these reasons, the UHA is constitutional in its entirety, and this Court should affirm the District Court.

## II.   BACKGROUND

### A.   The Need for the UHA

In the 1990s, California faced a serious public safety threat created by a flood of cheap, poorly made handguns. These "Saturday Night Specials" or "junk guns" were made almost entirely by a group of gun manufacturers in Southern California, called the "Ring of Fire" companies. *See* Garen Wintemute, *Ring of Fire: The Handgun Makers of Southern California*, A Report from the Violence Prevention Research Program ix, 11–17, University of California, Davis (1994), http://www.ucdmc.ucdavis.edu/vprp/pdf/RingofFire1994.pdf; Brent W. Stricker, *Gun Control 2000: Reducing the Firepower*, 31 McGeorge L. Rev. 293, 314 (2000). "Saturday Night Specials" were "poorly made, unreliable, and in some cases unsafe." Wintemute, *supra*, at x. Although federal law banned importation of these guns, it did not apply the same standards to domestically produced weapons. Stricker, *supra*, at 312–13. Local governments across California enacted ordinances to fill the gap, and in 1999 California passed a statewide law, the Unsafe Handgun Act. *See Fiscal v. City & Cnty. of San Francisco*, 158 Cal. App. 4th 895, 912 (2008).

### B.   State Regulation of Gun Safety Effectively Fills a Dangerous Legislative Gap

State regulation in this area is especially important because federal consumer protection law leaves a significant gap in the area of domestically manufactured

guns. Federal law permits importation of firearms only if they meet certain criteria: minimally, both pistols and revolvers must have a safety device, and revolvers must further pass a safety test. *See* 18 U.S.C. § 925(d)(3); U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, ATF Form 4590, *Factoring Criteria for Weapons*, https://www.atf.gov/file/61591/download. Critically, however, these federal requirements do not apply to domestically manufactured firearms. In fact, the federal Consumer Product Safety Act expressly *excludes* firearms and ammunition from its requirements. *See* 15 U.S.C. § 2052(a)(5)(E); Stricker, *supra*, at 312–13. Federal regulation thus provides no protection to the public from poorly made, unreliable, or otherwise unsafe firearms that are manufactured domestically.

California is not alone in its efforts to fill this gap. Six other states and the District of Columbia have laws regarding handgun design features and safety testing. Rosters that list approved firearms are found in the District of Columbia, Maryland, and Massachusetts. *See* D.C. Code Ann. § 7-2505.04; D.C. Mun. Regs. tit. 24, § 2323; Md. Code Ann., Pub. Safety §§ 5-405, 5-406; Mass. Gen. Laws ch. 140, § 131¾; 501 Mass. Code Regs. §§ 7.01–7.16. Massachusetts and New York require drop testing and firing testing, a melting point test, and specific handgun safety features. *See* Mass. Gen. Laws ch. 140, § 123; 940 Mass. Code Regs. §§ 16.01–16.06; N.Y. Penal Law § 400.00(12-a); N.Y. Comp. Codes R. & Regs. tit. 9,

§§ 482.1–482.7; *see also* Law Center to Prevent Gun Violence, *Design Safety Standards Policy Summary*, http://smartgunlaws.org/gun-design-safety-standards-policy-summary/. Illinois, Hawaii, and Minnesota also require a melting point test. *See* 720 Ill. Comp. Stat. 5/24-3(A)(h); Haw. Rev. Stat. Ann. § 134-15(a); Minn. Stat. §§ 624.712, 624.716.

Protecting states' ability to enact sensible regulations is paramount because gun regulation is effective. California has one of the nation's most intelligent and comprehensive gun regulation schemes and has been very successful at reducing gun violence and gun-related deaths as a result. In 1993, 5,322 Californians died in a single year as a result of gun violence. *See* California Department of Public Health, *Safe and Active Communities Branch Report* generated from http://epicenter.cdph.ca.gov on: August 18, 2015. By 2013, after California enacted more than 30 significant gun safety laws, including the UHA, that number had fallen to 2,900. *See id*. California's success is a benchmark nationally: in 2010, California had the ninth lowest gun death rate in the nation. Twenty years before, California was thirty-fifth. *See* Law Center to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* 3 (2013), http://smartgunlaws.org/wp-content/uploads/2013/07/20YearsofSuccess_ForWebFINAL3.pdf (citing U.S. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-Based Injury Statistics

Query & Reporting System (WISQARS), 1981–1998 Fatal Injury Report, 1981–1998, http://webappa.cdc.gov/sasweb/ncipc/mortrate9.html (accessed on July 11, 2013)).

