# In the United States Court of Appeals for the Ninth Circuit

―――――――――――――――

IVAN PEÑA, ROY VARGAS, DOÑA CROSTON, BRETT THOMAS,
SECOND AMENDMENT FOUNDATION, INC., AND THE CALGUNS FOUNDATION, INC.
*Plaintiffs-Appellants,*

v.

STEPHEN LINDLEY, CHIEF OF THE CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS,
*Defendant-Appellee.*

―――――――――――――――

On Appeal from the United States District Court
for the Eastern District of California

No. 2:09-cv-01185-KJM-CKD
(The Honorable Kimberly J. Mueller, United States District Judge)

―――――――――――――――

**BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF APPELLEE AND AFFIRMANCE**

―――――――――――――――

J. ADAM SKAGGS
MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Amicus Curiae
Everytown for Gun Safety*

September 28, 2015

# CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Everytown for Gun Safety has no parent corporations. It has no

stock, and therefore, no publicly held company owns 10% or more of its stock.

/s/ Deepak Gupta

Deepak Gupta
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

# TABLE OF CONTENTS

Corporate disclosure statement ..................................................................... i

Table of Authorities ..................................................................................... iii

Introduction and interest of *amicus curiae* .................................................. 1

Statement ....................................................................................................... 3

    A.  Safety-based firearm regulations.................................................... 3

        1.  In the Founding Era, colonies and States regulate gunpowder manufacturing to ensure public safety. ................................. 3

        2.  From the early 19th century onwards, States regulate firearm quality and performance to ensure public safety................................ 4

        3.  States require that new firearm models pass design and manufacturing tests before sale. ........................................... 5

        4.  Between the 1980s and early 2000s, States implement regulations requiring firearms to possess specific safety features— including chamber-load indicators and magazine disconnects. ........... 7

        5.  Starting with Maryland in 1988, States create rosters of guns approved for sale. ................................................................ 9

    B.  Registration and serialization to facilitate law enforcement ..................... 12

        1.  Firearm registration begins in the colonial period. ............................ 12

        2.  Serialization becomes popular in the late 19th century, facilitating widespread registration laws in the early 20th century.................................................................................... 12

        3.  States seek to facilitate law enforcement based on information from shell casings. ........................................................ 15

Argument ...................................................................................................... 19

  Because the plaintiffs have not shown that California's Unsafe Handgun Act burdens their right of self-defense, the district court's decision should be affirmed. ......................................................... 19

    A.  The plaintiffs have not shown that the Unsafe Handgun Act burdens their right of self-defense........................................... 20

    B.  Plaintiffs' extreme "common use" theory conflicts with Supreme Court and Ninth Circuit precedent, rests on flawed constitutional analogies, and would lead to absurd results............................ 23

Conclusion ................................................................................................... 30

Appendix of state firearms statutes

# TABLE OF AUTHORITIES

## Cases

*Carey v. Population Services International,*
    431 U.S. 678 (1977) ........................................................ 26

*Clark v. Community for Creative Non-Violence,*
    468 U.S. 288 (1984) ........................................................ 21

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..................................................*passim*

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015) ................................... 24, 27

*Fyock v. City of Sunnyvale,*
    799 F.3d 991 (9th Cir. 2015) .......................................... 24

*Glossip v. Gross,*
    135 S. Ct. 2726 (2015) .................................................... 29

*Griswold v. Connecticut,*
    381 U.S. 479 (1965) ........................................................ 26

*Heller v. District of Columbia,*
    — F.3d —, 2015 WL 5472555 (D.C. Cir. Sept. 18, 2015).................... 20, 22, 23

*Jackson v. City & County of San Francisco,*
    746 F.3d 953 (9th Cir. 2014)....................... 21, 24, 25, 27

*Kampfer v. Cuomo,*
    993 F. Supp. 2d 188 (N.D.N.Y. 2014) .............................. 24

*Lim v. City of Long Beach,*
    217 F.3d 1050 (9th Cir. 2000)........................................ 21

*McDonald v. City of Chicago,* 561 U.S. 742 (2010)........................ 19, 24, 27

*People ex rel. Darling v. Warden,*
    139 N.Y.S. 277 (N.Y. App. Div. 1913) ........................... 13

*Peruta v. San Diego,*
    No. 10-56971 (9th Cir.) ................................................................ 1

*Silvester v. Harris,*
    No. 14-16840 (9th Cir.) ................................................................ 1

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ................................................ 22, 25

*Voting for America, Inc. v. Steen,*
    732 F.3d 382 (5th Cir. 2013) ........................................................ 21

**Legislative and Regulatory Materials**

18 U.S.C. § 921(a)(34) ...................................................................... 8

18 U.S.C. § 922(z)(1) ........................................................................ 8

18 U.S.C. § 923 ............................................................................... 15

1917 Cal. Stat. 222-23, § 7 ............................................................ 14

Cal. Penal Code § 16380 ................................................................ 11

Cal. Penal Code § 31910 .................................................................. 3

Cal. Penal Code § 31910(b)(4) ......................................................... 9

Cal. Penal Code § 31910(b)(7)(A) .................................................. 16

Cal. Penal Code § 32000 ................................................................ 11

Cal. Penal Code § 32010(d) ........................................................... 11

Cal. Penal Code § 32015(a) ............................................................ 11

Cal. Penal Code § 32030 ................................................................ 11

Senate Bill Analysis: S.B. 489 (Cal. 2003) ................................... 11

Senate Bill Analysis: S.B. 510 (Cal. 2001) ................................... 12

1911 Colo. Sess. Laws 408-09, § 3 ................................................ 14

1923 Conn. Acts 3709, § 11 ............................................. 15

26 Del. Laws 28 (1911) .................................................. 14

26 Del. Laws 29 (1911) .................................................. 14

26 Del. Laws 29, § 4 (1911) ............................................. 14

D.C. Act. § 17-651 (2009) ............................................... 16

1893 Fla. Acts 71 ....................................................... 13

1925 Haw. Sess. Laws 790-91, § 2136 .................................... 14

1975 Haw. Sess. Laws 281 ................................................. 7

1925 Ill. Laws 340, § 2 ................................................. 14

1973 Ill. Laws 1130, § 1 ................................................. 7

1925 Ind. Acts 497-98, § 9 .............................................. 15

1913 Iowa Acts 308-09, § 3 .............................................. 14

1913 Iowa Acts 308-09, § 9-10 ........................................... 14

1821 Me. Laws 685, ch. 162 § 1 ........................................... 4

1988 Md. Laws 3494 ....................................................... 9

1988 Md. Laws 3495 ....................................................... 9

1988 Md. Laws 3496 ....................................................... 9

2003 Md. Laws 246 ........................................................ 8

Md. Code Ann., Pub. Safety § 5-131 ..................................... 16

Md. Code Ann., Pub. Safety §§ 5-403-06 .................................. 9

1809 Mass. Acts 444, ch. 52 ............................................. 3

1814 Mass. Acts 464-65, § 2 ............................................. 4

1881 Mass. Acts 333-34, ch. 60 § 18.........................................................4

1998 Mass. Acts 364 § 19.......................................................................7

1998 Mass. Acts 379-80 § 41 ...............................................................10

501 Mass. Code Regs. § 7.03...............................................................10

501 Mass. Code Regs. § 7.04(2)...........................................................10

940 Mass. Code Regs. § 16.05(1)...........................................................8

940 Mass. Code Regs. § 16.05(3)...........................................................8

Mass. Gen. Laws ch. 140, § 123 .........................................................10

