No. 15-15449

# In the United States Court of Appeals for the Ninth Circuit

IVAN PENA, DONA CROSTON, ROY VARGAS, BRETT STEWART,
SECOND AMENDMENT FOUNDATION, INC. AND
THE CALGUNS FOUNDATION, INC.,

Plaintiffs-Appellants,

v.

STEPHEN LINDLEY, Chief of the
California Dep't of Justice Bureau of Firearms,

Defendant-Appellee.

Appeal from a Judgment of the
United States District Court for the Eastern District of California
The Hon. Kimberly J. Mueller, District Judge
(Dist. Ct. No. 2:09-CV-01185-KJM-CKD)

## REPLY BRIEF

Donald E. J. Kilmer, Jr.
Law Offices of Donald Kilmer
1645 Willow Street, Suite 150
San Jose, CA 95125
408.264-8489/408.264-8487
don@dklawoffice.com

Alan Gura
   Counsel of Record
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
703.835.9085/703.997.7665
alan@gurapossessky.com

October 29, 2015

Counsel for Appellants

## Corporate Disclosure Statement

Appellants Second Amendment Foundation, Inc. and Calguns Foundation have no parent corporations, and no publicly-held corporations hold 10% or more of their stock.

/s/ Alan Gura
Alan Gura

Counsel for Appellants

# TABLE OF CONTENTS

Corporate Disclosure Statement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.      The Two-Step Inquiry Is Inapplicable. . . . . . . . . . . . . . . . . 6

    II.     The Common Use Test Is Not Absurd. In Any Event, It is the Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    III.    California's Scheme Bans Guns. . . . . . . . . . . . . . . . . . . . . . . 15

            A.    The Rostering Scheme Is a Ban, Not a "Safety Regulation". . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            B.    The Rostering Scheme Is a Ban, Not a "Commercial Restriction".. . . . . . . . . . . . . . . . . . . . . 17

    IV.    California's Scheme Is Not Presumptively Lawful. . . . . . . 19

    V.     There Is More to Heightened Scrutiny Than "Deference".. 24

    VI.    Defendant Fails to Address the Equal Protection Challenge.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TABLE OF AUTHORITIES

Cases

*Binderup* v. *Holder*, No. 13-6750,
  2014 U.S. Dist. LEXIS 135110 (E.D. Pa. Sept. 25, 2014). . . . . . . . . . 7

*Carey* v. *Pop. Servs. Int'l*,
  431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Delaware* v. *Prouse*,
  440 U.S. 648 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*District of Columbia* v. *Heller*,
  554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Draper* v. *Healey*, No. 14-12471-NMG,
  2015 U.S. Dist. Ct. LEXIS 26976 (D. Mass. Mar. 5, 2015) . . . . . . 15

*Fyock* v. *City of Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Haynes* v. *United States*,
  390 U.S. 85 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hickman* v. *Block*,
  81 F.3d 98 (9th Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ill. Ass'n of Firearms Retailers* v. *City of Chicago*,
  961 F. Supp. 2d 928 (N.D. Ill. 2014).. . . . . . . . . . . . . . . . . . . . . . 18

*Jackson* v. *City & Cnty. of San Francisco*,
  746 F.3d 943 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 7, 19

*Katz* v. *United States*,
  389 U.S. 347 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mills* v. *District of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009)............................... 22

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco,*
  *Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) ........... 20

*Olmstead* v. *United States*,
  277 U.S. 438 (1928). ...................................... 12

*Peruta* v. *Cnty. of San Diego*,
  742 F.3d 1144 (9th Cir. 2014)......................... 6, 26, 27

*Reliable Consultants, Inc.* v. *Earle*,
  517 F.3d 738 (5th Cir. 2008)................................ 15

*Suarez* v. *Holder*, No. 14-968,
  2015 U.S. Dist. LEXIS 19378 (M.D. Pa. Feb. 18, 2015) ........... 7

*Turner Broadcasting System, Inc.* v. *FCC*,
  520 U.S. 180 (1997) ....................................... 26

*United States* v. *Barton*,
  633 F.3d 168 (3d Cir. 2011). ................................ 7

*United States* v. *Henry*,
  688 F.3d 637 (9th Cir. 2012) ......................... 9, 11, 12

*United States* v. *Jones*,
  132 S. Ct. 945 (2012) ..................................... 22

*United States* v. *Marzzarella*,
  614 F.3d 85 (3d Cir. 2010). ................................ 19

*United States* v. *Moore*,
  666 F.3d 313 (4th Cir. 2012)................................. 8

Other Authorities

Allen Rostron, *Justice Breyer's Triumph in the
    Third Battle over the Second Amendment*,
    80 Geo. Wash. L. Rev. 703 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