### C.    The UHA's Provisions

The UHA identifies "unsafe handguns" as a "pistol, revolver, or other firearm capable of being concealed upon the person" that does not meet the safety criteria set out in the statute. *See* Cal. Penal Code § 31910. To be sold in the state, a handgun must meet certain requirements, such as possessing a safety device and passing safety testing. If a handgun meets the requisite conditions, it may be listed on a roster maintained by the California Department of Justice. *See id.* § 32015. Those handguns not on the roster may not be manufactured, imported for sale, kept for sale, offered for sale, given, or lent in the State of California. *See id.* § 32000(a). Notably, the UHA does not prohibit the *possession* of handguns not on the roster.

### 1.    Safety Features and Testing

The required safety devices vary by type of handgun. New pistol models, for example, must have a "positive manually operated" safety device, new center fire semiautomatic pistol models must have a chamber load indicator, and new center fire or rimfire semiautomatic pistol models must have a magazine disconnect mechanism, if the pistol has a detachable magazine. *See* Cal. Penal Code §

31910(a)(1), (b)(1)-(6). These requirements are designed to promote public safety. Chamber load indicators and magazine disconnect mechanisms, for example, are safety devices designed to prevent accidental firing under the erroneous belief that the gun is not loaded. Chamber load indicators "plainly indicate" that a firearm has a cartridge in the firing chamber, *see id.* § 16380, while magazine disconnect mechanisms prevent handguns using detachable magazines from firing a chambered round when a magazine is not attached (making the gun appear unloaded), *see id.* § 16900. All handgun models with the proper safety devices must also pass safety testing, including a drop test to prevent accidental firing and a firing test to evaluate potential malfunction or breakage. *See id.* §§ 31900, 31910(a)(2)-(3), (b)(2)-(3), 31905(b)(1)-(2). These requirements further a primary goal of the UHA: to ensure that handguns sold in California function as intended. *See* ER5 (District Court Order at 4) (describing one purpose of the UHA as to "ensure handguns 'fire when they are supposed to and that they do not fire when dropped'") (quoting S. Rules Comm., 1999–2000 Leg.-Comm. Analysis of S.B. 15, Reg. Sess. at 11 (Cal. Apr. 28, 1999)); SER0036.

### 2.    Microstamping

For new models not already on the approved roster that are sold after May 17, 2013,[2] the UHA also has a provision requiring the incorporation of microstamping technology for semiautomatic pistols. *See* Cal. Penal Code § 31910(b)(7)(A). Microstamping is a technological improvement on traditional ballistic identification techniques. Microstamping technology marks each fired cartridge with a specific code identifying the exact firearm used. *See* Law Center to Prevent Gun Violence, *Microstamping and Ballistic Information Policy Summary* (Dec. 1, 2013), http://smartgunlaws.org/microstamping-ballistic-identification-policy-summary/.

Microstamping presents significant advantages over traditional ballistic identification methods and significantly furthers law enforcement efforts to investigate and prosecute gun-related crime. *See* Law Center to Prevent Gun Violence, *Microstamping*, *supra* (citing Todd E. Lizotte, Orest P. Ohar, *Forensic Firearm Identification of Semiautomatic Handguns Using Laser Formed Microstamping Elements*, 7070 Proc. of SPIE 70700K (2008),

---

[2] Although the bill requiring microstamping passed in 2007, the technology was not deemed available under the terms of the statute until May 17, 2013. *See* Cal. Dep't of Justice, Div. of Law Enforcement, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Information Bulletin*, No. 2013-BOF-03 (May 17, 2013), https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/infobuls/2013-BOF-03.pdf.

http://csgv.org/wp/wp-content/uploads/2013/06/FORENSIC-FIREARM-IDENTIFICATION-OF-SEMIAUTOMATIC-HANDGUNS-LIZOTTE.pdf).

### 3. Exceptions

Certain handguns need not be on the roster to be sold in California, and certain types of transfers are not regulated under the UHA. Exempted handguns include certain single-action revolvers and Olympic target shooting pistols, among others. *See* Cal. Penal Code §§ 32100, 32105, 32110. Importantly, there are also a number of exempt transfers under the UHA, including handgun sales between private parties. *See id*. § 32110(a).