1925 Mich. Acts 475, § 11 ..................................................................14

1927 Mich. Acts 891, § 9 ....................................................................15

1975 Minn. Laws 1279 ..........................................................................7

1975 Minn. Laws 1283 ..........................................................................7

1921 Mo. Laws 692, § 1 ..................................................................14, 15

1921 Mo. Laws 692, § 2 ......................................................................15

1921 Mo. Laws 692, § 3 ......................................................................15

1918 Mont. Laws 6, § 1 ......................................................................14

1918 Mont. Laws 6, § 3 ......................................................................15

1786 N.H. Laws 10, ch. 22 ....................................................................3

1820 N.H. Laws 274, ch. 15 §§ 1-9.........................................................3

1820 N.H. Laws 274-75, ch. 15 § 3 .........................................................3

1923 N.H. Laws 140, § 12 ....................................................................15

1776-77 N.J. Laws 6-7, ch. 6, § 1............................................................3

1911 N.Y. Laws 443, § 1 ........................................................ 13, 14

1913 N.Y. Laws 1628, § 1 .......................................................... 13

1974 N.Y. Laws 2665-66, § 1 ........................................................ 5

N.Y. Gen. Bus. Law § 396-ff ...................................................... 16

N.Y. Penal Law § 400.12(a) ......................................................... 6

N.Y.C.R.R. 9, § 482.2 ............................................................... 6

N.Y.C.R.R. 9, § 482.5 ............................................................... 6

N.Y.C.R.R. 9, § 482.5(a) (1980) .................................................... 7

N.Y.C.R.R. 9, § 482.5(f) ............................................................ 8

N.Y.C.R.R. 9, § 482.6 ............................................................... 6

N.Y.C.R.R. 9, § 482.6(c) ............................................................ 7

1919 N.C. Sess. Laws 397, § 1 ..................................................... 15

1919 N.C. Sess. Laws 398-399, § 5 ................................................ 14

1923 N.D. Laws 383, § 14 .......................................................... 15

1795 Pa. Laws 240, § 2 .............................................................. 4

1795 Pa. Laws 242, § 6. ............................................................. 4

1776 R.I. Laws 18-19 (Oct. Sess.) .................................................. 3

1973 S.C. Acts 733, § 1 ............................................................. 7

1631 Va. Acts 155, Acts of Feb. 24, 1631, Act LVI ............................... 12

1926 Va. Acts 285, § 1 ............................................................. 14

12 Geo. 3, c. 61 (1764) (Eng.) ...................................................... 3

**Miscellaneous**

William Blackstone, *Commentaries on the Laws of England* (1769) ................................. 3

California Department of Justice, *Roster of Handguns Certified for Sale*, http://certguns.doj.ca.gov/ (last visited Sept. 23, 2015) .................................... 20

Perry Chiaramonte, *Gun fight: Smith & Wesson, Ruger quit California over stamping requirement*, Fox News, Jan. 26, 2014 ..................................... 18

Sarah Childress, *What Happened When a Major Gun Company Crossed the NRA*, PBS Frontline, Jan. 16, 2015 ..................................... 18

Daniel L. Cork, *Some Forensic Aspects of Ballistic Imaging*, 38 Fordham Urban L. J. 473 (2011) ..................................... 17

Saul Cornell, *A Well-Regulated Militia* (2006) ..................................... 12

Everytown, *Not Your Grandparents' NRA* (Apr. 24, 2014) ..................................... 17

Monica Fennell, *Missing the Mark in Maryland*, 13 Hamline J. Pub. L. & Pol'y 37 (1992) ..................................... 7

Erica Goode, *Method to Track Firearm Use is Stalled by Foes*, N.Y. Times, June 12, 2012 ..................................... 17

Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 84 Tenn. L. Rev. ___ (forthcoming 2016) ........... 26, 28

Emily Miller, *Smith & Wesson to stop selling guns in California due to microstamping law*, Washington Times, Jan. 4, 2014 ..................................... 18

National Rifle Association, *Serialization*, NRA National Firearms Museum ..................................... 12

Roger Pauly, *Firearms: The Life Story of a Technology* (2004) ..................................... 5

Paul A. Shackel, *Culture Change and the New Technology: An Archaeology of the Early American Industrial Era* (1996) ..................................... 5

Tom W. Smith, *1997-98 National Gun Policy Survey of the National Opinion Research Center* (1998) ..................................... 11

Smithsonian Institution, *Firearms: An Illustrated History* (2014)....................................... 8

Sam B. Warner, *Uniform Pistol Act*, 29 Am. Inst. Crim. L. & Criminology
    529 (1938)....................................................................................................... 14

U.S. Government Accountability Office, *Accidental Shootings: Many Deaths
    and Injuries Caused by Firearms Could Be Prevented* (1991)........................................ 12

U.S. Patent No. 891,438 (1908)............................................................................. 9

U.S. Patent No. 984,519 (1911)............................................................................. 9

**INTRODUCTION AND INTEREST OF *AMICUS CURIAE***

Everytown for Gun Safety is the largest gun-violence-prevention organization in the nation, with over three million supporters, including the mayors of over 40 California cities. Everytown has drawn on its expertise to file briefs in several Second Amendment cases, offering historical and doctrinal analysis that might otherwise be overlooked. *See, e.g., Peruta v. San Diego,* No. 10-56971 (9th Cir.); *Silvester v. Harris*, No. 14-16840 (9th Cir.). It seeks to do the same here.[1]

California's Unsafe Handgun Act requires handguns to include safety features—including chamber-load indicators and magazine-disconnect mechanisms—as well as microstamping, a technology to help law enforcement solve and prevent crimes. The plaintiffs here, all of whom already own handguns, claim that this Act "destroys" their Second Amendment right of self-defense because it allows "only 817 total handgun models" to be sold in the State.

Everytown files this brief to show that the Act does not burden the plaintiffs' Second Amendment rights and is constitutional under *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Heller* casts no doubt on laws that "do not remotely burden the right of self-defense as much as an absolute ban on handguns," such as "laws imposing conditions and qualifications on the commercial sale of arms," which

---

[1] All parties consent to this brief's filing, and no counsel for a party authored it in whole or part. Apart from *amicus*, no person contributed money to fund its preparation or submission.

carry "historical justifications." *Id.* at 626-27, 632, 635. That describes this Act. The plaintiffs have shown *no* burden on their self-defense right. And although they say that "there is no persuasive historical evidence" supporting the Act, there is in fact a rich history of laws regulating gun safety and assisting law enforcement.