D'verah Cohn, *Gun Homicide Rate Down 49% Since 1993
    Peak; Public Unaware*, Pew Research Center (May 7,
    2013), available at http://www.pewsocialtrends.org/
    2013/05/07/gun-homicide-rate-down-49-since-1993-
    peak-public-unaware/ (last visited Oct. 29, 2015). . . . . . . . . . . . . . . 26

Maggie Fox, *One in Three Americans Own Guns;
    Culture a Factor, Study Finds*, NBC News,
    available at http://www.nbcnews.com/news/
    us-news/one-three-americans-own-guns-
    culture-factor- study-finds-n384031
    (last visited Oct. 29, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## Introduction

Plaintiffs'[1] take heart in Defendant's choice to conjure and knock down strawman claims that they have never asserted, rather than address their case's full merits—or his case's various difficulties. But Plaintiffs are constrained to note that it's simply untrue that "[t]o prevail, plaintiffs would have to establish a constitutional right to purchase any handgun of one's choice from whomever one chooses." Appellee's Br. 1. Where have Plaintiffs asserted such a right? *Contra* Appellants' Br. 2 ("Nobody disputes that California can ban particular handguns on product safety rationales").

In a similar vein, Defendant claims that "[o]n appeal, plaintiffs' have abandoned their challenges to the UHA's safety device, firing safety, and drop safety requirements." Appellee's Br. 5 n.2. Where have Plaintiffs ever challenged these provisions? The page Defendant cites provides that "[t]hose rostering requirements are not at issue in this

---

[1] While it is technically true that Plaintiffs are "a group of individuals and organizations promoting the right to bear arms," Appellee's Br. 1, that is an odd way to describe Americans accessing an Article III court for the redress of constitutional injuries. There is no dispute that these are real people suffering real legal disabilities.

case." Appellants' Br. 5. Unsurprisingly, the opinion below does not discuss such challenges.

Rather than ascribing to Plaintiffs untenable positions that they have never asserted, Defendant should have better addressed the Plaintiffs' arguments, and defended his own extreme views. But the Defendant:

- Fails to defend his assertion that the state may *ban all handguns* but one model, without implicating the Second Amendment, ER 135;

- Does not deny that, per his argument's logic, California could *ban all revolvers* for failing to deposit microstamped shell casings, Appellants' Br. 23, 43, 49;

- Does not deny that under his logic, California could *ban all gun sales* without implicating the Second Amendment, as such a law would allegedly be a mere "commercial restriction," Appellants' Br. 35;

- Fails to address the argument that the Second Amendment secures the right to acquire arms, Appellants' Br. 28-32;

- Does not explain why the Supreme Court went so far as to reject the District of Columbia's "Question Presented" in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), for asserting the relevance of other arms' availability in a handgun ban challenge, Appellants' Br. 48;

- Fails to address this Court's acknowledgment in *Jackson* v. *City & Cnty. of San Francisco*, 746 F.3d 943, 960, 961, 970 (9th Cir. 2014) that no level of scrutiny is applied where a regulation amounts to a destruction of the right;

- Fails to argue exactly how the rostering scheme satisfies any level of heightened scrutiny, including intermediate scrutiny, beyond the mere assertion of "deference;" and perhaps most critically,

- Does not explain what is left of the "right" to keep arms, if the state can dictate, without limitation, which arms people may or may not keep.

To prevail, it suffices for Plaintiffs to show, as they have, that the challenged handgun ban bans handguns whose possession is constitutionally secured. The case really is that simple. The state bans

some (many) handguns. Is possession of these handguns imbued with Second Amendment protection? If so, the ban fails, because it destroys the right to keep those protected arms, regardless of how many *other* arms are permitted. *See Heller*.

On the other hand, for Defendant to prevail, he would have to establish that there are no constitutional limits whatsoever—none at all—on the state's ability to dictate which arms people can keep. Indeed, that's his essential argument—that demanding handguns have various features, some of which do not even exist, either does not implicate the Second Amendment or must be upheld as a matter of reflexive deference to the state's policy choices.

Where in this equation is allowance made for a *right* to keep arms of which the state disapproves? To be sure, the right is not unlimited; the state can ban arms that are dangerous and unusual, in that they are unsuitable for traditional lawful purposes. But the limiting principle is found not in the legislature's judgment, but in the scope of the right the People have ratified. The "right" to have whatever one is allowed to have by law isn't much of a right. The judgment below should be reversed.

The rostering scheme destroys the right to acquire arms that the People are constitutionally-entitled to possess. The two-step process Defendant endorses is inapposite, as it is designed to address regulatory measures. Moreover, the focus must be placed not on what is feasible for manufacturers to produce, but on what items the state has banned. Quite simply, protected arms cannot be banished merely because the state prefers substitutes. And the banned arms at issue here are protected under the Supreme Court's perfectly-workable common use test.