### D. <u>The UHA Is Not a Handgun Ban</u>

It is simply untrue that the UHA prevents anyone in California from purchasing or possessing handguns for purposes of self-defense. In 2012 alone, there were 388,006 handgun sales in California. *See* Decl. of Stephen Lindley in Supp. of Def's Mot. for Summ. J. 2, No. 2:09-CV-01185-KJM-CKD (E.D. Cal. Oct. 25, 2013), ECF No. 59. As the District Court noted, from this lawsuit's filing to the court's decision, there were "approximately 1.5 *million* legal handgun transactions in California." *See* ER21 (District Court Order at 20) (emphasis added). Indeed, as of September 25, 2015, no less than 822 handgun models are listed on the State's register. *See* State of California, Dep't of Justice, *Roster of Handguns Certified for Sale*, http://certguns.doj.ca.gov/ (accessed September 25,

2015). Appellants have admitted "to both having obtained and being able to obtain handguns capable of use for self-defense" in California under the UHA. *See* ER21 (District Court Order at 20).

## III. AS A LAW PLACING "CONDITIONS AND QUALIFICATIONS ON THE COMMERCIAL SALE OF ARMS," THE UHA DOES NOT BURDEN CONDUCT WITHIN THE SCOPE OF THE SECOND AMENDMENT

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects an "individual right to keep and bear arms." *See* 554 U.S. at 622. To determine whether a law violates the Second Amendment, the Ninth Circuit applies a two-step approach now common in the federal appellate courts. *See Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799 (2015) ("Like the majority of our sister circuits, we have discerned from *Heller*'s approach a two-step Second Amendment inquiry."); *United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 187 (2014). This inquiry "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Jackson*, 746 F.3d at 960 (quoting *Chovan*, 735 F.3d at 1136–37).

Under this framework, the UHA is constitutional because it imposes "conditions and qualifications on the commercial sale of arms," and is therefore a law falling into one of *Heller*'s identified limits on the scope of the Second

Amendment. As the Ninth Circuit recognizes, such laws do not burden conduct that is protected by the Second Amendment. For that reason, the UHA should be upheld at the first prong of the two-step analysis. In the alternative, the UHA is also constitutional under the second prong of the analysis. Because it does not impose a substantial burden on core Second Amendment rights, the UHA should be subject to, at most, intermediate scrutiny. As a law substantially related to the important government interest of protecting public safety, the UHA easily survives this level of review.

### A. The Ninth Circuit Properly Reads *Heller*'s Enumerated Categories of Firearm Regulations As Falling Outside the Scope of the Second Amendment

The Supreme Court was careful to emphasize that the Second Amendment right is "not unlimited," and has never been "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. The Court then identified specific limitations on the Second Amendment right, describing "prohibitions on carrying concealed weapons," "presumptively lawful" regulatory measures including "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws *imposing conditions and qualifications on the commercial sale of arms*,"

and a limitation on "dangerous and unusual weapons. " *Id.* at 626–27 & n.26 (emphasis added).

The Ninth Circuit properly treats each of *Heller*'s enumerated categories as a discrete class of law that does not burden conduct within the scope of the Second Amendment. *Jackson*, 746 F.3d at 960; *see also United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). Under binding Ninth Circuit precedent, a challenged law burdens conduct outside the Second Amendment's scope if *either*: (1) "the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*," *or* (2) "the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson*, 746 F.3d 960. If a challenged law falls into one of *Heller's* categorical exceptions under the first prong, the Second Amendment analysis is at an end. *Id.* at 960, 962–63.

The Ninth Circuit is not alone in adopting this approach—other courts treat laws falling into *Heller*'s enumerated categories as outside the scope of the Second Amendment. *See, e.g.*, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125–26 (10th Cir. 2015); *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011); *Commonwealth v. McGowan*, 982 N.E.2d 495, 500 (Mass. 2013) (concluding that "presumptively lawful prohibitions and regulations do not burden conduct that falls

within the scope of the Second Amendment" and are therefore not subject to heightened scrutiny) (internal quotation marks omitted).

The Ninth Circuit's approach, as described in *Jackson*, is the proper reading of *Heller*. As other courts have noted, this interpretation of *Heller*'s categorical exceptions is grounded in both the structure and text of the opinion itself. First, *Heller*'s structure supports this conclusion. The exceptions command their own section of the opinion that is focused entirely on the right's limitations. The categories are then described in a parallel structure, identified in order without any textual distinction. *See United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("By equating the list of presumptively lawful regulations with restrictions on dangerous and unusual weapons, we believe the Court intended to treat them equivalently—as exceptions to the Second Amendment guarantee."). *Jackson* in turn treats all five of the enumerated categories as equal, listing each category in succession and on equal footing. *See* 746 F.3d at 959.