Unable to demonstrate any burden, the plaintiffs instead advance a novel legal theory that no judge anywhere has accepted and that is incompatible with this Court's precedents: that the Second Amendment confers an absolute right to acquire any handgun model—in any style or color—so long as it is commonly sold in some States. They ground this theory in an analogy to the First Amendment's protection of the right to purchase particular books. But the Second Amendment under *Heller* does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. It protects the right of self-defense, not self-expression.

If the plaintiffs' theory were accepted, it would also lead to absurd results. Any time firearm technology changed, all States would have to ban that technology immediately, without knowing how it works or what the consequences would be, or else forever forfeit their ability to do so. And no State could require new technology to make guns safer. The upshot would be to freeze regulation in place nationwide, ending our long historical tradition of allowing gun laws to promote public safety and keep pace with technology. The theory is as dangerous as it is unprecedented.

**STATEMENT**

California's Unsafe Handgun Act has two key features: It requires handguns sold in the State to meet certain safety standards. Cal. Penal Code § 31910. And it requires the implementation of microstamping technology to help solve and prevent crimes. *Id.* In both respects, the Act carries forward a historical tradition of regulating firearms to achieve these goals in light of the latest technology.

**A.   Safety-Based Firearm Regulations**

**1. In the Founding Era, colonies and States regulate gunpowder manufacturing to ensure public safety.** Anglo-American regulation of ammunition dates to before the American Revolution. *See* 12 Geo. 3, c. 61 (1764); 4 Blackstone, *Commentaries on the Laws of England* 168 (1769); 1786 N.H. Laws 10, ch. 22. Once reliable testing methods became available, States began implementing regulations requiring inspection and pre-market approval of all gunpowder intended for sale.[2] Inspectors gave casks of approved gunpowder a distinguishing mark (*e.g.*, "New-Hampshire inspected proof") to signal to the purchaser that they were safe for use; they labeled gunpowder of inferior quality "condemned" and forbade its sale. 1820 N.H. Laws 274-75, ch. 15 § 3.

Other States went further, prescribing specific procedures and technology for gunpowder inspections. A 1795 Pennsylvania statute, for example, mandated

---

[2] *See, e.g.,* 1776 R.I. Laws 18-19 (Oct. Sess.); 1776-77 N.J. Laws 6-7, ch. 6, § 1; 1809 Mass. Laws 444, ch. 52; 1820 N.H. Laws 274, ch. 15 §§ 1-9.

use of a then-recent invention—a "pendulum powder proof, with a graduated arch and catch-pall"—to "prove" the strength of the gunpowder, and required inspectors to label gunpowder casks the "lowest," "middle," or "highest" proof. 1795 Pa. Laws 240, § 2. Once tested, each cask was stamped with this grade and the mark "S.P." ("State of Pennsylvania"). *Id.* at 242, § 6.

   **2. From the early 19th century onwards, States regulate firearm quality and performance to ensure public safety.** In the early 19th century, States began to require that firearms themselves pass pre-market safety and quality inspections. These laws provided for the appointment of "provers of gun barrels," who would "try the strength" of firearms and mark those that passed inspection. *E.g.*, 1821 Me. Laws 685, ch. 162 § 1. Some statutes also charged "provers" with numbering firearms—making possible a registry of approved guns, owners, and manufacturers. *Id.* This was later supplemented by procedures for stamping approved gun barrels. 1881 Mass. Acts 333-34, ch. 60 § 18. Those who attempted to sell new, unproved firearms or tamper with the markings could be fined, as could those who "knowingly purchase[d]" unapproved firearms. 1814 Mass. Acts 464-65, § 2.

   **3. States require that new firearm models pass design and manufacturing tests before sale.** In addition to expanding the types of guns available, the Industrial Revolution enabled firearm manufacturers to efficiently

vary the price and quality of weapons. *See* Paul A. Shackel, *Culture Change and the New Technology: An Archaeology of the Early American Industrial Era* 160 (1996). By driving down costs and transferring the savings to customers, manufacturers found that they could capture previously untapped markets. Price competition was especially fierce during the Civil War and the two World Wars, as manufacturers scrambled to produce low-cost, reasonably reliable firearms for standard military issue. *See* Roger Pauly, *Firearms: The Life Story of a Technology* 107, 112-13 (2004). Some manufacturers, however, sacrificed safety to maximize economies of scale. By the second half of the 20th century, as one state legislature observed, cost savings were often achieved by manufacturing guns "without the normal safety features and with inferior materials and poor workmanship." 1974 N.Y. Laws 2665-66, § 1.

In response, States beginning with New York in 1974 enacted regulations to prohibit the manufacture and sale of certain low-quality, unreliable firearms known as "junk guns" or "Saturday Night Specials." These regulations—which required new models to undergo a series of quality-assurance tests before sale—were 20th-century precursors to California's handgun law. Legislatures determined that these "inaccurate and unsafe" firearms "pos[ed] a danger to both the user and the public at large" and were "of no interest to persons who have a lawful right to possess a handgun for a legitimate purpose." *Id.* These laws also gave the state authority to promulgate regulations "establish[ing] safety standards" for "the manufacture and

assembly of firearms," "including specifications as to the materials and parts used" and "minimum standards of quality control." N.Y. Penal Law § 400.12(a). The regulations apply to all licensed gunsmiths and require licensees to obtain approval before assembling new firearms. N.Y.C.R.R. 9, § 482.2. Only firearms that satisfy a set of materials-and-design stipulations, as verified by inspection, are approved. *Id.*

"Firing tests," for example, are a primary method by which regulators confirm the durability and reliability of firearms. These tests—reminiscent of the Founding-era procedures for proving gun barrels—involve firing the gun for a specified number of rounds, then assessing whether it withstands successive discharges without cracking or malfunctioning. New York's testing typically consists of two parts. First, the experimenter fires "one proof cartridge in each chamber" and inspects the cartridge case, barrel, cylinder, slide, and cylinder-frame or receiver for "cracks, bulges, or splits." *Id.* § 482.5-6. Second, the experimenter "fire[s] 1,000 rounds of commercial ammunition" to test the weapon's endurance. *Id.* § 482.6.

"Melting point tests" are another method to ensure the safe use of firearms that became a regulatory tool during the 1970s. Because cheap metals melt at relatively low temperatures—and guns made out of low-quality materials tend to be unreliable, inaccurate, and unsafe—melting points were used a proxy for the gun's safety. *See* Monica Fennell, *Missing the Mark in Maryland*, 13 Hamline J. Pub. L.

& Pol'y 37, 65-67 (1992). By 1975, at least four States had laws requiring that firearm components not melt at less than 800 or 1,000 degrees Fahrenheit, and other States followed suit over the next few decades.[3] Illinois, for instance, passed a law in 1973 prohibiting the sale of firearms containing parts that are "a die casting of zinc alloy or any other nonhomogeneous metal which will melt or deform at a temperature of less than 800 degrees Fahrenheit." 1973 Ill. Laws 1130, § 1.