Even were the ban viewed as a regulatory measure, it cannot by any stretch of the imagination—even by Defendant and his amici's laborious stretching—be deemed presumptively lawful. There may be significant historical support for the laws Plaintiffs do not challenge, but nothing prior to the 1980s resembles the rostering scheme.

Were the rostering scheme treated as a regulatory measure, it would fail means-ends scrutiny. Defendant recites valid, if inapposite regulatory interests and asserts—but does not explain—the law's fit. But "deference" is not a magic word whose mere incantation unlocks

heightened scrutiny. The state must show actual fit to carry its burden, and there is simply no way that seeking to advance the state's preferred firearm designs justifies banning nearly all semi-automatic handguns, the result that the challenged provision is well on its way to accomplishing. Nor does rational basis review dispense with the serious equal protection questions raised by the rostering scheme's classifications.

## ARGUMENT

### I. THE TWO-STEP INQUIRY IS INAPPLICABLE.

As Defendant aptly notes, "*Heller* declined to indicate precisely what standard of review would apply to Second Amendment challenges," "[b]ecause the District's law was unconstitutional under any level of constitutional scrutiny." Appellee's Br. 23 (citation omitted).

This Court understands the plain import of this lesson: however useful in some cases, means-ends scrutiny is unavailing where the challenged provision effectively destroys the right. *Jackson*, 746 F.3d at 960, 961, 970. Defendant's suggestion, Appellee's Br. 17 n.6, that this concept is a creature of the currently not-binding decision in *Peruta* v. *Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *reh'g en banc*

*granted*, 781 F.3d 1106 (9th Cir. 2015), is simply false. *Peruta*, like

*Jackson* (which remains good law and which Plaintiffs cited), located

that holding in *Heller* (which also remains controlling).

Other courts also dispense with the two-step process where means-

ends scrutiny is uncalled for. Without applying the two-step process,

the Third Circuit instructed that as-applied challenges to felon

disarmament provisions require asking whether the challenger's

particular circumstances provide traditional grounds for disarmament.

*United States* v. *Barton*, 633 F.3d 168, 174 (3d Cir. 2011). One court,

following the federal government's suggestion, held that this analysis

supplanted the two-step method altogether. *Binderup* v. *Holder*, No.

13-6750, 2014 U.S. Dist. LEXIS 135110, at *35-*36 (E.D. Pa. Sept. 25,

2014). Another court held that the factual circumstance analysis

constitutes step one; when that first step is satisfied, "any means-end

scrutiny would be fatal in fact," and thus "[a]s a practical matter . . . the

second prong . . . is futile." *Suarez* v. *Holder*, No. 14-968, 2015 U.S.

Dist. LEXIS 19378, at *18-*19 (M.D. Pa. Feb. 18, 2015) (footnote

omitted). This comports with the Fourth Circuit's approach to such

cases, where a "streamlined" approach dispenses with the second prong altogether. *United States* v. *Moore*, 666 F.3d 313, 319 (4th Cir. 2012).

There is nothing sacrosanct or inevitable about the two-step analysis. It's *one* approach. It often applies, but sometimes, as seen in categorical ban cases such as *Heller*, or in as-applied personal circumstance challenges, it doesn't.

The court below, and Defendant, suggest that the "destruction" theory requires the categorical prohibition to reach a certain magnitude, making the availability of other arms a relevant consideration. Defendant went so far as to argue that so long as *one* handgun is available, all the rest may be banned. ER 135. But the Supreme Court rejected that view, even rewriting Washington, D.C.'s "Question Presented" based on that theory. Appellants' Br. 47-48.

In *Heller*, the Supreme Court did not bother asking whether Washington residents had adequate handgun substitutes. It asked whether the implements the city banned were constitutionally protected. The Second Amendment does not provide that the government may ban arms so long as there remains some magic number of others, any more than the First Amendment allows "unsafe"

books or movies to be banned provided some judicially-determined "reasonable" level of substitutes remain available.

By focusing on the availability of other arms within a particular category, Defendant advances the same arbitrary, semantic argument the he wrongly ascribes to Plaintiffs. "[T]aken to its logical conclusion," writes Defendant, "plaintiffs' position would require constitutional protection for any firearm that might be called a 'handgun,' even if it had features . . . disguising it as something other than a handgun, for example." Appellees' Br. 30. Not true. Plaintiffs' argument has nothing to do with what an arm is *called*, it has everything to do with the arm's function—whether the arm is of the kind in common use for traditional lawful purposes, including self-defense—and only that. *See United States* v. *Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (describing machine gun's function). If California's "handgun" ban extended to bazookas, Plaintiffs would not challenge its application to bazookas, as inelegant as the Penal Code would be. Defendant, on the other hand, could ban all real handguns by feature and function, label a rifle (or a slingshot, or a blender) a "handgun," and then claim that the ban does not destroy the right because at least one "handgun" remains available.