Second, *Heller*'s textual description of the "presumptively lawful" categories of firearm regulation shows that each is a hard limitation or boundary on the Second Amendment right. The opinion makes clear that "*nothing* in [the] opinion should be taken *to cast doubt on*" its list of presumptively lawful regulatory measures. 554 U.S. at 626 (emphasis added). This is declarative language that does not suggest that the enumerated categories should be considered

guidelines or potential areas for further consideration. It states that they are literally beyond doubt—categorical, outside the scope, and not subject to question. As such, it makes the most sense to read laws falling into these categories as not encroaching on the Second Amendment right and therefore beyond the reach of heightened review. *See Heller*, 554 U.S. at 626; *see also McGowan*, 982 N.E.2d at 500 ("These laws could be presumptively lawful . . . only if they fell outside the scope of the Second Amendment and therefore were not subject to heightened scrutiny.").

This approach is grounded in the language of *Heller*, but Appellants ignore this binding law[3] and their cited authority is unpersuasive. The Opening Brief repeats an argument from a *Marzzarella* footnote that regulations placing conditions and qualifications on the commercial sale of arms cannot fall outside the scope of the Second Amendment, despite this exception's parallel standing in *Heller*. Appellants' Opening Brief at 35 ("Opening Br."); *Marzzarella*, 614 F.3d at 92 n.8. The opinion reasons that such a categorical exception from the Second Amendment right would require "examin[ing] the nature and extent of the imposed condition," and could permit "prohibiting the commercial sale of firearms," which

---

[3] The Ninth Circuit has explicitly rejected the argument that *Heller*'s exception language is dicta. *See Vongxay*, 594 F.3d at 1115.

is inconsistent with *Heller*. *Marzzarella*, 614 F.3d at 92 n.8. But this argument from the Third Circuit directly conflicts with *Jackson* and is problematic.

The slippery slope hypothesized by Appellants and *Marzzarella's* footnote does not exist because the exception covers only "conditions and qualifications" on the "commercial sale" of firearms. A complete ban is not a "condition" or "qualification," it is a prohibition that would not fall into the category at all. The Supreme Court understood these distinctions, as the Court itself differentiated "conditions and qualifications" alongside "prohibitions" and "laws forbidding" other conduct. *See Heller*, 554 U.S. 626–27.

The need to evaluate a law's "nature" in order to make a categorical determination is nothing new to the Supreme Court. In the First Amendment context, for example, there is no question that certain speech is categorically unprotected and that courts must sometimes analyze a regulation to determine if a categorical exemption is warranted. *See Miller v. California*, 413 U.S. 15, 23 (1973) (noting that it has been "categorically settled by the Court, that obscene material is unprotected by the First Amendment" and stating a test for determining when a law regulates such material).

As with obscene speech under the First Amendment, the fact that a court must examine the nature of a condition placed on the commercial sale of firearms is no reason to conclude that the category is instead *always* protected by the

Second Amendment. Courts are well-equipped to draw distinctions between conditions and outright bans. *See, e.g.*, *Jackson*, 746 F.3d at 964 ("[A] ban is not merely regulatory; it prohibits."); *Barton*, 633 F.3d at 175 ("a prohibition does more than merely alter or restrain a person's behavior"). As the District Court noted below, "the UHA does not effectively ban firearms. Under the instant statutory scheme, the commercial sale of firearms proceeds robustly." ER21 (District Court Order at 20).

In sum, Appellants' argument does not rebut the conclusion that the UHA falls outside the scope of the Second Amendment.

### B. The UHA Is a Law Imposing Conditions and Qualifications on the Commercial Sale of Arms

Although *Jackson* does not provide detailed explanation of how to determine if a law fits into one of *Heller*'s recognized categories, its analysis focused on whether the challenged laws "resemble[d]" any of the enumerated categories based on the law's operational effect. *Jackson*, 746 F.3d at 962. To determine whether the challenged regulations were among the presumptively lawful regulations listed in *Heller*, *Jackson* compared each regulation against each *Heller* exception, including that for conditions on the commercial sale of arms. *See id.* at 962.

Under *Jackson*'s approach, the UHA is precisely the type of law "imposing conditions and qualifications on the commercial sale of arms" that falls outside the scope of the Second Amendment. The UHA's function is to regulate commercial

firearm sales through a variety of safety and equipment standards. It does not

regulate possession, means of storage, methods of carrying, who may carry or

possess, or the location in which firearms may be carried or concealed. Instead, it

regulates what types of handguns may be sold commercially in California by

placing safety-based "conditions and qualifications" on the commercial sale of

such firearms. *See Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012)

(upholding local ordinance placing conditions on securing firearms at gun shows,

citing *Heller*'s "conditions and qualifications on the commercial sale" language).