In the 1980s, States began requiring a third test: dropping the firearm from various heights and angles to ensure that it is not prone to accidental discharge. The exact procedures for conducting this "drop testing" are often quite detailed. For example, one State requires a test in which the handgun is dropped "36 inches in a line parallel to the barrel upon the rear of the hammer spur, a total of five times," to ensure that it is safe. N.Y.C.R.R. 9, § 482.6(c) (1980). Another State requires that the tester drop the gun onto a solid slab of concrete from six different positions. 1998 Mass. Laws 364, § 19.

***4. Between the 1980s and early 2000s, States implement regulations requiring firearms to possess specific safety features— including chamber-load indicators and magazine disconnects.*** At the same time that States required firearms to pass firing, melting-point, and drop

---

[3] 1973 Ill. Laws 1130, § 1; 1973 S.C. Acts 733, § 1; 1975 Minn. Laws 1279, 1283; 1975 Haw. Sess. Laws 281; *see also* N.Y.C.R.R. 9, § 482.5(a) (1980); 1998 Mass. Acts 364 § 19.

testing, they also enacted laws requiring manufacturers to incorporate certain safety-oriented design features into firearms. These include safety mechanisms, which have existed for centuries but have become far more ubiquitous because of regulation. *See* Smithsonian Institution, *Firearms: An Illustrated History* 34 (2014) (noting that a German gun invented circa 1560 included a "simple safety catch").

A New York regulation enacted in 1980 mandated "manual or automatically operated safety device[s]" in all pistols, and similar features for other firearms. N.Y.C.R.R. 9, § 482.5(f). Massachusetts similarly prohibits "sell[ing] a gun without a safety device." 940 Mass. Code Regs. § 16.05(1) (1997). Designed to "effectively preclude a five year old child from operating the handgun when it is ready to fire," that regulation provides a non-exhaustive list of design adjustments. *Id*.[4]

Another provision of the same Massachusetts regulation made it illegal to sell or transfer "any handgun which does not contain a load indictor or a magazine safety disconnect." *Id*. 16.05(3). In the early 1900s, inventors had filed patents for simple versions of both of these technologies, and several manufacturers later adopted them voluntarily as a design element of specific weapons. As described by the initial patents, a chamber-load indicator "provide[s] a positive and reliable

---

[4] Maryland prohibits dealers from selling, renting, or transferring new handguns "unless the handgun has an integrated mechanical safety device." 2003 Md. Laws 246. And federal law prohibits gun makers or dealers from selling or transferring guns without "a secure gun storage or safety device." 18 U.S.C. § 922(z)(1); *see also id*. § 921(a)(34).

device for indicating whether … a cartridge is contained in the chamber of the barrel," U.S. Patent No. 891,438 (1908), while magazine disconnects "insure absolutely against the dangerous accidental firing sometimes liable to occur if the trigger is pulled after the magazine is withdrawn." U.S. Patent No. 984,519 (1911). As discussed further below, California's Unsafe Handgun Act requires that certain handguns incorporate both century-old technologies: chamber-load indicators and magazine-disconnect mechanisms. Cal. Penal Code § 31910(b)(4).

**5. *Starting with Maryland in 1988, States create rosters of handguns approved for sale.*** Firearms testing and mandatory safety features cleared the path for comprehensive regulatory regimes directed toward creating rosters of handguns certified for sale. Maryland began implementing the first of these regimes in the 1980s, instituting a "Handgun Roster Board." *See* 1988 Md. Laws 3495. In deciding which guns to include on its roster, the Board was directed to consider "concealability; ballistic accuracy; weight; quality of materials; quality of manufacture; reliability as to safety; and caliber." *Id.* at 3496. Producing or distributing for sale a handgun manufactured after a certain date and not included in the roster was a misdemeanor punishable by $10,000 per violation. *Id.* at 3494. These provisions remain in effect. *See* Md. Code Ann., Pub. Safety §§ 5-403-06 (2003).

A decade later, Massachusetts established a handgun roster concurrently with firearms-testing requirements. Under this regulation, the Office of Public Safety must publish a list of "approved" handguns three times each year.[5] New guns may be added to the roster without testing by a Massachusetts-based "approved independent testing laboratory" if they are the "functional equivalent" of an approved firearm, or have undergone "identical" testing by a lab in another State. 501 Mass. Code Regs. § 7.04(2).

California's Unsafe Handgun Act is part of this generation of regulations. Enacted in 1998, it is a "narrower version" of a bill introduced the year before. ER4. The bill was motivated by concern that gun violence was the "leading cause of death[s] among young people ages 10 to 17 in California" in 1996, "[t]he overwhelming majority of [which] were caused by the cheaply manufactured Saturday Night Special." *Id.* It was also aimed at ensuring that "handguns fire when they are supposed to and that they do not fire when dropped." *Id.* As the bill's author put it, "[i]f a weapon is not reliable for self-defense it has no business being sold in California." *Id.*

To accomplish these objectives, the legislature implemented a pre-market-approval process including drop and firing testing and required that pistols and revolvers incorporate safety devices. Handguns meeting these requirements and

---

[5] Mass. Gen. Laws ch. 140, § 123; 501 Mass. Code Regs. § 7.03 (2007); 1998 Mass. Laws ch. 379-80 § 41.

determined "not to be unsafe" are listed on the approved-handgun roster. *See* Cal. Penal Code § 32015(a). With certain exceptions, the statute prohibits transfer of a handgun not listed. *Id*. § 32000. Like Massachusetts, California also allows sufficiently similar handguns to be listed without testing. *Id*. § 32030.

In 2003, California amended the Act to require two century-old safety technologies: magazine-disconnect mechanisms and chamber-load indicators "designed and intended to indicate to a reasonably foreseeable adult user of the pistol … whether a cartridge is in the firing chamber." Cal. Penal Code § 16380; *id.* § 32010(d). The bill's author, Senator Scott, observed that many gun-related deaths are caused by unintentional shootings that occur because the user thought the gun was incapable of firing. Senate Bill Analysis: S.B. 489, at 7 (Cal. 2003). He also cited a national survey showing that almost 35% of adults "either did not know that a gun could be fired, or believed that a gun could not be fired with the magazine removed." *Id.*; *see* Tom W. Smith, *1997-98 Nat'l Gun Policy Survey of the Nat'l Opinion Research Center* 17 (1998). The legislature was guided as well by a Johns Hopkins study concluding that magazine-disconnect mechanisms "are inexpensive and effective safety devices," and a 1991 GAO study estimating that "23% of accidental

shootings could … [be] prevented by chamber load indicators." Senate Bill Analysis: S.B. 510, at 5-6 (Cal. 2001).[6]

## B. Registration and Serialization to Facilitate Law Enforcement

*1. Firearm registration begins in the colonial period.* From the earliest period, colonial "government kept close tabs on the weapons citizens owned": the colonies routinely conducted censuses and inspections of colonists' guns to verify their quantity and quality. Saul Cornell, *A Well-Regulated Militia* 3 (2006). Under Virginia's 1631 census requirements, for example, "the commanders of all the severall plantations" would "take a muster" of the "armes and munition" owned by the plantations' inhabitants and submit it to the colony's government. 1631 Va. Acts 155, Acts of Feb. 24, 1631, Act LVI.