California's scheme bans guns. Many guns. But if it banned only one gun, the question would still be whether the state had destroyed the right to acquire that one arm. The Supreme Court would ask whether the arm is of the kind in common use for traditional lawful purposes, including self-defense—and the law would stand or fall accordingly.

II. THE COMMON USE TEST IS NOT ABSURD. IN ANY EVENT, IT IS THE LAW.

Plaintiffs can identify any number of gun control laws whose constitutionality they would never challenge. Plaintiffs agree, for example, that there are limiting principles on the types of arms imbued with constitutional protection (even if those principles differ greatly from Defendant's conception). But the government cannot be expected to identify *any* gun regulation that goes too far—whatever law it passes, will be vigorously defended here.

Neither have Defendants' amici, to Plaintiffs' knowledge, ever acknowledged that *any* gun law is unconstitutional—including in *Heller* (a case which amicus Brady opposed). Unsurprisingly, they endorse the view that the Second Amendment places *no limits whatsoever* on the government's ability to ban firearms of the kind in common use by Americans for traditional lawful purposes.

*Heller*'s common use test does not result in the absurdities offered by the other side. It is simply untrue, for example, that under *Heller*'s common use test, "[a]ny time firearm technology changed, all States would have to ban that technology immediately, without knowing how it works or what the consequences would be, or else forever forfeit their ability to do so." Everytown Br. 2. To ban a new technology, it would be enough that the technology were unsuitable for the traditional lawful purposes—primarily, self-defense—that the Second Amendment serves.

The common use test does not focus on mere prevalence, but also purpose and function. "[W]e consider whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes." *Fyock* v. *City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (citing *Henry*, 688 F.3d at 640). At the time the Supreme Court struck down Washington, D.C.'s handgun ban, handguns—which, it must be remembered, the entire anti-gun community vociferously condemned as unacceptably dangerous—had not been in common use for lawful purposes in that city for over thirty years. But the Court could look to traditional American experience and expectation to determine that handguns were

within the legitimate constitutional expectations of Washington, D.C. residents.

Conversely, were military weapons to suddenly attain widespread ownership, they would nonetheless not obtain Second Amendment protection absent some proof of traditional civilian function. *Henry*, 688 F.3d at 640. In this regard, the Second Amendment is not unlike the Fourth: it focuses on the people's objectively-reasonable, traditional expectations of what the right entails.[2] Whether the government bans an arm immediately upon its introduction does not impact, one way or another, the question of whether that arm falls within the Second Amendment.

Nor would it necessarily be true that "no state could require new technology to make guns safer." *Id*. At some point, if people have come to expect certain safety features, and they have become prevalent, the state might require their incorporation to safeguard ordinary consumer

---

[2]The common use test, properly understood, is no more circular than the Fourth Amendment's focus on privacy expectations. For example, in *Katz* v. *United States*, 389 U.S. 347 (1967), it would not have been an answer to the claim of Fourth Amendment protection against wiretaps that the defendant should have read *Olmstead* v. *United States*, 277 U.S. 438 (1928), and learned that the expectation had long been unfounded.

expectations of how firearms are supposed to function. But that is very different from having the state ban everything that doesn't fit its own views as to what people should or shouldn't have.

The only "absurd" position is that advanced here by Defendant and their amici: that any new "safety" technology, once hypothesized, may be mandated—and nevermind any other consideration. Suppose that tomorrow, a new type of "safer" laser weapon is invented, but rejected by consumers. Could California immediately ban all firearms as "unsafe?" If tracing shooters is important, why not ban all firearms today that lack GPS, a rear-facing camera and realtime internet law-enforcement connection? Appellants' Br. 43. Why not ban revolvers, which do not eject any casings when fired?[3]

Feasability is relevant only in the sense that everything that is unfeasible is, by definition, outside common use; not everything that is feasible is within common use. Los Angeles's City Attorney thus misses

---

[3]The same rationale for mandating microstamping might also support a mandate for criminals to leave fingerprints and DNA, or perhaps their business cards, at crime scenes. Plaintiffs are not planning to commit any crimes, let alone with firearms. But at some point, the microstamping mandate's rationale might raise First and Fifth Amendment compelled speech and self-incrimination issues. *See Haynes* v. *United States*, 390 U.S. 85 (1968).

the point by arguing that microstamping is feasible. This is not a battle of the experts, and Plaintiffs' case does not turn on microstamping's impossibility.[4] Defendant likewise misses the point by arguing that various "safety" features are readily practical, an undisputed and equally irrelevant point.