That these conditions are perfectly attainable is evidenced by the fact that more

than 800 handgun models are currently available on the roster.

A Massachusetts district court considering a regulation requiring load

indicators or magazine disconnects came to this exact conclusion. The challenged

consumer protection law prevented the plaintiffs from commercially purchasing a

specific handgun they desired to own, but left available "a variety of handguns

with appropriate safety devices." *Draper v. Healey*, No. 14-12471-NMG, 2015 WL

997424, at *6 (D. Mass. Mar. 5, 2015), *appeal docketed*, No. 15-1429 (1st Cir.

April 14, 2015). The Court concluded that "[t]he regulation fits comfortably among

the categories of regulation that *Heller* suggested would be 'presumptively lawful'

because it 'impos[es] conditions and qualifications on the commercial sale of

arms.'" *Id.* at *7. Several district courts in the Ninth Circuit have drawn similar

conclusions, including upholding fees on firearm sales and ordinances placing limitations on permissible locations for gun stores. *See Bauer v. Harris*, No. 1:11-cv-1440-LJO-MSJ, 2015 WL 881515, at *6 (E.D. Cal. Mar. 2, 2015), *appeal docketed*, No. 15-15428 (9th Cir. Mar. 9, 2015); *Teixeira v. Cnty. of Alameda*, No. 12-CV-03288-WHO, 2013 WL 4804756, at *6 (N.D. Cal. Sept. 9, 2013), *appeal docketed*, No. 13-17132 (9th Cir. Oct. 23, 2013).

It is beyond doubt that the UHA imposes "conditions or qualifications on the commercial sale of arms," a category of laws the Supreme Court places outside the scope of the Second Amendment. No further analysis is necessary.

### C. *Jackson* Recognizes That Individual Laws Falling into *Heller*'s Enumerated Exceptions Need Not Be Independently "Longstanding"

Appellants mistakenly argue that "it is not enough to simply declare a regulation 'commercial.' There must be something more—the contested practice must have some historical pedigree to warrant exclusion from the Constitution's reach." *See* Opening Br. 33, 36–37. This is contrary to *Heller* and Ninth Circuit precedent, regardless of the Fifth Circuit's position in *NRA v. ATF* (which in fact declined to decide this issue, but did uphold the challenged law). *See* Opening Br. 36; *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 206 (5th Cir. 2012). The Supreme Court already made this judgment when it identified the enumerated categories in *Heller* as outside the

scope of the Second Amendment. If a law fits into one of these categories, it is not subject to challenge because laws of that type have a historical background that puts them beyond scrutiny—whether or not the specific law has a direct ancient analogue. Ninth Circuit precedent properly applies *Heller* on this issue, and the Court should reject Appellants' alternative approach.

Again, *Jackson* clearly states the Circuit's governing analytical framework for this question and rejects any inquiry into the historical background of laws falling into *Heller*'s categorical exceptions. *Jackson* makes clear that a law regulates conduct outside the scope of the Second Amendment if it *either* falls into an enumerated category *or* if "persuasive historical evidence" shows that the law's impact is outside the Amendment's traditional scope. 746 F.3d at 960. Accordingly, when evaluating whether the challenged laws fit into any of *Heller*'s exceptions, the *Jackson* court did not look to the laws' history. Rather, it conducted its historical analysis *separately and apart from* the enumerated categories, to determine if the laws were otherwise historically beyond the Second Amendment's purview. *Id.* at 962, 968.

This has been the approach of this Court's decisions to date. Ninth Circuit cases concluding that a law is within one of *Heller*'s enumerated categories do not address those laws' longstanding nature. *See Vongxay*, 594 F.3d at 1115 (citing *Heller*'s exception language when evaluating § 922(g)(1), prohibiting possession

of a firearm by a person convicted of a felony, and concluding, without further analysis, that "felons are categorically different from the individuals who have a fundamental right to bear arms, and Vongxay's reliance on *Heller* is misplaced") (footnote omitted); *Nordyke*, 681 F.3d at 1044 (citing *Heller*'s language regarding conditions and qualifications on commercial sale and concluding, without a discussion of history, that "it is clear that, as applied to Plaintiffs' gun shows and as interpreted by the County, this regulation is permissible").

When the Ninth Circuit has considered a law's historical background, the analysis has been consistent with considering whether the law falls outside the Second Amendment's scope independent of *Heller*'s exceptions, including when a law is similar or analogous to one of the categories but may fall outside the exception's purview. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (analyzing *separately* whether large-capacity magazines were "the subject of longstanding, accepted regulation" independent of *Heller*'s enumerated categories, and looking to "historical prevalence" *only* when determining whether such regulations were independently longstanding) (internal quotation marks omitted); *Chovan*, 735 F.3d at 1137 (examining the historical record only after concluding that firearm prohibitions for domestic violence misdemeanants were "not mentioned in *Heller*").