*2. Serialization becomes popular in the late 19th century, facilitating widespread registration laws in the early 20th century.* During the 1800s, prominent American gun manufacturers—including Colt and Winchester—began serializing firearms to track production and sales. *See Serialization*, NRA Nat'l Firearms Museum, 2364, 2390, http://bit.ly/1WrYZgk.

Over time, serialization became enough of an industry standard that it was incorporated into state firearms laws, particularly licensing regimes. One of the earliest licensing requirements—enacted in 1893—provided that, in issuing licenses

---

[6] U.S. Gov't Accountability Office, *Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented* 3-4 (1991).

to own "a Winchester or other repeating rifle," the county would record the "name of the person … , the name of the maker of the firearm so licensed to be carried and the caliber and *number* of the same." 1893 Fla. Acts 71 (emphasis added).

The majority of early licensing laws, however, pertained to handguns. In 1911, New York broke ground by enacting the Sullivan Act, criminalizing ownership of a concealable weapon without a license. *See* 1911 N.Y. Laws 443, § 1; 1913 N.Y. Laws 1628, § 1. This was an extension of a longstanding regulation limiting the carrying of concealed guns, and was intended as an "effective preventive to the possession of [concealable handguns] by the criminal classes." *People ex rel. Darling v. Warden*, 139 N.Y.S. 277, 423 (N.Y. App. Div. 1913). Another provision made it a misdemeanor for dealers to sell concealable guns to permit-less customers or to fail to document, for each gun sold, the sale's time and date and the "name, age, occupation and residence of every [firearms] purchaser … together with the caliber, make, model, *manufacturer's number or other mark of identification* on [the] pistol, revolver, or other firearm." 1911 N.Y. Laws 444, § 1 (emphasis added). Failing to maintain these records (which had to be signed by buyer and seller) or to show them to law enforcement was punishable by a fine,

imprisonment, or both. *Id.* Within twenty years, 24 other States and the District of Columbia had enacted similar registration requirements.[7]

Of the States that adopted regulations of this kind, seventeen (plus the District of Columbia) made maintaining sales records a condition of obtaining a permit to sell firearms, and criminalized sale without a permit.[8] The Uniform Firearms Act—promoted by the National Rifle Association in the early 20th century and adopted in several States—supported this method of ensuring that dealers thoroughly documented handgun sales. Sam B. Warner, *Uniform Pistol Act*, 29 Am. Inst. Crim. L. & Criminology 529, 531-32, n. 13 (1938). Although five States only required sales records to be made available for inspection by law enforcement upon request,[9] the vast majority enforced their record-keeping regulations by compelling firearms dealers to submit regular (or even daily) sales reports to local officials.[10] In addition to requiring firearms dealers to record sales, some States implemented mandatory firearm registration,[11] or forbade individuals

---

[7] *E.g.,* 1911 Colo. Sess. Laws 408-09, § 3; 26 Del. Laws 29, § 4 (1911); see the appendix to this brief for a complete list of statutes.

[8] *E.g.*, 26 Del. Laws 28 (1991)-29; 1913 Iowa Acts 308-09, § 9-10; see appendix.

[9] 1911 Colo. Sess. Laws 408-09, § 3; 26 Del. Laws 29, § 4 (1911); 1919 N.C. Sess. Laws 398-399, § 5; 1921 Mo. Laws 692, § 1; 1925 Ill. Laws 340, § 2.

[10] *E.g.*, 1913 Iowa Acts 308-09, § 3; 1917 Cal. Stat. 222-23, § 7; see appendix.

[11] 1918 Mont. Laws 6, § 1; 1925 Haw. Sess. Laws 790-91, § 2136; 1925 Mich. Acts 475, § 11; 1926 Va. Acts 285, § 1.

from buying guns without first acquiring a permit.[12] Michigan's process, among the most rigorous, required firearms owners to present their weapons for safety certification.[13]

Serial numbers were typically an important part of the registration process. *See*, *e.g.*, 1925 Ind. Acts 497-98, § 9 (specifying that firearms sellers "*shall …* [record the] manufacturer's number of the [transferred] weapon"). In addition, some registration statutes prohibited the sale or purchase of concealable weapons that were not "plainly and permanently marked" with the maker's trademark, the weapon's model, and a unique serial number. 1921 Mo. Laws 692, § 1, 3. Even States that did not require serialization recognized serial numbers' central role in facilitating firearms identification and criminalized their alteration.[14] Decades later, in 1968, Congress imposed a federal serialization requirement. 18 U.S.C. § 923 (mandating that all importers and manufacturers "identify" each gun by means of a "serial number engraved or cast on the [weapon's] receiver or frame").

**3.  *States seek to facilitate law enforcement based on information from shell casings.*** Over the past two decades, States have attempted to solve a problem left unaddressed by registration laws. Registration allows law enforcement

_____

[12] 1918 Mont. Laws 6, § 3; 1919 N.C. Sess. Laws 397, § 1; 1921 Mo. Laws 692, § 2.
[13] 1927 Mich. Acts 891, § 9.
[14] *E.g.*, 1923 Conn. Acts 3709, § 11; 1923 N.D. Laws 383, § 14; 1923 N.H. Laws 140, § 12; see appendix.

to find a gun's owner when that gun is recovered at a crime scene, but not to track a crime to a gun owner in the far more common situation in which police recover shell casings but not the gun itself.

A few jurisdictions tackled this problem by requiring dealers to provide law enforcement with samples of bullets or shell casings actually fired from any gun sold, which include distinctive markings unique to the gun that fired them.[15] In theory, a database containing these "ballistic fingerprints" would allow law enforcement to track casings recovered at a crime scene to the owner of the gun. The databases, however, proved unworkable given available technology.

In the wake of this failed first-generation strategy, California sought to accomplish the same goal through a less burdensome and more narrowly tailored approach: microstamping. California's approved firearms roster excludes any non-grandfathered pistol that is "not designed and equipped with a microscopic array of characters that identify the make, model, and serial number of the pistol." Cal. Penal Code § 31910(b)(7)(A). These "microstamped" characters must be etched on the pistol itself and must be "transferred by imprinting on each cartridge case when the firearm is fired." *Id.* Any shell casings recovered at a crime scene will thus lead law enforcement directly to the gun's owner.

---

[15] *See* N.Y. Gen. Bus. Law § 396-ff; D.C. Act. § 17-651 (2009); Md. Code Ann., Pub. Safety § 5-131.

One "distinct advantage" of this strategy is that it enables non-experts to assess forensic matches at the scene of a crime using "equipment no more sophisticated than a magnifying glass." Daniel L. Cork, *Some Forensic Aspects of Ballistic Imaging*, 38 Fordham Urban L. J. 473, 475 (2011). As former Baltimore Police Commissioner Frederick Bealefeld III put it: Microstamping "is one of these things in law enforcement that would just take us from the Stone Age to the jet age in an instant. I just can't comprehend the opposition to it." Erica Goode, *Method to Track Firearm Use is Stalled by Foes*, N.Y. Times, June 12, 2012, http://nyti.ms/1FyxNbq.