The issue is not what guns may be feasible to produce and market. The issue is whether *the handguns that California bans* enjoy Second Amendment protection. "Regulation of a weapon not typically possessed by law-abiding citizens for lawful purposes does not implicate the Second Amendment," *Fyock*, 779 F.3d at 997, but regulation of a weapon that *is* typically possessed by law-abiding citizens for lawful purposes—like the scores of unrostered handguns at issue here—*would* implicate the Second Amendment. And prohibition of such arms, as seen here, outright violates the Second Amendment. The guns banned by the rostering scheme are handguns of the kind in common use by Americans for traditional lawful purposes, including self-defense,

---

[4]Defendant, who called no experts below, certainly did not carry his burden in this regard. Microstamping's non-existence ought to at least suggest its impossibility, as manufacturers would doubtless love to serve a market of California's size with new semiautomatic handguns.

notwithstanding their lack of particular features—and they would remain within the Second Amendment's protection even if tomorrow, some whiz-bang new and "better" technology is invented.[5]

III. CALIFORNIA'S SCHEME BANS GUNS.

This much should be obvious enough. Banning people from acquiring firearms is tantamount to banning the possession and use of those firearms. Appellants' Br. 29; *Carey* v. *Pop. Servs. Int'l*, 431 U.S. 678, 687-88 (1977); *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008).

Defendant does not bother addressing the right to acquire guns, Appellants' Br. 28-32, or explain why banning the acquisition of something is not tantamount to banning its possession and use. Instead, he proceeds along two tracks that deny the reality of the roster scheme's categorical prohibition on types of arms, claiming that the

---

[5]The unpublished district court opinion in *Draper* v. *Healey*, No. 14-12471-NMG, 2015 U.S. Dist. Ct. LEXIS 26976 (D. Mass. Mar. 5, 2015) that Defendant endorses cannot be persuasive, because its dismissal of the Second Amendment challenge to handgun feature mandates is unreasoned. The opinion largely discusses vagueness arguments not here at issue, followed by a short description of the two-step process. When it comes to the Second Amendment claims, *Draper* offers only a brief conclusion, perfunctorily listing unelaborated reasons 1, 2, and 3 for upholding the laws.

rostering scheme is either a "safety" regulation or a "commercial restriction." Neither argument holds water.

A.        The Rostering Scheme Is a Ban, Not a "Safety Regulation."

Defendant argues that the handgun rostering scheme does not so much ban guns, but is rather "akin to the safety laws that *Heller* permits—laws like gunpowder storage laws." Appellee's Br. 26. Amicus Everytown likewise dredges up gunpowder safety laws, apparently on the theory that because safety laws are historically rooted, any law claimed to advance "safety" is constitutional. The argument is unavailing.

Guns are allowed if they appear on the roster, and banned if they do not. They are eligible for rostering based on their physical characteristics. The roster scheme does not mandate that people do something, or refrain from doing something, with their guns. It bans people from keeping certain guns, period.

Of course Defendant would rather frame the law as a safety measure subject to a balancing test, under which he automatically wins because who are judges to second-guess any legislative plea for "safety." Defendant would rather the law not be subject to a categorical test that

focuses on whether the People have the right to keep the arms that the government is banning. But under Defendant's conception, the government does not ban categories of unprotected speech, it merely regulates the manner in which books and DVDs are sold, *i.e.*, the physical media cannot contain illicit content. Nor does the government ban drugs; it merely regulates the manner in which people arrange molecules.

But this is not the way in which courts conceive of categorical prohibitions. Plaintiffs agree that the rostering scheme "simply does not prohibit the possession or use of firearms *in any fashion.*" Appellee's Br. 27 (emphasis added). By prohibiting acquisition, the scheme prohibits the possession and use of unrostered firearms. The only way to resolve this case is to examine the banned arms, and determine whether or not they are arms that may be banned notwithstanding the Constitution's admonition that the People enjoy a right to keep arms.

B.      The Rostering Scheme Is a Ban, Not a "Commercial Restriction."

The rostering scheme does not impose "conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27, such that

the sales may somehow go through if only a consumer jumps through some particular regulatory hoop. Under the rostering scheme, new, unrostered handguns are contraband. The law outright prohibits the manufacture, import, and acquisition of these arms. Appellant's Br. 33.

*Heller* would not have turned out differently had Washington, D.C. thought to argue, as Defendant argues here, that it had merely regulated the acquisition rather than possession of handguns. Washington could have framed its law that way, as it grandfathered the possession of registered handguns, banned "only" the possession of unregistered handguns, and closed new handgun registrations as of February, 1977. When Chicago, unable to maintain a similar scheme, banned the acquisition of guns, it quickly lost, and did not bother with an appeal. *See Ill. Ass'n of Firearms Retailers* v. *City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014).