This Court's governing approach is the most logical way to read *Heller*. Under *Heller*, it cannot be that each and every law falling within the enumerated categories must also individually meet a minimum standard of historical vintage, as the exceptions identified by the Court hale from various different eras. It is impossible to discern from *Heller* any time period against which such laws should be measured.

Statutes forbidding felons from possessing firearms, particularly non-violent felons, for example, emerged in the middle of the 20th century. *See Barton*, 633 F.3d at 173 (noting that the "first federal statute disqualifying felons from possessing firearms was enacted in 1938," and that "Congress did not bar non-violent felons from possessing guns until 1961"); *Heller v. Dist. of Columbia (Heller II)*, 670 F.3d 1244, 1253 (D.C. Cir. 2011). Prohibitions on possession by the mentally ill are only slightly older. *See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 90 n.11 (2d Cir. 2012) ("[P]rohibitions on the possession of firearms by felons and the mentally ill . . . were not enacted until the early twentieth century."). *Heller* references authorities concerning "dangerous and unusual" weapons ranging from the Founding era to the mid-1800s. *See Heller*, 554 U.S. at 627.

The lack of any consistent standard for what is "longstanding" is compounded by the inconsistency and arbitrariness of using a law's age as the defining condition for lawfulness. *See United States v. Booker*, 644 F.3d 12, 24

(1st Cir. 2011) ("Nor can it be that the relative age of a regulation is the key to its constitutionality. As the Seventh Circuit has observed, '[i]t would be weird to say that § 922(g)(9) is unconstitutional [at this time] but will become constitutional by 2043, when it will be as 'longstanding' as § 922(g)(1) was when the Court decided *Heller*.'") (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)). This tension may inform some courts' forgoing historical analysis when upholding felon-in-possession laws. *See, e.g.*, *Vongxay*, 594 F.3d at 1118 (upholding federal felon-in-possession statute without heightened scrutiny even though "the historical question has not been definitively resolved").

In addition, *Heller*'s closing language shows that the Court already concluded that each exception is independently historically justified, stating: "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635.

In sum, the only way to read *Heller* consistently and clearly is to recognize that a law falling into one of the categorical exceptions need not be independently "longstanding." This Circuit has already recognized this, and this Court should reject Appellants' bypassing binding authority.

**IV. THERE IS NO SECOND AMENDMENT RIGHT TO PURCHASE UNSAFE HANDGUNS**

Appellants' argument is anchored in the concept that any firearm that is "in common use," and essentially any handgun, is a constitutionally protected item whose purchase, possession, and use cannot be regulated. Because Appellants claim a Second Amendment right to purchase any such firearm, they claim the UHA violates the Second Amendment under any standard. But this misreads *Heller*, which states that one has *no right* to arms *not* in common use, but does not create a parallel blanket right to any and all arms that *are* in common use. *See* 554 U.S. at 625. The Second Amendment "does not protect guns, but rather conduct." *See* ER23 (District Court Order at 22) (citing *Chovan*, 735 F.3d at 1136).

Under the framework already adopted by the Ninth Circuit, even if conduct falls within the scope of the Second Amendment, there is no violation unless the proper two-step means-fit analysis demonstrates a violation. The exclusion of "dangerous and unusual" weapons, or those not in "common use," from the Second Amendment's purview does not imply that all weapons falling outside that description are necessarily subject to absolute Second Amendment protection. For example, *Marzzarella* upheld the prohibition on possessing a handgun with an obliterated serial number, reasoning in part that "[t]he mere fact that some firearms possess a nonfunctional characteristic should not create a categorically protected class of firearms on the basis of that characteristic." 614 F.3d at 94.

The Ninth Circuit has recognized "corollary rights" that must exist for the Second Amendment right to be realized, but these are not absolute, either. In *Jackson*, the court recognized a corollary right to purchase some form of ammunition—but not highly destructive hollow-point bullets. *See* 746 F.3d at 969. *Fyock* also acknowledged that, "to the extent that certain firearms capable of use with a magazine . . . are commonly possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that there must also be some corollary, *albeit not unfettered*, right to possess the magazines necessary to render those firearms operable." 779 F.3d at 998 (emphasis added).