Governor Arnold Schwarzenegger signed the microstamping bill into law in 2007. To ensure that the technology would be available and feasible, the law did not take effect until May 2013, when the California Justice Department certified that the technology was available to more than one manufacturer. ER7-8.

Despite the technology's feasibility and capacity to solve violent crimes, the National Rifle Association and its allies—including members of one of the organizational plaintiffs here—have vigorously opposed microstramping and sought to thwart its implementation. *See, e.g.*, Everytown, *Not Your Grandparents' NRA* (Apr. 24, 2014), http://every.tw/1KUJg5L (chronicling the NRA's opposition efforts); Calguns, http://bit.ly/1KzhHNY (poll of Calguns members showing intent of more than 82% of respondents to "boycott" any "manufacturer [that]

caved in and implemented micro-stamping"). Their efforts have thus far paid off: Last year, Smith & Wesson, a leading gun maker, announced that it would pull its guns from the California market rather than equip them with microstamping. Perry Chiaramonte, *Gun fight: Smith & Wesson, Ruger quit California over stamping requirement*, Fox News, Jan. 26, 2014, http://fxn.ws/1e7BXHd.

Smith & Wesson's decision should have come as no surprise. It knew full well the consequences of crossing the NRA. Fourteen years earlier, the company had been the target of a devastatingly effective boycott after agreeing to adopt basic firearm-safety features (like child locks) in response to a wave of litigation. *See* Sarah Childress, *What Happened When a Major Gun Company Crossed the NRA*, PBS Frontline, Jan. 16, 2015, http://to.pbs.org/1sVVQuu. This time, rather than subject itself to another boycott, Smith & Wesson's CEO publicly declared that the company would "continue to work with the NRA" to oppose microstamping. Emily Miller, *Smith & Wesson to stop selling guns in California due to microstamping law*, Washington Times, Jan. 4, 2014, http://bit.ly/1askXMx.

# ARGUMENT

**BECAUSE THE PLAINTIFFS HAVE NOT SHOWN THAT CALIFORNIA'S UNSAFE HANDGUN ACT BURDENS THEIR RIGHT OF SELF-DEFENSE, THE DISTRICT COURT'S DECISION SHOULD BE AFFIRMED.**

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," and struck down as unconstitutional a law "totally ban[ning] handgun possession in the home." 554 U.S. 570, 629, 635 (2008). The Court made clear, however, that its analysis does not "suggest the invalidity of laws" that "do not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* at 632. And it specifically identified several "examples" of laws—including "laws imposing conditions and qualifications on the commercial sale of arms"—that are considered "exceptions" to the self-defense right by virtue of their "historical justifications," and thus deemed constitutional. *Id.* at 626-27 n.26, 635.[16]

Applying that precedent here, California's Unsafe Handgun Act must be upheld. The plaintiffs have not shown that the Act—a commercial-sales restriction with historical antecedents that have advanced similar interests since the nation's Founding—imposes *any* burden on their ability to defend themselves, let alone

---

[16] Two years later, the Supreme Court held that "the Second Amendment right recognized in *Heller*"—of which "individual self-defense is the *central component*"—applies to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 768, 791 (2010) (internal quotation marks omitted).

more than a "de minimis" burden. *Heller v. District of Columbia*, — F.3d —, 2015 WL 5472555, *6 (D.C. Cir. Sept. 18, 2015) (*Heller III*).

Unable to make the required showing, the plaintiffs instead ask this Court to adopt a radical interpretation of the Second Amendment, under which each handgun model—as soon as it is sold in some States—becomes sacrosanct and exempt from regulation in *any* State. That extreme view cannot be reconciled with *Heller* and has not been endorsed by a single judge. If accepted, it would allow the gun industry (aided by the inaction of some state legislatures) to define the scope of the Second Amendment, rendering other States powerless to require even the most basic gun-safety features. This Court should reject that novel theory out of hand.

## A. The plaintiffs have not shown that the Unsafe Handgun Act burdens their right of self-defense.

The Unsafe Handgun Act does not prohibit the possession or ownership of any handgun used for self-defense. Nor does it prohibit the commercial sale of all handguns. Quite the contrary: The Act currently permits 822 different handgun models to be sold in California, including nearly 600 semiautomatic models, and requires only that handguns have certain safety features to be approved for sale. California DOJ, *Roster of Handguns Certified for Sale*, http://certguns.doj.ca.gov/ (last visited Sept. 23, 2015). The plaintiffs here, moreover, admit that they already own handguns, which California law allows them to keep in their homes for self-defense. *See* SER0006, SER0010, SER0014, SER0017. So the question in this case is

whether the plaintiffs' "right of self-defense," as protected by the Second Amendment, *Heller*, 554 U.S. at 632, is infringed because "there are only [822] total handgun models" available to the plaintiffs in selecting a firearm to add to their arsenals. Appellants' Br. 12.

In answering that question, this Court should place on the plaintiffs "the initial burden of proving" that the law "restrict[s]" protected conduct. *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 n.4 (9th Cir. 2000); *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013). That is the rule in the First Amendment context, *id.*, which this Court has looked to in crafting its Second Amendment jurisprudence, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014), and there is no reason for a different rule here. The plaintiffs must therefore establish that California's Act burdens their ability to defend themselves.

They have not come close to doing so. Plaintiff Doña Croston, for example, claims that her self-defense right has been infringed because her preferred handgun ("a Springfield Armory XD-45 Tactical [5-inch] Bi-Tone stainless steel/black handgun in .45 ACP, model number XD9623") is available only "in different color finishes." Appellants' Br. 16. But she has offered no evidence demonstrating that her ability to defend herself is compromised by the fact that she must make do with a black, green, or dark-earth version of the Springfield Armory handgun (plus the

handguns she already owns), rather than the black and stainless steel version she covets. Nor could she possibly make this showing: How can her ability to defend herself be burdened when she says that she may buy an "identical gun"? *Id.*

The other plaintiffs fare no better. Ivan Peña and Brett Thomas, two "gun collectors" looking to add to their collections, have their eyes on "a Para USA (Para Ordnance) P1345SR/Stainless Steel .45 ACP [4.25 inch]" handgun, and "a High Standards 9-shot revolver in .22 with a [9.5-inch] Buntline-style barrel," respectively. *Id.* at 15, 17. Neither collector, however, even suggests that these models are superior for self-defense to the hundreds that California makes available to them, or even why they want those particular guns at all.

The last individual plaintiff, Roy Vargas, wants a Glock 21 SF with an ambidextrous magazine release. *Id.* at 16. Unlike the others, he at least puts forth a reason why. *Id.* Yet he does not claim that he is unable to choose another gun with an ambidextrous release, that would be equally effective for self-defense, from among the 822 models on California's roster. To the contrary, he admits that he is "able to purchase an operable handgun that is suitable for self-defense." SER0014.