There is no point in arguing about whether California's so-called "commercial restriction" is presumptively lawful, or if so, how that presumption might be surmounted, because the law is not, in fact, a "commercial restriction" at all. But Plaintiffs are nonetheless constrained to reply to Defendant's arguments along those lines.

IV.  CALIFORNIA'S SCHEME IS NOT PRESUMPTIVELY LAWFUL.

Even were the rostering scheme a "commercial restriction," it would not be presumptively lawful. In clinging to the notion that the handgun roster scheme is merely a "commercial restriction" and thus, presumptively lawful under *Heller*, Defendant fails to address the fact that it is impossible for *all* commercial restriction to be presumptively (let alone conclusively) lawful. Appellants' Br. 35-36. It is Defendant, not Plaintiffs, who misunderstands *United States* v. *Marzzarella*, 614 F.3d 85 (3d Cir. 2010), which specifically rejected his overbroad, all-encompassing view of presumptively lawful restrictions. Appellants' Br. 35; *Marzzarella*, 614 F.3d at 92 n.8.

Amicus Law Center candidly rejects *Marzzarella*'s statement that *Heller* does not sanction the complete prohibition of commercial firearm sales, and reasons that this Court's decision in *Jackson* would be perfectly consistent with such a total ban. Law Center Br. 16-17. That is not only a serious misreading of *Jackson*; it is a remarkable call for

this Court to create a circuit split[6] by adopting an extreme, untenable position unnecessary to decide this case.

Commercial restrictions can only be "presumptively lawful" if they have Framing Era roots. Any other reading of *Heller* would constitutionalize any number of absurd regulations, culminating in the total gun ban that amici (if not Defendant) truly desire. Appellants' Br. 35. A modern regulation, of the kind unknown to the Framers, cannot be evidence of what the Framers thought of the right's scope. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35. To point this out is not to claim that the Second Amendment protects only those guns that existed in 1791. Defendant's argument to that effect, Appellee's Br. 31, is difficult to comprehend.

---

[6]As Plaintiffs showed, the Fifth Circuit also believed it necessary to advance to the second step in considering the constitutionality of a condition and qualification on gun commerce. Appellants' Br. 36; *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012).

Nor does the requirement that "presumptively lawful" measures have Framing Era roots mean that the state cannot enact restrictions that did not exist in 1791. *Id.* It just means that new restrictions are not *presumptively* lawful. They rise or fall at the second step.

Sensing that a completely novel restriction enjoys no presumptive validity, Defendant and his amici labor hard to demonstrate that California's effort to catalog all acceptable handguns, and especially its demand for science fiction microstamping technology, is deeply rooted in American tradition. The effort fails.

Defendant's historical argument on behalf of microstamping is particularly specious. True,

> ammunition components have had markings such as etches and striations ever since ammunition has been loaded into firearms and subjected to the firing process, which has been occurring for centuries.

Appellee's Br. 32. But the fact that ammunition has naturally been impacted by being fired (for centuries, per Defendant) does not support a radical law demanding that it be impacted by a particular microscopic array. What laws have ever mandated microstamping? People have historically worn clothes, but that fact does not lend historic support for a new law mandating the wearing of government-issued uniforms.

The analogy with serializing firearms is equally untenable. People have long been serialized, too, *e.g.*, a social security number is required to function in American society. But the government could not require that social security numbers be tattooed on everyone's forehead (perhaps to aid law enforcement's identification and apprehension of wanted individuals, an important governmental interest).

While federal law prohibits the obliteration of serial numbers, no law has ever required their constant disclosure, let alone on every shell casing. Likewise, cars must have license plates, and drivers, licenses, but that does not justify erecting police checkpoints for the disclosure of such information, *Mills* v. *District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009); *cf. Delaware* v. *Prouse*, 440 U.S. 648 (1979), or constant warrantless GPS surveillance, *United States* v. *Jones*, 132 S. Ct. 945, 964 (2012) (Alito, J., concurring in the judgment).

Unlike these cases, though, microstamping's burden is far more severe than that inherent in merely disclosing information. Because it does not actually exist in the marketplace, California's microstamping requirement is more akin to having demanded that all cars be equipped with GPS tracking—in 1960.

It is unclear why amicus Everytown devotes so much space explaining the history of serialization and registration requirements. These are not remotely at issue here. Neither are drop testing, melting points, firing tests, and the like. Plaintiffs have never challenged these requirements, *see supra*, and nothing in their argument precludes laws ensuring that guns function safely and reliably in accordance with ordinary consumer expectations. The Second Amendment does not protect a right to sell dangerously defective firearms.