The right Appellants infer from this case law, however, is far broader than these limited holdings. *Jackson* and *Fyock* recognize the right to access items necessary to effectuate use of a firearm for self-defense purposes. *Ezell* similarly recognized a right to become proficient in the use of that firearm, in order to effectuate defending oneself. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Appellants claim that there is a right to commercially purchase *any* handgun *of their choice*, but this is not a right necessary to effectuate the core Second Amendment right to possess a handgun in the home for self-defense purposes. *See, e.g.*, *Heller II*, 670 F.3d at 1262. *Heller* held that handguns are entitled to at least some constitutional protection as a *class* of firearm commonly chosen for self-defense purposes, but did not purport to create absolute protection

for *specific models* of handguns. Ninth Circuit case law is in accordance with this principle.

## V. EVEN IF HEIGHTENED REVIEW WERE PROPER, INTERMEDIATE SCRUTINY WOULD BE THE APPROPRIATE STANDARD

Even if the Court were to conclude that the UHA does not fit one of *Heller*'s enumerated exceptions and to move on to the second step of the analysis, intermediate scrutiny is the proper standard for the Court to apply. The applicable level of scrutiny depends on "how close the law comes to the core of the Second Amendment right," and "the severity of the law's burden on that right." *See Jackson*, 746 F.3d at 960–61. In the case of the UHA, both considerations weigh in favor of applying intermediate scrutiny. Indeed, courts overwhelmingly apply intermediate scrutiny to Second Amendment challenges that reach the second prong of the analysis. *See Chovan*, 735 F.3d at 1138 n.5 (collecting cases in the context of challenges to 18 U.S.C. § 922(g)(9) and similar statutes). Moreover, it would be antithetical to apply strict scrutiny to a "presumptively lawful" regulatory measure. *See NRA*, 700 F.3d at 206 ("[T]o the extent that these laws resemble presumptively lawful regulatory measures, they must not trigger strict scrutiny."); Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U.L. Rev. 375, 422 (2009) (analogizing the commercial sale of

arms to commercial speech, which receives reduced protection under the First Amendment).

### A.    <u>The UHA Does Not Affect the Core of the Second Amendment</u>

The core of the Second Amendment right is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Chovan*, 735 F.3d at 1138 (internal citation and quotation marks omitted). The UHA's focus and impact falls far from the core of the Second Amendment right.

The UHA does not create a prohibition on the possession of any handgun, and has nothing to do with whether any handgun may be used in defense of hearth and home. *See NRA v. ATF*, 700 F.3d at 206–07 (concluding that the federal law requiring a minimum age for a commercial handgun purchase did not implicate the core of the Second Amendment). Appellants do not argue that the guns they wish to purchase are more effective for purposes of self-defense in the home, or that the more than 800 handgun models lawfully available are somehow deficient for self-defense purposes. *See Jackson*, 746 F.3d at 968 ("There is no evidence in the record indicating that ordinary bullets are ineffective for self-defense."). Instead, Appellants argue that reducing the firearms available for purchase is itself a substantial burden on the core of the right, even though hundreds of handgun models remain available. *See* Opening Br. 51.

Unlike the blanket prohibition at issue in *Heller*, the UHA does not prevent law-abiding citizens from possessing an entire class of firearm. Such a ban burdens the core of the Second Amendment right, because it entirely forecloses the use of handguns for self-defense purposes. Under the UHA, in sharp contrast, more than 800 handgun models remain available for commercial sale and may be used for this very purpose. As the District Court pointed out below, "each individual plaintiff admits to both having obtained and being able to obtain handguns capable of use for self-defense." ER21 (District Court Order at 20). Appellants may be unable to obtain the *exact* handgun model of their choosing, but this is simply not part of the core protection of the Second Amendment, which "does not protect guns, but rather conduct." ER23 (District Court Order at 22) (citing *Chovan*, 735 F.3d at 1136).

The UHA impacts only which safety features a handgun must possess to be available for commercial sale. It does not affect self-defense in the home, except to ensure that the guns Californians purchase for their self-defense are reliable and equipped with a certain baseline level of safety features.

**B.    The UHA Does Not Substantially Burden Second Amendment Rights**

"[I]f a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, we may apply intermediate scrutiny." *Jackson*, 746 F.3d at 961. The Court is guided in this

analysis by the "time, place, and manner" jurisprudence used to analyze First Amendment claims. *Id*. Thus, laws that regulate only the "manner" of exercising Second Amendment rights, or leave open alternative channels for self-defense, are less burdensome on the right. *Id*.; *Chovan*, 735 F.3d at 1138.