In short, none of the plaintiffs has shown that California's Act burdens their ability to defend themselves, much less that it imposes more than a "de minimis" burden. *Heller III*, 2015 WL 5472555, at *6; *see also United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010) (remarking that, even though the federal serialization

law criminalizes possession of guns without a serial number, "the burden on [the individual's] ability to defend himself is arguably *de minimis*" because "the presence of a serial number does not impair the use or functioning of a weapon in any way"). California's Act does not make it "considerably more difficult" for the plaintiffs "to acquire and keep a firearm . . . for the purpose of self-defense in the home. *Heller III*, 2015 WL 5472555, at *6. Although the plaintiffs assert (at 2) that the Act "obliterat[es] the handgun market by commanding the use of non-existent technology," that is wrong as a factual matter. The district court found that the plaintiffs failed to "offer evidence sufficient to support a finding of imminent disappearance" of handguns—a conclusion they do not challenge on appeal. ER21.

## B. Plaintiffs' extreme "common use" theory conflicts with Supreme Court and Ninth Circuit precedent, rests on flawed constitutional analogies, and would lead to absurd results.

Because the plaintiffs cannot establish a burden on their "right of self-defense," *Heller*, 554 U.S. at 632, they instead ask this Court to expand the Second Amendment beyond the bounds of what any court has ever held, to include a new right to acquire any gun model on the market. By their lights, if a model is in "common use" in some States (and what that means, the plaintiffs do not say), then the Second Amendment confers an absolute right to acquire it in *every* State.

But that radical view has not been adopted by any judge and cannot be reconciled with *Heller*, which recognizes that the Second Amendment does not

guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Although *Heller* held that a total ban on handgun possession in the home is unconstitutional because it "amount[s] to a prohibition of an entire *class* of 'arms' that is overwhelmingly chosen by American society" for self-defense, the Court did not suggest that this analysis applies to particular models *within* a class of arms. *Id.* at 628 (emphasis added). And whereas "[t]he Justices took note of some of the reasons, including ease of accessibility and use, that citizens might prefer handguns to long guns for self-defense," the plaintiffs here have given no reason why the 822 handgun models for sale in California do not provide "ample means to exercise the 'inherent right of self-defense' that the Second Amendment protects." *Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015) (Easterbrook, J.); *see also Kampfer v. Cuomo*, 993 F. Supp. 2d 188, 196 (N.D.N.Y. 2014) (upholding a law because it did "not create a categorical ban on an entire class of weapons, and ample firearms remain[ed] available to carry out the '*central component*' of the Second Amendment right: self-defense.") (quoting *McDonald*, 561 U.S. at 767).

Nor can the plaintiffs' theory be reconciled with this Court's recent precedents upholding prohibitions on specific gun components in common use elsewhere. *See Fyock v. City of Sunnyvale*, 799 F.3d 991 (9th Cir. 2015) (upholding city's ban on possession of all large-capacity magazines); *Jackson*, 746 F.3d 953

(upholding city's ban on sale of all hollow-point bullets); *see also id.* at 967 (noting that "*Heller* did not differentiate between regulations governing ammunition and regulations governing firearms themselves"). If the plaintiffs' view were the law, these cases would necessarily have come out the other way.

On their theory, the Second Amendment creates a constitutional right to acquire a particular handgun in a particular style and color. Invoking the First Amendment, plaintiffs liken their inability to buy a gun with a silver-and-black finish (as opposed to an identical black gun *without* the silver finish) to a ban on Vladimir Nabokov's *Lolita*. Appellants' Br. 1-2. In this way, the plaintiffs claim, the "rationing of handguns" is like the "rationing of books." *Id.* at 48. But it "would make little sense" for the Second Amendment to guarantee a right to acquire "weapons bearing a certain characteristic wholly unrelated to their utility." *Marzzarella*, 614 F.3d at 94. Under *Heller*, the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. at 635—not of people to acquire them as fashion accessories or collectibles. Self-defense is not the same as self-expression.

The plaintiffs fundamentally misunderstand this point. Contrary to their repeated assertions, firearms are not "books or deities." Appellants' Br. 48. If anything, they are more like contraceptives, *id.* at 1, in that they may be regulated for safety reasons. If the Food and Drug Administration implemented new safety

requirements that removed some high-risk contraceptives from the market, while leaving 822 different types available, would anyone say that the right to privacy has been "destroy[ed]"? *Id.* at 44; *see Griswold v. Connecticut*, 381 U.S. 479 (1965). Just as *Heller* holds that "laws imposing conditions and qualifications on the commercial sale of arms" are constitutional, 554 U.S. at 626-27, so too the Court has held that "the business of manufacturing and selling contraceptives may be regulated" consistent with the right to privacy. *Carey v. Population Servs. Int'l*, 431 U.S. 678, 686 (1977); *see id.* ("That the constitutionally protected right of privacy extends to an individual's liberty to make choices regarding contraception does not, however, automatically invalidate every state regulation in this area.").

The plaintiffs' theory would also be unworkable in practice and lead to absurd results. For starters, it is unclear what constitutes common use. *See* Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 84 Tenn. L. Rev. ___ (forthcoming 2016), *at* http://bit.ly/1gVsyGZ. If a million people own a particular handgun model, is that enough? How about a few hundred thousand? Is it a regional test or a national test? Does it look to ownership numbers or manufacturing numbers? If a survey revealed that half a million people own firearms without serial numbers, would the federal serialization requirement suddenly become unconstitutional because unmarked firearms are in common use? If not, why not? As Judge Easterbrook has explained, "it would be absurd to say

that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman*, 784 F.3d at 409.

Imagine what would happen if the plaintiffs' theory became law. Whenever a new, potentially dangerous firearm technology became available—as has happened throughout this country's history—States would either have to ban it immediately, and in unison, or else forfeit their ability to do so in the future. But, as shown above, regulation often takes time to catch up to technology, sometimes decades or more. If some States chose to gather more information before regulating, or if their citizens simply had a different position on gun policy, those legislative decisions would change the meaning of the Second Amendment.

The decisions of some parts of the country, however, should not make laws in other parts any "more or less open to challenge under the Second Amendment." *Id.* at 408. Federalism "is no less a part of the Constitution than is the Second Amendment." *Id.* at 412. The Supreme Court's decision in *Heller* (as applied to the States in *McDonald*) "does not foreclose *all* possibility of experimentation" by state and local governments, *id.*, but rather permits them to do what they have long done in the realm of firearm legislation: "experiment with solutions to admittedly serious problems," *Jackson*, 746 F.3d at 970 (internal quotation marks omitted). Sometimes that experimentation has taken the form of regulating firearm quality

and performance; other times it has taken the form of requiring particular safety or serialization features as they become technologically feasible. But if the plaintiffs have their way, it would bring this regulatory tradition to a halt nationwide, freezing laws in place even as gun technology continues to evolve. That outcome is inconsistent with our historical tradition of allowing regulation to adapt to, and take advantage of, technological advancements.

Just as intolerable, the plaintiffs' theory would require invalidation of many sensible laws already on the books—like those prohibiting the sale of dangerous, poorly made handguns. That includes California's drop-testing and firing-testing requirements, which the plaintiffs now claim they are not challenging in this case, conceding (at 2) that "California can ban particular handguns on product safety rationales." But the logic of their own theory holds otherwise: Because many States do not have such requirements, the plaintiffs' theory would prohibit California from restricting the sale of handguns that fail testing requirements because those guns are commonly used in other States. So long as firearms manufacturers decide to continue making enough of those guns, they will be constitutionally protected.