But there is a world of difference between laws banning guns that pose unexpected dangers, and banning guns unless they contain features that would otherwise be unexpected. There is a difference between laws banning guns that misfire, and mandating that guns have features that may well be useless or, as in the case of CLIs and MDMs, potentially dangerous per the *state's* safety instructions. It may be true, as in amicus's parlance, that "there is no Second Amendment right to purchase unsafe handguns." Law Center Br. 25. But the right to acquire a Second Amendment handgun is not abolished because the state suddenly labels it "unsafe."

In any event, as Everytown helpfully explains, the very few rostering laws and laws mandating CLIs and MDMs date as far back as the 1980s, a decade that no one involved in the Second Amendment's ratification lived to enjoy. These laws cannot possibly be "longstanding" regulations that inform the Second Amendment's scope.

## V.  THERE IS MORE TO HEIGHTENED SCRUTINY THAN "DEFERENCE."

The first clue that something is amiss in Defendant's step-two argument is his reliance on Justice Breyer's *Heller* opinion for the proposition that strict scrutiny is unavailable in Second Amendment cases. Appellee's Br. 35 n.8. That many courts have preferred to follow Justice Breyer's Second Amendment views has been noted by a former attorney for amicus Brady. *See* Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 Geo. Wash. L. Rev. 703 (2012). But that opinion was offered in dissent.

That California has substantial interests in reducing crime and gun accidents is a given. That California has any interest in banning guns that the People have a fundamental right to keep is less obvious. Crime reduction or safety interests might be served by actual regulations— such as California's handgun safety test that teaches consumers to

ignore the "safety" devices that the roster mandates in favor of manual inspection and common sense rules for gun handling. But to say that handguns might be banned because they are subject to criminal or accidental misuse does not satisfy any level of scrutiny. *See Heller*.

Beyond the battle over the level of scrutiny, which is largely immaterial, and Defendant's description of important state interests in crime-fighting and reducing the misuse of firearms, which is as unremarkable as it is irrelevant, Defendant's "balancing" approach fails for essentially following Justice Breyer's views on the level of deference when it comes to the Second Amendment.

Defendant believes that in order to satisfy intermediate scrutiny—a test that places the burden of proof on *the government*, Appellants' Br. 53—it is enough to assert that the legislature "was targeting the connection" between the subject and object of the law, Appellee's Br. 37 (what else ought legislation do?); "that reducing the number of cheaply made guns," by which he must mean poorly made, defective guns, and not merely guns that are affordable, reduces social harm, *id.* at 37-38; and that some studies indicated that the legislature's desired features

would be beneficial, *id.* at 38-39.[7] All this allegedly suffices to meet a heightened form of constitutional scrutiny, which can be waived away by the now-familiar incantation that "courts 'must accord substantial deference to the predictive judgments' of legislative bodies,'" *id.* at 37 (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 195 (1997)).

But Defendant misreads *Turner.* The measuring of constitutional fit is a judicial, not legislative function. Deference is only owed to "traditional legislative authority to make predictive judgments." *Turner*, 520 U.S. at 196. "Intermediate scrutiny" is not fancy legalese for "rubber stamp."

*Peruta* may not be citable as precedent, but its recitation of *Turner* appears accurate:

---

[7]Amicus Legal Community throws out the number that California deaths from "gun violence" fell dramatically between 1993—thirteen years before the challenged provisions started going into effect—and 2013, LCAGV Br. 7, but how is this even correlated to the roster? The *national* gun homicide rate dropped 43% over that same period. D'verah Cohn, *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware*, Pew Research Center (May 7, 2013), available at http://www.pewsocialtrends.org/2013/05/07/gun-homicide-rate-down-49-since-1993-peak-public-unaware/ (last visited Oct. 29, 2015).

In Part II.A. of *Turner*, the Court applied deference to the legislature's judgment regarding the first portion of the intermediate scrutiny analysis: whether there was a "real harm" amounting to an important government interest and "whether [the statutory provisions at issue] will alleviate it in a material way." *Turner*, 520 U.S. at 195. But in Part II.B, when assessing "the fit between the asserted interests and the means chosen to advance them," the Court applied no such deference. *Id.* at 213. Instead, it required the government to prove that the statute did not burden the right "substantially more . . . than is necessary to further [the government's legitimate] interests." *Id.* at 214.

*Peruta*, 742 F.3d at 1177 (quotation omitted).

Thus, even were the state entitled to deference in identifying a relevant interest, and even were it entitled to deference on the question of whether its legislative solution materially alleviates the problem, there would still remain the question of constitutional fit. The Court can doubtless imagine any number of laws that would materially advance some compelling interests in crime and accident reduction, but which would impermissibly trample on rights that Courts are entrusted to uphold.

Defendant and his amici makes no effort at all to carry the burden as to fit. They merely assert that the rostering scheme serves important interests, and demand "deference" to the legislative belief that the law has proper fit. Of course, when the rostering scheme was

first enacted, few legislators believed that the Second Amendment right even existed, and this Court had made clear to the legislature that the Second Amendment posed no impediment at all to whatever gun-banning schemes the state might imagine. *Hickman* v. *Block*, 81 F.3d 98 (9th Cir. 1996), *overruled in Heller*. Even were it appropriate for courts to defer to the legislature's self-serving judgment as to the constitutionality of its own laws, here, there was not even a chance that the legislature considered the constitutional right as a limit on its power.

Even under intermediate scrutiny, there is more to the analysis than deference to the belief in the law's utility. Yet Defendant and his amici pay no attention at all to the roster scheme's enormous cost—the loss of access to thousands upon thousands of handgun models, including modern, safer and better guns that cannot be rostered, and *all new semiautomatic models introduced since 2013*; and the potential deaths and injuries flowing from reliance on "safety" devices that the state teaches people to ignore.

To the contrary, Defendant is willing to impose a nearly unlimited handgun ban. If the legislature could identify just a single gun

containing all of its desired features, it could *ban all other guns*, and this measure would be effectively immunized from judicial review. ER 135. This is not heightened scrutiny, or any other approach remotely consistent with fundamental rights.[8]

VI. DEFENDANT FAILS TO ADDRESS THE EQUAL PROTECTION CHALLENGE.

Defendant correctly acknowledges that heightened scrutiny is applied in equal protection cases where people are being treated differently in their exercise of a fundamental right. Appellee's Br. 44. Yet resting on his views that the rostering scheme does not implicate the Second Amendment, Defendant claims that the scheme's various classifications survive rational basis review. *Id.* at 45.

---

[8]Amicus Everytown's conspiracy theory, that California-mandated guns are rare or non-existent because gun organizations bully manufacturers to refrain from producing them, does not merely contradict the record. It is mathematically challenged. Amicus NRA reports "only" over 5 million members, while perhaps one-third of all Americans (including a fifth of Californians) own guns. Maggie Fox, *One in Three Americans Own Guns; Culture a Factor, Study Finds*, NBC News, available at http://www.nbcnews.com/news/us-news/one-three-americans-own-guns-culture-factor-study-finds-n384031 (last visited Oct. 29, 2015). Everytown, the creation of New York City's billionaire ex-mayor, should procure a sense of irony before complaining about "the pressure tactics of powerful private interests to define the meaning of the Constitution." Everytown Br. 30.

There is nothing rational about allowing supposedly "unsafe" handguns to be possessed by some people and not others. If a handgun is dangerously prone to malfunction and misfiring, why should people with out-of-state relatives or movie industry connections have special access to it? Why should police introduce those dangerous handguns into their homes and neighborhoods? The police may well have unique "experience, training and special needs for firearms," Appellee's Br. 42, but there is no explanation for how such experience, training, or need comports with a "cheap" gun that fails drop-testing, or cannot be microstamp-traced if stolen and used in crime; or how a gun owner's police background is of any benefit to a child who happens upon the "unsafe" handgun. Indeed, California now allows *widows* of police officers to have these "unsafe" handguns. *See* Dkt. 21. If the rostering scheme had a valid safety rationale, it would not include a proliferation of "special needs" classes entitled to access unrostered handguns.

## CONCLUSION

The People's right to keep and bear arms does not impede California's ability to ban dangerous and unusual guns. But it does not

allow the state to exercise an unlimited power as to what arms people

may or may not have for traditional lawful purposes.

The judgment below should be reversed.

Dated:   October 29, 2015             Respectfully submitted,

/s/ Donald E. J. Kilmer, Jr.          /s/ Alan Gura
Donald E. J. Kilmer, Jr.              Alan Gura
Law Offices of Donald Kilmer             Counsel of Record
1645 Willow Street, Suite 150         Gura & Possessky, PLLC
San Jose, CA 95125                    105 Oronoco Street, Suite 305
408.264-8489/408.264-8487             Alexandria, VA 22314
don@dklawoffice.com                   703.835.9085/703.997.7665
                                      alan@gurapossessky.com

CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-3(3) because this brief contains 5,808 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.

/s/ Alan Gura_____
Alan Gura
Attorney for Plaintiffs-Appellants
Dated: October 29, 2015

## CERTIFICATE OF SERVICE

On this, the 29th day of October, 2015, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on October 29, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 29th day of October, 2015.

/s/ Alan Gura
Alan Gura