The UHA regulates only which *types* of handguns may be purchased commercially in California. This is conduct regulating the "manner" of Second Amendment exercise, affecting the means but not the ability of an individual to exercise the right. *See Marzzarella*, 614 F.3d at 97 (analogizing requiring serial numbers on firearms as regulation on the "form" of conduct, and similar to "time, place, and manner" restrictions, upholding a law that "leaves a person free to possess any otherwise lawful firearm he chooses"). The UHA is also not an absolute prohibition on any class of weapons or type of conduct. Laws regulating or limiting conduct are less burdensome than outright prohibitions. *See id*.; *Ezell*, 651 F.3d at 708 ("The City's firing-range ban is not merely regulatory; it *prohibits* the 'law-abiding, responsible citizens' of Chicago from engaging in target practice . . .").

The UHA also leaves open many alternative methods for exercising one's Second Amendment rights, including private sales, purchasing one of the over 800 handguns on the roster, purchasing other forms of firearms, or purchasing a handgun falling into an enumerated exception. *See Fyock*, 779 F.3d at 999

(reasoning that large-capacity magazine ban did not affect ability to possess handguns, did not restrict ability to possess magazines generally, and had an exception for weapons that are inoperable without such a magazine); *NRA v. ATF*, 700 F.3d at 207; *Marzzarella*, 614 F.3d at 97.

The fact that Appellants cannot obtain the *particular* handguns they would prefer to purchase does not change the fact that they have access to, and indeed already own, handguns enabling them to effectively exercise the right of self-defense in their homes. *See Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015) ("Unlike the District of Columbia's ban on handguns, Highland Park's ordinance leaves residents with many self-defense options."); *Draper*, 2015 WL 997424, at *7 ("The regulation does not substantially burden the right to bear arms in self-defense in one's home because the ban on two kinds of Glock pistols in no way prevents citizens from obtaining a wide array of firearms."); *Kampfer v. Cuomo*, 993 F. Supp. 2d 188, 195–96 (N.D.N.Y. 2014), *appeal docketed*, No. 14-110 (2d Cir. Jan. 14, 2014) ("[A]mple firearms remain available to carry out the *'central component'* of the Second Amendment right: self-defense") (internal quotation marks and citations omitted). The availability of alternative means to exercise Appellants' Second Amendment rights is analogous to leaving open alternative channels of expression in the First Amendment context, even if those alternatives are not the speaker's exact preference. *See United States v. Decastro*,

682 F.3d 160, 167–68 (2d Cir. 2012) ("Regulation may 'reduce to some degree the potential audience for [one's] speech' so long as 'the remaining avenues of communication are [ ]adequate.'") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989)).

It is also important to note that the UHA does not address one's right to possess a handgun at all, nor does it create any limits on when or how one may possess a firearm in one's home. *See Heller II*, 670 F.3d at 1257–58 (noting that registration requirements were less burdensome because they did not prevent "an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose"). As Appellees establish, the UHA easily satisfies intermediate scrutiny as it is substantially related to important government interests. *See* Opp'n Br. 36–40.

## VI.  **CONCLUSION**

*Amicus curiae* respectfully requests that the Court affirm the District Court's determination that the UHA fits squarely into the "presumptively lawful" category of regulations placing "conditions and qualifications on the commercial sale of arms" identified by the Supreme Court in *Heller*, and is therefore constitutional.

Dated:  September 28, 2015

s/ *Grace R. DiLaura*

David H. Fry
Grace R. DiLaura
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Fax: (415) 512-4077

Attorneys for *Amicus Curiae* Law Center
to Prevent Gun Violence

## **CERTIFICATION OF COMPLIANCE WITH RULE 32(a)**

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 6,945 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word 2010 in 14-point Times New Roman font.


Dated:  September 28, 2015          *s/ Grace R. DiLaura*
                                    David H. Fry
                                    Grace R. DiLaura
                                    Munger, Tolles & Olson LLP
                                    560 Mission Street, 27th Floor
                                    San Francisco, CA 94105-2907
                                    Telephone: (415) 512-4000
                                    Fax: (415) 512-4077

                                    Attorneys for *Amicus Curiae* Law Center
                                    to Prevent Gun Violence

## CERTIFICATION OF SERVICE

I hereby certify that on September 28, 2015, I electronically filed the foregoing Brief of *Amicus Curiae* Law Center to Prevent Gun Violence in Support of Defendant-Appellee with the Clerk of the Court using the CM/ECF System and served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

Dated:  September 28, 2015

s/ *Grace R. DiLaura*
Grace R. DiLaura
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Fax: (415) 512-4077

Attorneys for *Amicus Curiae* Law Center
to Prevent Gun Violence