The plaintiffs' theory thus "hinder[s] efforts to require consumer features on guns," while "putting a great deal of power"—*constitutional* power, no less—"into the hands of gun manufacturers." Jacobs, *End the Popularity Contest*, at 36. They would have "the ability to unilaterally make" particular models "protected simply

by manufacturing and heavily marketing them" in States where they are not prohibited. *Id.* at 33. This would create perverse incentives for manufacturers to overproduce the very types of guns that most warrant regulatory attention, and to flood the market, whenever new technology developed, with firearms possessing that technology before regulators could assess their safety.

At bottom, the plaintiffs' pitch is that, because the gun industry has not implemented microstamping, California's law is tantamount to a ban on the sale of new handguns: They complain that it "command[s] the use of non-existent technology," akin to a "mandate that handguns read the operator's mind and refuse to fire when detecting criminal intent." Appellants' Br. 2, 43. But microstamping is anything but "science fiction." *Id.* at 2. It is a readily available technology that gun manufacturers could easily implement. To the extent that their refusal to do so is the result of concerted pressure by the NRA and its allies, that boycott should be given no constitutional significance. Just a few months ago, in upholding Oklahoma's lethal-injection protocol in *Glossip v. Gross*, the Supreme Court made clear that it was unwilling to allow the Eighth Amendment's scope to be dictated by "anti-death-penalty advocates [who] pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences." 135 S. Ct. 2726, 2733 (2015). Intense disagreement about constitutional controversies is

inevitable, but this Court should not allow the pressure tactics of powerful private interests to define the meaning of the Constitution.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Deepak Gupta*

J. Adam Skaggs
Mark Anthony Frassetto
Everytown for Gun Safety
P.O. Box 4184
New York, NY 10163

Deepak Gupta
Jonathan E. Taylor
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

September 28, 2015

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

# APPENDIX OF STATE FIREARMS STATUTES

**State laws requiring the registration of firearms:**

- 1911 Colo. Laws 408-09, § 3;
- 26 Del. Laws 29, § 4 (1911);
- 1913 Iowa Acts 308-09;
- 1913 Or. Laws 497, *amended by* 1917 Or. Laws 805-07, § 5, 1925 Or. Laws 471-73;
- 1917 Cal. Laws 222-224, § 7, *repealed and reenacted in substantive part by* 1923 Cal. Laws 699-702;
- 1918 Mont. Laws 6-9
- 1919 Ill. Laws 432, § 3, *repealed and reenacted in substantive part by* 1925 Ill. Laws 340, § 3;
- 1919 N.C. Sess. Laws 397-98;
- 1921 Mo. Laws 692, § 2;
- 1923 Conn. Acts 3707-08;
- 1923 N.D. Laws 382-83;
- 1923 Haw. Sess. Laws 185-86, § 1, *amended by* 1925 Haw. Code 790-93, 1927 Haw. Sess. Laws 210-16;
- 1923 N.H. Laws 141, § 10;
- 1925 Ind. Acts 497-99;
- 1925 Mich. Laws 474-75, *amended by* 1927 Mich. Laws 887-88, § 2;
- 1925 N.J. Laws 187-88, § 3, *amended by* 1927 N.J. Laws 743-47;
- 1925 W. Va. Laws 32;
- 1926 Va. Acts 285;
- 1927 Mass. Acts 414-15, § 2;
- 1931 Pa. Laws 499-500;
- 1931 Tex. Laws 447-48;
- 1935 S.D. Laws 356-57;
- 1932 D.C. Laws 652-53;
- 1935 Wash. Laws 601-02;
- 1936 Ala. Laws 52-54.

**State laws making maintaining a record of sales a condition of obtaining a permit to sell handguns or firearms, and criminalizing the sale of such weapons without a permit:**

- 26 Del. Laws 28-29 (1911);
- 1913 Iowa Acts 308-09, § 9-10;
- 1913 Or. Laws 497;
- 1919 N.C. Sess. Laws 397, 399;
- 1921 Mo. Laws 692-93;
- 1923 Conn. Acts 3707, 3710;
- 1923 N.D. Laws 382-83, § 11-12;
- 1923 N.H. Laws 140-41, § 9-10;
- 1925 Ind. Acts 497-99;
- 1925 W. Va. Laws 32;
- 1927 Haw. Sess. Laws 211-13;
- 1927 N.J. Laws 743-45;
- 1927 Mass. Acts 414, § 2;
- 1931 Pa. Laws 499-500;
- 1932 D.C. Laws 652-53;
- 1935 S.D. Laws 356-57;
- 1935 Wash. Laws 601-02, 604;
- 1936 Ala. Laws 52-54.

**State laws enforcing recordkeeping requirements by compelling firearms dealers to submit regular (and, in some cases, daily) sales reports to local officials:**

- 1913 Iowa Acts 308-09, § 3;
- 1917 Cal. Stat. 222-23, § 7;
- 1923 N.D. Laws 381-82, § 10;
- 1923 N.H. Acts 140, § 10;
- 1925 Ind. Laws 497-98, § 9;
- 1925 Mich. Laws 474, § 7;
- 1927 Haw. Sess. Laws 211, § 9;
- 1927 N.J. Laws 746-47, § 9;

- 1925 W. Va. Laws 32; 1925 Or. Laws 471-72, § 9;
- 1926 Va. Laws 285, § 2;
- 1927 Mass. Acts 414, § 2;
- 1931 Pa. Laws 499, § 9;
- 1931 Tex. Laws 447, § 3;
- 1932 D.C. Laws 652-53, § 10;
- 1935 S.D. Laws 356, § 9;
- 1935 Wash. Laws 601-02, § 9;
- 1936 Ala. Laws 53-54, § 11.

**State laws criminalizing the alteration of firearm serial numbers:**
- 1923 Conn. Acts 3709, § 11;
- 1923 N.D. Acts 383, § 14;
- 1923 N.H. Acts 140, § 12;
- 1925 Ind. Acts 499-500, § 13;
- 1925 Mich. Acts 475, § 10;
- 1925 Or. Laws 474, § 13;
- 1927 Haw. Sess. Laws 212, § 13;
- 1927 N.J. Laws 749, § 15;
- 1931 Pa. Acts 501, § 15;
- 1935 S.D. Laws 357, § 14;
- 1935 Wash. Laws 603-04, § 14;
- 1932 D.C. Laws, § 12;
- 1936 Ala. Laws 54, § 14.

## STATEMENT OF RELATED CASES

To the best of my knowledge, there are no related cases.

*/s/ Deepak Gupta*
Deepak Gupta


## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that my word processing program, Microsoft Word, counted 6,999 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

*/s/ Deepak Gupta*
Deepak Gupta


## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2015, I electronically filed the foregoing Brief of *Amicus Curiae* Everytown for Gun Safety in Support of Appellee with the Clerk of the Court of the U.S. Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta